**EXHIBIT 3.B**

**Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction,**
*Biovail Corporation, et al. v. U.S. Food & Drug Administration, et al.*



**KELLER AND HECKMAN LLP**
*Serving Business through Law and Science*®

1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
*tel.* 202.434.4100
*fax* 202.434.4646

Writer's Direct Access
**John B. Dubeck**
(202) 434-4125
dubeck@khlaw.com

December 20, 2005

**Via Hand Delivery**

Division of Dockets Management (HFA-305)
Food and Drug Administration
5630 Fishers Lane, Room 1061
Rockville, MD 20852

## CITIZEN PETITION

The undersigned, on behalf of Biovail Corporation, submits this petition under 21 C.F.R. § 10.30 and section 505(j) of the Federal Food, Drug, and Cosmetic Act (FDC Act) requesting that the Commissioner of Food and Drugs require that generic versions of Wellbutrin XL® (bupropion hydrochloride extended-release tablets) meet the criteria described below in order to be considered bioequivalent to Wellbutrin XL®. This action is necessary to protect patients against potentially serious risks (particularly seizures) which are currently disclosed in the approved Wellbutrin XL® labeling. Unless the factors described below are satisfied, there can be no assurance that these warnings are adequate to ensure that generic versions are as safe and effective as the innovator product. Biovail manufactures Wellbutrin XL® for GlaxoSmithKline (the holder of the approved New Drug Application).

## I. Action Requested

In order to assess the potential risks of a new formulation of bupropion extended-release tablets in proper context, and to ensure that the labeling accurately reflects those anticipated risks, it is critical that FDA require that any Abbreviated New Drug Application (ANDA) for a generic version of Wellbutrin XL® satisfy the following criteria:

    a. All bioequivalence trials should calculate and evaluate parameters based on concentrations of the parent drug and active metabolites.

    b. Any generic formulation should be shown, based on the above criteria, to be bioequivalent to Wellbutrin XL®, sustained-release, and immediate-release bupropion.

    c. The bioequivalence studies described above should be conducted at steady-state evaluating the performance of the dosage form based on AUC, $C_{max}$, $C_{min}$.

    d. Data using FDA's *in vitro* approach for evaluating the effect of alcohol on the performance of the controlled-release dosage form should be required to ensure the absence of "dose dumping" if the drug is consumed with alcohol.

The basis for these requests is described in detail below.

Washington, D.C.      Brussels      San Francisco      Shanghai
www.khlaw.com

## KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 2

II.    **Statement of Grounds**

A.    <u>Generic Drugs are Expected to Provide the Same Therapeutic Effect as the Innovator Drugs They Copy</u>

The bedrock principal behind the generic drug approval system is the assurance that a generic drug will provide the same level of safety and efficacy demonstrated by the innovator drug. This concept has received significantly more public attention in the last few years through efforts by the government to promote the use of generic drugs. For example, "FDA requires that all drugs be safe and effective and that their benefits outweigh their risks. Since generics use the same active ingredients and are shown to work the same way in the body, they have the same risk-benefit profile as their brand-name counterparts."[1] In October 2002, President Bush echoed these comments during the announcement of an initiative to speed the approval of ANDAs, noting that "generic drugs [] are just as safe and effective as the brand name drugs. . . ."[2] FDA also initiated a series of public service announcements to emphasize the message "Generic Drugs: Safe. Effective. FDA Approved."[3] All of these activities are designed to reinforce the message that consumers can rely on generic drugs to provide the same performance as the innovators they copy. This confidence is only justified, however, to the extent that the generic has been shown to deliver the active ingredient in a way that does not raise potential issues concerning its safety or effectiveness.

B.    <u>Statutory and Regulatory Requirements are Intended to Assure the "Similarity" of the Generic and Innovator Drug Products</u>

The Federal Food, Drug, and Cosmetic Act (FDC Act), identifies the information required to be included in an ANDA for any generic drug product, including (among other things) data to show that the generic drug is bioequivalent to the innovator product it seeks to copy (the "reference listed drug" (RLD)) and that the labeling of the two drugs is "the same" but for changes required because the drugs are produced by different manufacturers. *See* FDC Act § 505(j)(2)(A). Two drugs are considered bioequivalent if "the rate and extent of absorption of the [generic] drug do not show a significant difference from the rate and extent of absorption of the [RLD] when administered at the same molar dose of the therapeutic ingredient under similar

---

[1]    "FDA Ensures Equivalence of Generic Drugs" (August 2002), page 2 (available at: http://www.fda.gov/cder/about/whatwedo/testtube-17.pdf).

[2]    "President Takes Action to Lower Prescription Drug Prices - Remarks by the President on Prescription Drugs" (October 21, 2002) (available at: http://www.whitehouse.gov/news/releases/2002/10/20021021-2.html).

[3]    The campaign included six different headlines, including "Your generic drug is safe and effective. And we've got the results to prove it." (campaign available at: http://www.fda.gov/cder/consumerinfo/generic_info/default.htm).

# KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 3

experimental conditions. . . ." FDC Act § 505(j)(8)(B)(i). The *in vivo* activity of the generic drug must be considered when assessing whether any difference between the two is "significant."

Through its regulations, FDA has established what must be shown for a generic drug's labeling to be considered "the same" as the RLD's. Under 21 C.F.R. § 314.94(a)(8)(iv), the ANDA must include:

> (iv) *Comparison of approved and proposed labeling.* A side-by-side comparison of the applicant's proposed labeling . . . with the approved labeling for the reference listed drug with all differences annotated and explained. <u>Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug,</u> except for changes required because of differences approved under a petition filed under [21 C.F.R.] 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. <u>Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics,</u> labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the [FDC] act.  [Underlining added.]

Overall, the permitted variations between the generic and RLD labeling are very limited. The bioequivalence and labeling provisions must be read in conjunction with the FDC Act's finding that a drug is "misbranded" if "its labeling is false or misleading in any particular." FDC Act § 502(a). As a result, information in the drug labeling discussing specific performance results or performance characteristics for the innovator drug must also be true for the generic drug.

Importantly, the statute states that FDA "may not require that an [ANDA] contain information in addition to that required by" § 505(j)(2(A). As a result, all decisions concerning the adequacy of the labeling of the generic drug (including determining that it is not "false or misleading in any particular") must be based on the statutory elements required for an ANDA.

C.    <u>Bupropion Presents Potentially Serious Risks</u>

FDA is very familiar with bupropion as an active ingredient, so Biovail does not intend to present a comprehensive discussion of the ingredient's pharmacologic properties. However, there are several formulation-related issues that must be considered with respect to controlled-release dosage forms.

# KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 4

As is clearly disclosed in the approved labeling for Wellbutrin XL®, bupropion is associated with a dose-related risk of seizures.[4] This risk is also related to patient factors, including certain concomitant medications and the excessive use of alcohol (for which warnings are provided). To reduce the risk of seizures, the labeling recommends that the total daily dose of bupropion not exceed 450 mg/day and that the rate of dose incrementation be gradual.[5] Variability in the bupropion release rate and/or "dose dumping" in the presence of food or alcohol may have an effect similar to rapid dose incrementation, particularly if the effect were unpredictable. Therefore, seizure potential may be directly related to a particular dosage form and its release rate and performance characteristics in the presence of food and alcohol.

Bupropion is extensively metabolized. Of the circulating drug related materials, a substantial amount are active metabolites (such as hydroxybupropion, threohydrobupropion, and erythrohydrobupropion). While these active metabolites have intrinsic activities lower than bupropion, they are present in plasma concentrations that are as high as or higher than those of bupropion. Hence, along with bupropion, they contribute to both the activity and the toxicity of bupropion formulations, and represent the majority of what circulates in blood following doses of bupropion.

The relationship between serum levels of bupropion and its circulating active metabolites and seizures is not well understood. However, recent data from on-going research have led to the investigation of specific metabolites, and their influence on seizure potential. Conclusions on the assessment of bioequivalence in both the fasted and fed states can vary substantially depending on whether the assessment is based on the parent drug or individual metabolites.[6]

   D.    The Wellbutrin XL® Labeling Includes Conditions That any Generic Drug Must Duplicate

Wellbutrin XL® (bupropion hydrochloride extended-release) Tablets (NDA 21-515) was approved on August 28, 2003, for the treatment of major depressive disorder. The application

---

[4]    Wellbutrin XL® Labeling ("Warnings - - Seizures"). Complete prescribing information for Wellbutrin XL® is available at: http://us.gsk.com/products/assets/us_wellbutrinXL.pdf (Attachment 1).

[5]    Wellbutrin XL® Labeling ("Warnings - - Recommendations for Reducing the Risk of Seizure").

[6]    *See e.g.,* "A two-way, crossover, open-label, single dose, food-effect, comparative bioavailability study of bupropion HCl extended release 300mg tablets in normal healthy non-smoking male and female subjects." Summary Report of Study No. AK1BIOVAIL2548, available from the GlaxoSmithKline Clinical Trial Register (http://ctr.gsk.co.uk/summary/bupropion/I_AK1BIOVAIL2548.pdf) (Attachment 2).

# KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 5

covered 150 mg and 300 mg dosage strengths. The 150 mg strength has been designated by FDA as the RLD.

There are numerous portions of the approved Wellbutrin XL® labeling that refer to specific test results or other scientific findings that are crucial to the safe and effective use of the product. Any proposed generic product must demonstrate that it satisfies these conditions as well. Absent such a finding, the generic may not be considered "bioequivalent" to Wellbutrin XL® and the labeling would be false or misleading if it included those conditions.

1.     Any Generic Must Demonstrate Bioequivalence to Wellbutrin XL®, Sustained-Release, and Immediate-Release Bupropion

The approved labeling for Wellbutrin XL® contains the following statement:

As both WELLBUTRIN XL and the sustained-release formulation of bupropion (WELLBUTRIN SR) are bioequivalent to the immediate-release formulation of bupropion, the seizure incidence with WELLBUTRIN XL, while not formally evaluated in clinical trials, may be similar to that presented below for the immediate-release and sustained-release formulations of bupropion.[7]

In addition, the Wellbutrin XL® labeling specifically describes bioequivalence to sustained-release and immediate-release forms of bupropion:

In a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the immediate-release formulation of bupropion at 100 mg 3 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites (hydroxybupropion, threohydrobupropion, and erythrohydrobupropion). Additionally, in a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the sustained-release formulation of bupropion at 150 mg 2 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites.[8]

---

[7]    Wellbutrin XL® Labeling ("Warnings - - Seizures").

[8]    Wellbutrin XL® Labeling ("Clinical Pharmacology - - Pharmacokinetics").

KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 6

In order to appropriately use this labeling, any proposed generic drug must demonstrate bioequivalence to Wellbutrin XL®, sustained-release, and immediate-release bupropion.[9] Unless such data are presented, there could be no assurance that the generic labeling would not be "false or misleading" with respect to the applicability of the seizure risk information presented in the labeling.

As noted in the Introduction to the Orange Book under the heading "Statistical Criteria for Bioequivalence": "The primary concern from the regulatory point of view is the protection of the patient against approval of products that are not bioequivalent. The current practice of carrying out two one-sided tests at the 0.05 level of significance ensures that there is no more than a 5% chance that a generic product that is not truly equivalent to the reference will be approved."[10] "By designating a single reference listed drug as the standard to which all generic versions must be shown to be bioequivalent, FDA hopes to avoid possible significant variations among generic drugs and their brand name counterpart. Such variations could result if generic drugs were compared to different reference listed drugs."[11] The same potential for significant variations arises between a generic version of a RLD and the immediate release version of the drug to which the RLD was shown to be bioequivalent. The relevance and accuracy of data regarding seizure incidence and other side effects is open to question if the generic drug has not been shown to be bioequivalent to the same reference that was relied upon for approval of the RLD.[12]

    2.    The Evaluation of Any Generic Version of Wellbutrin XL® Must Consider the Metabolites of Bupropion

_____

[9]     This assessment would also require a demonstration of the absence of a "food effect" on the release of the active ingredient in the generic product. The approved Wellbutrin XL® labeling states that "time to peak plasma concentrations for bupropion was approximately 5 hours and food did not affect the $C_{max}$ or AUC of bupropion." Wellbutrin XL® Labeling ("Clinical Pharmacology - - Absorption"). In the Patient Information leaflet, it states that "You may take WELLBUTRIN XL with or without food."

[10]     "Approved Drug Products with Therapeutic Equivalence Evaluations" (25th Edition) (2005) (the "Orange Book"), Sec. 1.3, pages x – xi (available at: http://www.fda.gov/cder/orange/obannual.pdf).

[11]     2005 Orange Book, Sec. 1.4, page xi.

[12]     Significant adverse reaction data in the Wellbutrin XL® labeling refer to the sustained release product, Wellbutrin SR®, which itself was approved on the basis of bioequivalence to immediate release Wellbutrin®. Data referenced in the labeling establish that Wellbutrin XL® is also bioequivalent to Wellbutrin SR®. Unless generic versions of Wellbutrin XL® are also shown to be bioequivalent to immediate release Wellbutrin® and Wellbutrin SR®, the relevance of the adverse effect data is not established.

# KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 7

The metabolites of bupropion play a very significant role in the clinical performance of Wellbutrin XL® and any generic version should demonstrate similar results in order to assure that the generic will provide similar effects. The Wellbutrin XL® labeling discusses specific findings and methodology:

> In a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the immediate-release formulation of bupropion at 100 mg 3 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites (hydroxybupropion, threohydrobupropion, and erythrohydrobupropion). Additionally, in a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the sustained-release formulation of bupropion at 150 mg 2 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites.[13]

The most reliable means to assess the rate and extent of exposure of bupropion is through the conduct of bioequivalence trials at steady-state. Any comparison to immediate-release bupropion based on single dose data would be tenuous at best. Steady-state comparisons are the most accurate and relevant since they make it possible to evaluate $C_{min}$ (which ensures that the coverage is adequate over the entire 24 hour dosing interval and cannot be estimated in any other manner) as well as $C_{max}$ and AUC.

Comparisons of the AUC between immediate- and extended-release bupropion become problematic under single dose conditions as a result of the difficulty in estimating the area from the last sampling point to infinity. The immediate-release estimate from time zero to infinity is straight forward; the extended-release estimate is difficult because one is not measuring the true half life or elimination rate, but rather an apparent one. If the studies are done at steady state, there is no estimation involved, because the AUC of the dosing interval is being measured directly.

3.   Any Generic Formulation Must be Assessed for the Impact of Alcohol Consumption on Dose Release

The potential effects of alcohol on the dose-release mechanism of extended-release tablets is a serious concern. This is especially true for patients suffering from major depressive disorder, who are generally more likely to consumer alcohol with medication despite warnings not to. The Wellbutrin XL® labeling includes numerous references to avoiding the use of

---

[13]   Wellbutrin XL® Labeling ("Clinical Pharmacology - - Pharmacokinetics").

KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 8

alcohol when taking the drug and a sober awareness of the fact that such warnings may not be
heeded:

- "WELLBUTRIN XL is contraindicated in patients undergoing abrupt discontinuation of
  alcohol or sedatives (including benzodiazepines)." [14]
- "Circumstances associated with an increased seizure risk include, among others,
  excessive use of alcohol or sedatives . . . ."[15]
- "The consumption of alcohol during treatment with WELLBUTRIN XL should be
  minimized or avoided (also see CONTRAINDICATIONS)." [16]
- Patients should be told that the excessive use or abrupt discontinuation of alcohol or
  sedatives (including benzodiazepines) may alter the seizure threshold. Some patients
  have reported lower alcohol tolerance during treatment with WELLBUTRIN XL.
  Patients should be advised that the consumption of alcohol should be minimized or
  avoided.[17]

FDA discussed the potential concerns with the effect of alcohol on extended-release
dosage forms at a recent meeting of the Advisory Committee for Pharmaceutical Science.[18]
Although styled as an "awareness presentation,"[19] FDA clearly indicated its concern with the
potential effect that alcohol might have on extended-release drug delivery systems. Given these
concerns, the potentially serious risks posed by alcohol consumption with bupropion, and the
tendency of depressed patients to consume alcohol despite appropriate warnings, FDA should
require *in vitro* data on any generic version of Wellbutrin XL® confirming that there are no
substantial differences in the dose-release profile in the presence of alcohol. To the extent that
any such differences exist, they should be weighed to determine whether the risks posed by the
generic version are adequately addressed by the Wellbutrin XL® labeling.

---

[14]    Wellbutrin XL® Labeling ("Contraindications").

[15]    Wellbutrin XL® Labeling ("Warnings - - Seizures - - Clinical situations").

[16]    Wellbutrin XL® Labeling ("Precautions - - Alcohol").

[17]    Wellbutrin XL® Labeling ("Information for Patients"). The patient information leaflet
repeats the acknowledgement that warnings to not consume alcohol may be ignored: "What
should I avoid while taking WELLBUTRIN XL?  Do not drink a lot of alcohol while taking
WELLBUTRIN XL. If you usually drink a lot of alcohol, talk with your doctor before suddenly
stopping. If you suddenly stop drinking alcohol, you may increase your chance of having
seizures."

[18]    Advisory Committee for Pharmaceutical Science meeting on October 26, 2005 (transcript
available at: http://www.fda.gov/ohrms/dockets/ac/05/transcripts/2005-4187T2.pdf).

[19]    *See* Meeting Transcript at 9.

KELLER AND HECKMAN LLP

Division of Dockets Management
December 20, 2005
Page 9

    E.    <u>Conclusion</u>

For the reasons discussed above, FDA should require that any ANDA for a generic version of Wellbutrin XL® satisfy the criteria outlined in Section I of this petition.

**III.    Environmental Impact**

Biovail claims a categorical exclusion under 21 C.F.R. §§ 25.30 and 25.31.

**IV.    Economic impact**

This information will be provided upon request of the Commissioner.

**V.    Certification**

The undersigned certifies that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.

Respectfully submitted,

John B. Dubeck
Frederick A. Stearns

Keller and Heckman LLP
1001 G Street, N.W., Suite 500 West
Washington, D.C. 20001

Counsel to Biovail Corporation

Attachments:

(1) Complete prescribing information for Wellbutrin XL®.

(2) Summary Report of Study No. AK1BIOVAIL2548, "A two-way, crossover, open-label, single dose, food-effect, comparative bioavailability study of bupropion HCl extended release 300mg tablets in normal healthy non-smoking male and female subjects." (GlaxoSmithKline Clinical Trial Register)

PRESCRIBING INFORMATION

# WELLBUTRIN XL®
**(bupropion hydrochloride extended-release tablets)**

---

**Suicidality in Children and Adolescents**

Antidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders. Anyone considering the use of WELLBUTRIN XL or any other antidepressant in a child or adolescent must balance this risk with the clinical need. Patients who are started on therapy should be observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised of the need for close observation and communication with the prescriber. WELLBUTRIN XL is not approved for use in pediatric patients. (See WARNINGS and PRECAUTIONS: Pediatric Use.)

Pooled analyses of short-term (4 to 16 weeks) placebo-controlled trials of 9 antidepressant drugs (SSRIs and others) in children and adolescents with major depressive disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders (a total of 24 trials involving over 4,400 patients) have revealed a greater risk of adverse events representing suicidal thinking or behavior (suicidality) during the first few months of treatment in those receiving antidepressants. The average risk of such events in patients receiving antidepressants was 4%, twice the placebo risk of 2%. No suicides occurred in these trials.

---

## DESCRIPTION

WELLBUTRIN XL (bupropion hydrochloride), an antidepressant of the aminoketone class, is chemically unrelated to tricyclic, tetracyclic, selective serotonin re-uptake inhibitor, or other known antidepressant agents. Its structure closely resembles that of diethylpropion; it is related to phenylethylamines. It is designated as (±)-1-(3-chlorophenyl)-2-[(1,1-dimethylethyl)amino]-1-propanone hydrochloride. The molecular weight is 276.2. The molecular formula is $C_{13}H_{18}ClNO \cdot HCl$. Bupropion hydrochloride powder is white, crystalline, and highly soluble in water. It has a bitter taste and produces the sensation of local anesthesia on the oral mucosa. The structural formula is:



1

WELLBUTRIN XL Tablets are supplied for oral administration as 150-mg and 300-mg, creamy-white to pale yellow extended-release tablets. Each tablet contains the labeled amount of bupropion hydrochloride and the inactive ingredients: ethylcellulose aqueous dispersion (NF), glyceryl behenate, methacrylic acid copolymer dispersion (NF), polyvinyl alcohol, polyethylene glycol, povidone, silicon dioxide, and triethyl citrate. The tablets are printed with edible black ink.

The insoluble shell of the extended-release tablet may remain intact during gastrointestinal transit and is eliminated in the feces.

## CLINICAL PHARMACOLOGY

**Pharmacodynamics:** Bupropion is a relatively weak inhibitor of the neuronal uptake of norepinephrine, serotonin, and dopamine, and does not inhibit monoamine oxidase. While the mechanism of action of bupropion, as with other antidepressants, is unknown, it is presumed that this action is mediated by noradrenergic and/or dopaminergic mechanisms.

**Pharmacokinetics:** Bupropion is a racemic mixture. The pharmacologic activity and pharmacokinetics of the individual enantiomers have not been studied. The mean elimination half-life ($\pm$SD) of bupropion after chronic dosing is 21 ($\pm$9) hours, and steady-state plasma concentrations of bupropion are reached within 8 days.

In a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the immediate-release formulation of bupropion at 100 mg 3 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites (hydroxybupropion, threohydrobupropion, and erythrohydrobupropion). Additionally, in a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the sustained-release formulation of bupropion at 150 mg 2 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites.

*Absorption:* Following oral administration of WELLBUTRIN XL Tablets to healthy volunteers, time to peak plasma concentrations for bupropion was approximately 5 hours and food did not affect the $C_{max}$ or AUC of bupropion.

*Distribution:* In vitro tests show that bupropion is 84% bound to human plasma proteins at concentrations up to 200 mcg/mL. The extent of protein binding of the hydroxybupropion metabolite is similar to that for bupropion, whereas the extent of protein binding of the threohydrobupropion metabolite is about half that seen with bupropion.

*Metabolism:* Bupropion is extensively metabolized in humans. Three metabolites have been shown to be active: hydroxybupropion, which is formed via hydroxylation of the *tert*-butyl group of bupropion, and the amino-alcohol isomers threohydrobupropion and erythrohydrobupropion, which are formed via reduction of the carbonyl group. In vitro findings suggest that cytochrome P450IIB6 (CYP2B6) is the principal isoenzyme involved in the formation of hydroxybupropion, while cytochrome P450 isoenzymes are not involved in the formation of threohydrobupropion. Oxidation of the bupropion side chain results in the formation of a glycine conjugate of

meta-chlorobenzoic acid, which is then excreted as the major urinary metabolite. The potency and toxicity of the metabolites relative to bupropion have not been fully characterized. However, it has been demonstrated in an antidepressant screening test in mice that hydroxybupropion is one half as potent as bupropion, while threohydrobupropion and erythrohydrobupropion are 5-fold less potent than bupropion. This may be of clinical importance because the plasma concentrations of the metabolites are as high or higher than those of bupropion.

Because bupropion is extensively metabolized, there is the potential for drug-drug interactions, particularly with those agents that are metabolized by the cytochrome P450IIB6 (CYP2B6) isoenzyme. Although bupropion is not metabolized by cytochrome P450IID6 (CYP2D6), there is the potential for drug-drug interactions when bupropion is co-administered with drugs metabolized by this isoenzyme (see PRECAUTIONS: Drug Interactions).

In humans, peak plasma concentrations of hydroxybupropion occur approximately 7 hours after administration of WELLBUTRIN XL. Following administration of WELLBUTRIN XL, peak plasma concentrations of hydroxybupropion are approximately 7 times the peak level of the parent drug at steady state. The elimination half-life of hydroxybupropion is approximately 20 (±5) hours, and its AUC at steady state is about 13 times that of bupropion. The times to peak concentrations for the erythrohydrobupropion and threohydrobupropion metabolites are similar to that of the hydroxybupropion metabolite. However, their elimination half-lives are longer, approximately 33 (±10) and 37 (±13) hours, respectively, and steady-state AUCs are 1.4 and 7 times that of bupropion, respectively.

Bupropion and its metabolites exhibit linear kinetics following chronic administration of 300 to 450 mg/day.

*Elimination:* Following oral administration of 200 mg of $^{14}$C-bupropion in humans, 87% and 10% of the radioactive dose were recovered in the urine and feces, respectively. However, the fraction of the oral dose of bupropion excreted unchanged was only 0.5%, a finding consistent with the extensive metabolism of bupropion.

**Population Subgroups:** Factors or conditions altering metabolic capacity (e.g., liver disease, congestive heart failure [CHF], age, concomitant medications, etc.) or elimination may be expected to influence the degree and extent of accumulation of the active metabolites of bupropion. The elimination of the major metabolites of bupropion may be affected by reduced renal or hepatic function because they are moderately polar compounds and are likely to undergo further metabolism or conjugation in the liver prior to urinary excretion.

*Hepatic:* The effect of hepatic impairment on the pharmacokinetics of bupropion was characterized in 2 single-dose studies, one in patients with alcoholic liver disease and one in patients with mild to severe cirrhosis. The first study showed that the half-life of hydroxybupropion was significantly longer in 8 patients with alcoholic liver disease than in 8 healthy volunteers (32±14 hours versus 21±5 hours, respectively). Although not statistically significant, the AUCs for bupropion and hydroxybupropion were more variable and tended to be greater (by 53% to 57%) in patients with alcoholic liver disease. The differences in half-life for bupropion and the other metabolites in the 2 patient groups were minimal.

3

The second study showed no statistically significant differences in the pharmacokinetics of bupropion and its active metabolites in 9 patients with mild to moderate hepatic cirrhosis compared to 8 healthy volunteers. However, more variability was observed in some of the pharmacokinetic parameters for bupropion (AUC, $C_{max}$, and $T_{max}$) and its active metabolites ($t_{1/2}$) in patients with mild to moderate hepatic cirrhosis. In addition, in patients with severe hepatic cirrhosis, the bupropion $C_{max}$ and AUC were substantially increased (mean difference: by approximately 70% and 3-fold, respectively) and more variable when compared to values in healthy volunteers; the mean bupropion half-life was also longer (29 hours in patients with severe hepatic cirrhosis vs 19 hours in healthy subjects). For the metabolite hydroxybupropion, the mean $C_{max}$ was approximately 69% lower. For the combined amino-alcohol isomers threohydrobupropion and erythrohydrobupropion, the mean $C_{max}$ was approximately 31% lower. The mean AUC increased by about 1½-fold for hydroxybupropion and 2½-fold for threo/erythrohydrobupropion. The median $T_{max}$ was observed 19 hours later for hydroxybupropion and 31 hours later for threo/erythrohydrobupropion. The mean half-lives for hydroxybupropion and threo/erythrohydrobupropion were increased 5- and 2-fold, respectively, in patients with severe hepatic cirrhosis compared to healthy volunteers (see WARNINGS, PRECAUTIONS, and DOSAGE AND ADMINISTRATION).

**Renal:** There is limited information on the pharmacokinetics of bupropion in patients with renal impairment. The elimination of the major metabolites of bupropion may be reduced by impaired renal function (see PRECAUTIONS: Renal Impairment).

**Left Ventricular Dysfunction:** During a chronic dosing study with bupropion in 14 depressed patients with left ventricular dysfunction (history of CHF or an enlarged heart on x-ray), no apparent effect on the pharmacokinetics of bupropion or its metabolites was revealed, compared to healthy volunteers.

**Age:** The effects of age on the pharmacokinetics of bupropion and its metabolites have not been fully characterized, but an exploration of steady-state bupropion concentrations from several depression efficacy studies involving patients dosed in a range of 300 to 750 mg/day, on a 3 times daily schedule, revealed no relationship between age (18 to 83 years) and plasma concentration of bupropion. A single-dose pharmacokinetic study demonstrated that the disposition of bupropion and its metabolites in elderly subjects was similar to that of younger subjects. These data suggest there is no prominent effect of age on bupropion concentration; however, another pharmacokinetic study, single and multiple dose, has suggested that the elderly are at increased risk for accumulation of bupropion and its metabolites (see PRECAUTIONS: Geriatric Use).

**Gender:** A single-dose study involving 12 healthy male and 12 healthy female volunteers revealed no sex-related differences in the pharmacokinetic parameters of bupropion.

**Smokers:** The effects of cigarette smoking on the pharmacokinetics of bupropion were studied in 34 healthy male and female volunteers; 17 were chronic cigarette smokers and 17 were nonsmokers. Following oral administration of a single 150-mg dose of bupropion, there

4

was no statistically significant difference in $C_{max}$, half-life, $T_{max}$, AUC, or clearance of bupropion or its active metabolites between smokers and nonsmokers.

## CLINICAL TRIALS

The efficacy of bupropion as a treatment for major depressive disorder was established with the immediate-release formulation of bupropion in two 4-week, placebo-controlled trials in adult inpatients and in one 6-week, placebo-controlled trial in adult outpatients. In the first study, patients were titrated in a bupropion dose range of 300 to 600 mg/day of the immediate-release formulation on a 3 times daily schedule; 78% of patients received maximum doses of 450 mg/day or less. This trial demonstrated the effectiveness of bupropion on the Hamilton Depression Rating Scale (HDRS) total score, the depressed mood item (item 1) from that scale, and the Clinical Global Impressions (CGI) severity score. A second study included 2 fixed doses of the immediate-release formulation of bupropion (300 and 450 mg/day) and placebo. This trial demonstrated the effectiveness of bupropion, but only at the 450-mg/day dose of the immediate-release formulation; the results were positive for the HDRS total score and the CGI severity score, but not for HDRS item 1. In the third study, outpatients received 300 mg/day of the immediate-release formulation of bupropion. This study demonstrated the effectiveness of bupropion on the HDRS total score, HDRS item 1, the Montgomery-Asberg Depression Rating Scale, the CGI severity score, and the CGI improvement score.

In a longer-term study, outpatients meeting DSM-IV criteria for major depressive disorder, recurrent type, who had responded during an 8-week open trial on bupropion (150 mg twice daily of the sustained-release formulation) were randomized to continuation of their same dose of bupropion or placebo, for up to 44 weeks of observation for relapse. Response during the open phase was defined as CGI Improvement score of 1 (very much improved) or 2 (much improved) for each of the final 3 weeks. Relapse during the double-blind phase was defined as the investigator's judgment that drug treatment was needed for worsening depressive symptoms. Patients receiving continued bupropion treatment experienced significantly lower relapse rates over the subsequent 44 weeks compared to those receiving placebo.

Although there are no independent trials demonstrating the antidepressant effectiveness of WELLBUTRIN XL, studies have demonstrated similar bioavailability of WELLBUTRIN XL to both the immediate-release formulation and to the sustained-release formulation of bupropion under steady-state conditions, i.e., WELLBUTRIN XL 300 mg once daily was shown to have bioavailability that was similar to that of 100 mg 3 times daily of the immediate-release formulation of bupropion and to that of 150 mg 2 times daily of the sustained-release formulation of bupropion, with regard to both peak plasma concentration and extent of absorption, for parent drug and metabolites.

## INDICATIONS AND USAGE

WELLBUTRIN XL is indicated for the treatment of major depressive disorder.

The efficacy of bupropion in the treatment of a major depressive episode was established in two 4-week controlled trials of inpatients and in one 6-week controlled trial of outpatients whose

5

diagnoses corresponded most closely to the Major Depression category of the APA Diagnostic and Statistical Manual (DSM) (see CLINICAL PHARMACOLOGY).

A major depressive episode (DSM-IV) implies the presence of 1) depressed mood or 2) loss of interest or pleasure; in addition, at least 5 of the following symptoms have been present during the same 2-week period and represent a change from previous functioning: depressed mood, markedly diminished interest or pleasure in usual activities, significant change in weight and/or appetite, insomnia or hypersomnia, psychomotor agitation or retardation, increased fatigue, feelings of guilt or worthlessness, slowed thinking or impaired concentration, a suicide attempt, or suicidal ideation.

The efficacy of bupropion in maintaining an antidepressant response for up to 44 weeks following 8 weeks of acute treatment was demonstrated in a placebo-controlled trial with the sustained-release formulation of bupropion (see CLINICAL PHARMACOLOGY). Nevertheless, the physician who elects to use WELLBUTRIN XL for extended periods should periodically reevaluate the long-term usefulness of the drug for the individual patient.

## CONTRAINDICATIONS

WELLBUTRIN XL is contraindicated in patients with a seizure disorder.

WELLBUTRIN XL is contraindicated in patients treated with ZYBAN® (bupropion hydrochloride) Sustained-Release Tablets; WELLBUTRIN® (bupropion hydrochloride), the immediate-release formulation; WELLBUTRIN SR® (bupropion hydrochloride), the sustained-release formulation; or any other medications that contain bupropion because the incidence of seizure is dose dependent.

WELLBUTRIN XL is contraindicated in patients with a current or prior diagnosis of bulimia or anorexia nervosa because of a higher incidence of seizures noted in patients treated for bulimia with the immediate-release formulation of bupropion.

WELLBUTRIN XL is contraindicated in patients undergoing abrupt discontinuation of alcohol or sedatives (including benzodiazepines).

The concurrent administration of WELLBUTRIN XL Tablets and a monoamine oxidase (MAO) inhibitor is contraindicated. At least 14 days should elapse between discontinuation of an MAO inhibitor and initiation of treatment with WELLBUTRIN XL Tablets.

WELLBUTRIN XL is contraindicated in patients who have shown an allergic response to bupropion or the other ingredients that make up WELLBUTRIN XL Tablets.

## WARNINGS

**Clinical Worsening and Suicide Risk:** Patients with major depressive disorder (MDD), both adult and pediatric, may experience worsening of their depression and/or the emergence of suicidal ideation and behavior (suicidality) or unusual changes in behavior, whether or not they are taking antidepressant medications, and this risk may persist until significant remission occurs. There has been a long-standing concern that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients. Antidepressants

6

increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders.

Pooled analyses of short-term placebo-controlled trials of 9 antidepressant drugs (SSRIs and others) in children and adolescents with MDD, OCD, or other psychiatric disorders (a total of 24 trials involving over 4,400 patients) have revealed a greater risk of adverse events representing suicidal behavior or thinking (suicidality) during the first few months of treatment in those receiving antidepressants. The average risk of such events in patients receiving antidepressants was 4%, twice the placebo risk of 2%. There was considerable variation in risk among drugs, but a tendency toward an increase for almost all drugs studied. The risk of suicidality was most consistently observed in the MDD trials, but there were signals of risk arising from some trials in other psychiatric indications (obsessive compulsive disorder and social anxiety disorder) as well. **No suicides occurred in any of these trials.** It is unknown whether the suicidality risk in pediatric patients extends to longer-term use, i.e., beyond several months. It is also unknown whether the suicidality risk extends to adults.

**All pediatric patients being treated with antidepressants for any indication should be observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases. Such observation would generally include at least weekly face-to-face contact with patients or their family members or caregivers during the first 4 weeks of treatment, then every other week visits for the next 4 weeks, then at 12 weeks, and as clinically indicated beyond 12 weeks. Additional contact by telephone may be appropriate between face-to-face visits.**

**Adults with MDD or co-morbid depression in the setting of other psychiatric illness being treated with antidepressants should be observed similarly for clinical worsening and suicidality, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases.**

**In addition, patients with a history of suicidal behavior or thoughts, those patients exhibiting a significant degree of suicidal ideation prior to commencement of treatment, and young adults, are at an increased risk of suicidal thoughts or suicide attempts, and should receive careful monitoring during treatment.**

The following symptoms, anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor restlessness), hypomania, and mania, have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as for other indications, both psychiatric and nonpsychiatric. Although a causal link between the emergence of such symptoms and either the worsening of depression and/or the emergence of suicidal impulses has not been established, there is concern that such symptoms may represent precursors to emerging suicidality.

Consideration should be given to changing the therapeutic regimen, including possibly discontinuing the medication, in patients whose depression is persistently worse, or who are experiencing emergent suicidality or symptoms that might be precursors to worsening depression

7

or suicidality, especially if these symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms.

**Families and caregivers of pediatric patients being treated with antidepressants for major depressive disorder or other indications, both psychiatric and nonpsychiatric, should be alerted about the need to monitor patients for the emergence of agitation, irritability, unusual changes in behavior, and the other symptoms described above, as well as the emergence of suicidality, and to report such symptoms immediately to health care providers. Such monitoring should include daily observation by families and caregivers.** Prescriptions for WELLBUTRIN XL should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose. Families and caregivers of adults being treated for depression should be similarly advised.

**Screening Patients for Bipolar Disorder:** A major depressive episode may be the initial presentation of bipolar disorder. It is generally believed (though not established in controlled trials) that treating such an episode with an antidepressant alone may increase the likelihood of precipitation of a mixed/manic episode in patients at risk for bipolar disorder. Whether any of the symptoms described above represent such a conversion is unknown. However, prior to initiating treatment with an antidepressant, patients with depressive symptoms should be adequately screened to determine if they are at risk for bipolar disorder; such screening should include a detailed psychiatric history, including a family history of suicide, bipolar disorder, and depression. It should be noted that WELLBUTRIN XL is not approved for use in treating bipolar depression.

**Patients should be made aware that WELLBUTRIN XL contains the same active ingredient found in ZYBAN, used as an aid to smoking cessation treatment, and that WELLBUTRIN XL should not be used in combination with ZYBAN, or any other medications that contain bupropion, such as WELLBUTRIN SR (bupropion hydrochloride), the sustained-release formulation or WELLBUTRIN (bupropion hydrochloride), the immediate-release formulation.**

**Seizures: Bupropion is associated with a dose-related risk of seizures. The risk of seizures is also related to patient factors, clinical situations, and concomitant medications, which must be considered in selection of patients for therapy with WELLBUTRIN XL. WELLBUTRIN XL should be discontinued and not restarted in patients who experience a seizure while on treatment.**

**As WELLBUTRIN XL is bioequivalent to both the immediate-release formulation of bupropion and to the sustained-release formulation of bupropion, the seizure incidence with WELLBUTRIN XL, while not formally evaluated in clinical trials, may be similar to that presented below for the immediate-release and sustained-release formulations of bupropion.**

- **Dose: At doses up to 300 mg/day of the sustained-release formulation of bupropion (WELLBUTRIN SR), the incidence of seizure is approximately 0.1% (1/1,000).**

Data for the immediate-release formulation of bupropion revealed a seizure incidence of approximately 0.4% (i.e., 13 of 3,200 patients followed prospectively) in patients treated at doses in a range of 300 to 450 mg/day. This seizure incidence (0.4%) may exceed that of some other marketed antidepressants.

Additional data accumulated for the immediate-release formulation of bupropion suggested that the estimated seizure incidence increases almost tenfold between 450 and 600 mg/day. The 600 mg dose is twice the usual adult dose and one and one-third the maximum recommended daily dose (450 mg) of WELLBUTRIN XL Tablets. This disproportionate increase in seizure incidence with dose incrementation calls for caution in dosing.

- **Patient factors:** Predisposing factors that may increase the risk of seizure with bupropion use include history of head trauma or prior seizure, central nervous system (CNS) tumor, the presence of severe hepatic cirrhosis, and concomitant medications that lower seizure threshold.
- **Clinical situations:** Circumstances associated with an increased seizure risk include, among others, excessive use of alcohol or sedatives (including benzodiazepines); addiction to opiates, cocaine, or stimulants; use of over-the-counter stimulants and anorectics; and diabetes treated with oral hypoglycemics or insulin.
- **Concomitant medications:** Many medications (e.g., antipsychotics, antidepressants, theophylline, systemic steroids) are known to lower seizure threshold.

**Recommendations for Reducing the Risk of Seizure:** Retrospective analysis of clinical experience gained during the development of bupropion suggests that the risk of seizure may be minimized if

- the total daily dose of WELLBUTRIN XL Tablets does *not* exceed 450 mg,
- the rate of incrementation of dose is gradual.

WELLBUTRIN XL should be administered with extreme caution to patients with a history of seizure, cranial trauma, or other predisposition(s) toward seizure, or patients treated with other agents (e.g., antipsychotics, other antidepressants, theophylline, systemic steroids, etc.) that lower seizure threshold.

**Hepatic Impairment:** WELLBUTRIN XL should be used with extreme caution in patients with severe hepatic cirrhosis. In these patients a reduced frequency and/or dose is required, as peak bupropion, as well as AUC, levels are substantially increased and accumulation is likely to occur in such patients to a greater extent than usual. The dose should not exceed 150 mg every other day in these patients (see CLINICAL PHARMACOLOGY, PRECAUTIONS, and DOSAGE AND ADMINISTRATION).

**Potential for Hepatotoxicity:** In rats receiving large doses of bupropion chronically, there was an increase in incidence of hepatic hyperplastic nodules and hepatocellular hypertrophy. In dogs receiving large doses of bupropion chronically, various histologic changes were seen in the liver, and laboratory tests suggesting mild hepatocellular injury were noted.

## PRECAUTIONS

**General:** *Agitation and Insomnia:* Increased restlessness, agitation, anxiety, and insomnia, especially shortly after initiation of treatment, have been associated with treatment with bupropion. Patients in placebo-controlled trials with WELLBUTRIN SR, the sustained-release formulation of bupropion, experienced agitation, anxiety, and insomnia as shown in Table 1.

**Table 1. Incidence of Agitation, Anxiety, and Insomnia in Placebo-Controlled Trials**

| Adverse Event Term | WELLBUTRIN SR 300 mg/day (n = 376) | WELLBUTRIN SR 400 mg/day (n = 114) | Placebo (n = 385) |
|---|---|---|---|
| Agitation | 3% | 9% | 2% |
| Anxiety | 5% | 6% | 3% |
| Insomnia | 11% | 16% | 6% |

In clinical studies, these symptoms were sometimes of sufficient magnitude to require treatment with sedative/hypnotic drugs.

Symptoms were sufficiently severe to require discontinuation of treatment in 1% and 2.6% of patients treated with 300 and 400 mg/day, respectively, of bupropion sustained-release tablets and 0.8% of patients treated with placebo.

*Psychosis, Confusion, and Other Neuropsychiatric Phenomena:* Depressed patients treated with bupropion have been reported to show a variety of neuropsychiatric signs and symptoms, including delusions, hallucinations, psychosis, concentration disturbance, paranoia, and confusion. In some cases, these symptoms abated upon dose reduction and/or withdrawal of treatment.

*Activation of Psychosis and/or Mania:* Antidepressants can precipitate manic episodes in bipolar disorder patients during the depressed phase of their illness and may activate latent psychosis in other susceptible patients. WELLBUTRIN XL is expected to pose similar risks.

*Altered Appetite and Weight:* In placebo-controlled studies using WELLBUTRIN SR, the sustained-release formulation of bupropion, patients experienced weight gain or weight loss as shown in Table 2.

**Table 2. Incidence of Weight Gain and Weight Loss in Placebo-Controlled Trials**

| Weight Change | WELLBUTRIN SR 300 mg/day (n = 339) | WELLBUTRIN SR 400 mg/day (n = 112) | Placebo (n = 347) |
|---|---|---|---|
| Gained >5 lbs | 3% | 2% | 4% |
| Lost >5 lbs | 14% | 19% | 6% |

In studies conducted with the immediate-release formulation of bupropion, 35% of patients receiving tricyclic antidepressants gained weight, compared to 9% of patients treated with the

immediate-release formulation of bupropion. If weight loss is a major presenting sign of a patient's depressive illness, the anorectic and/or weight-reducing potential of WELLBUTRIN XL Tablets should be considered.

**Allergic Reactions:** Anaphylactoid/anaphylactic reactions characterized by symptoms such as pruritus, urticaria, angioedema, and dyspnea requiring medical treatment have been reported in clinical trials with bupropion. In addition, there have been rare spontaneous postmarketing reports of erythema multiforme, Stevens-Johnson syndrome, and anaphylactic shock associated with bupropion. A patient should stop taking WELLBUTRIN XL and consult a doctor if experiencing allergic or anaphylactoid/anaphylactic reactions (e.g., skin rash, pruritus, hives, chest pain, edema, and shortness of breath) during treatment.

Arthralgia, myalgia, and fever with rash and other symptoms suggestive of delayed hypersensitivity have been reported in association with bupropion. These symptoms may resemble serum sickness.

**Cardiovascular Effects:** In clinical practice, hypertension, in some cases severe, requiring acute treatment, has been reported in patients receiving bupropion alone and in combination with nicotine replacement therapy. These events have been observed in both patients with and without evidence of preexisting hypertension.

Data from a comparative study of the sustained-release formulation of bupropion (ZYBAN® Sustained-Release Tablets), nicotine transdermal system (NTS), the combination of sustained-release bupropion plus NTS, and placebo as an aid to smoking cessation suggest a higher incidence of treatment-emergent hypertension in patients treated with the combination of sustained-release bupropion and NTS. In this study, 6.1% of patients treated with the combination of sustained-release bupropion and NTS had treatment-emergent hypertension compared to 2.5%, 1.6%, and 3.1% of patients treated with sustained-release bupropion, NTS, and placebo, respectively. The majority of these patients had evidence of preexisting hypertension. Three patients (1.2%) treated with the combination of ZYBAN and NTS and 1 patient (0.4%) treated with NTS had study medication discontinued due to hypertension compared to none of the patients treated with ZYBAN or placebo. Monitoring of blood pressure is recommended in patients who receive the combination of bupropion and nicotine replacement.

There is no clinical experience establishing the safety of WELLBUTRIN XL Tablets in patients with a recent history of myocardial infarction or unstable heart disease. Therefore, care should be exercised if it is used in these groups. Bupropion was well tolerated in depressed patients who had previously developed orthostatic hypotension while receiving tricyclic antidepressants, and was also generally well tolerated in a group of 36 depressed inpatients with stable congestive heart failure (CHF). However, bupropion was associated with a rise in supine blood pressure in the study of patients with CHF, resulting in discontinuation of treatment in 2 patients for exacerbation of baseline hypertension.

**Hepatic Impairment:** WELLBUTRIN XL should be used with extreme caution in patients with severe hepatic cirrhosis. In these patients, a reduced frequency and/or dose is required. WELLBUTRIN XL should be used with caution in patients with hepatic impairment (including

11

mild to moderate hepatic cirrhosis) and reduced frequency and/or dose should be considered in patients with mild to moderate hepatic cirrhosis.

All patients with hepatic impairment should be closely monitored for possible adverse effects that could indicate high drug and metabolite levels (see CLINICAL PHARMACOLOGY, WARNINGS, and DOSAGE AND ADMINISTRATION).

**Renal Impairment:** There is limited information on the pharmacokinetics of bupropion in patients with renal impairment. Bupropion is extensively metabolized in the liver to active metabolites, which are further metabolized and subsequently excreted by the kidneys. WELLBUTRIN XL should be used with caution in patients with renal impairment and a reduced frequency and/or dose should be considered as the metabolites of bupropion may accumulate in such patients to a greater extent than usual. The patient should be closely monitored for possible adverse effects that could indicate high drug or metabolite levels.

**Information for Patients:** Prescribers or other health professionals should inform patients, their families, and their caregivers about the benefits and risks associated with treatment with WELLBUTRIN XL and should counsel them in its appropriate use. A patient Medication Guide About Using Antidepressants in Children and Teenagers is available for WELLBUTRIN XL. The prescriber or health professional should instruct patients, their families, and their caregivers to read the Medication Guide and should assist them in understanding its contents. Patients should be given the opportunity to discuss the contents of the Medication Guide and to obtain answers to any questions they may have. The complete text of the Medication Guide is reprinted at the end of this document. Additional important information concerning WELLBUTRIN XL is provided in a tear-off leaflet entitled "Patient Information" at the end of this labeling.

Patients should be advised of the following issues and asked to alert their prescriber if these occur while taking WELLBUTRIN XL.

**Clinical Worsening and Suicide Risk:** Patients, their families, and their caregivers should be encouraged to be alert to the emergence of anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor restlessness), hypomania, mania, other unusual changes in behavior, worsening of depression, and suicidal ideation, especially early during antidepressant treatment and when the dose is adjusted up or down. Families and caregivers of patients should be advised to observe for the emergence of such symptoms on a day-to-day basis, since changes may be abrupt. Such symptoms should be reported to the patient's prescriber or health professional, especially if they are severe, abrupt in onset, or were not part of the patient's presenting symptoms. Symptoms such as these may be associated with an increased risk for suicidal thinking and behavior and indicate a need for very close monitoring and possibly changes in the medication.

Patients should be made aware that WELLBUTRIN XL contains the same active ingredient found in ZYBAN, used as an aid to smoking cessation treatment, and that WELLBUTRIN XL should not be used in combination with ZYBAN or any other medications that contain bupropion hydrochloride (such as WELLBUTRIN SR, the sustained-release formulation, and WELLBUTRIN, the immediate-release formulation).

12

Patients should be told that WELLBUTRIN XL should be discontinued and not restarted if they experience a seizure while on treatment.

Patients should be told that any CNS-active drug like WELLBUTRIN XL Tablets may impair their ability to perform tasks requiring judgment or motor and cognitive skills. Consequently, until they are reasonably certain that WELLBUTRIN XL Tablets do not adversely affect their performance, they should refrain from driving an automobile or operating complex, hazardous machinery.

Patients should be told that the excessive use or abrupt discontinuation of alcohol or sedatives (including benzodiazepines) may alter the seizure threshold. Some patients have reported lower alcohol tolerance during treatment with WELLBUTRIN XL. Patients should be advised that the consumption of alcohol should be minimized or avoided.

Patients should be advised to inform their physicians if they are taking or plan to take any prescription or over-the-counter drugs. Concern is warranted because WELLBUTRIN XL Tablets and other drugs may affect each other's metabolism.

Patients should be advised to notify their physicians if they become pregnant or intend to become pregnant during therapy.

Patients should be advised to swallow WELLBUTRIN XL Tablets whole so that the release rate is not altered. Do not chew, divide, or crush tablets.

Patients should be advised that they may notice in their stool something that looks like a tablet. This is normal. The medication in WELLBUTRIN XL is contained in a non-absorbable shell that has been specially designed to slowly release drug in the body. When this process is completed, the empty shell is eliminated from the body.

**Laboratory Tests:** There are no specific laboratory tests recommended.

**Drug Interactions:** Few systemic data have been collected on the metabolism of bupropion following concomitant administration with other drugs or, alternatively, the effect of concomitant administration of bupropion on the metabolism of other drugs.

Because bupropion is extensively metabolized, the coadministration of other drugs may affect its clinical activity. In vitro studies indicate that bupropion is primarily metabolized to hydroxybupropion by the CYP2B6 isoenzyme. Therefore, the potential exists for a drug interaction between WELLBUTRIN XL and drugs that are substrates or inhibitors of the CYP2B6 isoenzyme (e.g., orphenadrine, thiotepa, and cyclophosphamide). In addition, in vitro studies suggest that paroxetine, sertraline, norfluoxetine, and fluvoxamine as well as nelfinavir, ritonavir, and efavirenz inhibit the hydroxylation of bupropion. No clinical studies have been performed to evaluate this finding. The threohydrobupropion metabolite of bupropion does not appear to be produced by the cytochrome P450 isoenzymes. The effects of concomitant administration of cimetidine on the pharmacokinetics of bupropion and its active metabolites were studied in 24 healthy young male volunteers. Following oral administration of two 150-mg tablets of the sustained-release formulation of bupropion with and without 800 mg of cimetidine, the pharmacokinetics of bupropion and hydroxybupropion were unaffected. However, there were

13

16% and 32% increases in the AUC and $C_{max}$, respectively, of the combined moieties of threohydrobupropion and erythrohydrobupropion.

While not systematically studied, certain drugs may induce the metabolism of bupropion (e.g., carbamazepine, phenobarbital, phenytoin).

Multiple oral doses of bupropion had no statistically significant effects on the single dose pharmacokinetics of lamotrigine in 12 healthy volunteers and was associated with a slight increase in the AUC (15%) of lamotrigine glucuronide.

Animal data indicated that bupropion may be an inducer of drug-metabolizing enzymes in humans. In one study, following chronic administration of bupropion, 100 mg 3 times daily to 8 healthy male volunteers for 14 days, there was no evidence of induction of its own metabolism. Nevertheless, there may be the potential for clinically important alterations of blood levels of coadministered drugs.

***Drugs Metabolized By Cytochrome P450IID6 (CYP2D6):*** Many drugs, including most antidepressants (SSRIs, many tricyclics), beta-blockers, antiarrhythmics, and antipsychotics are metabolized by the CYP2D6 isoenzyme. Although bupropion is not metabolized by this isoenzyme, bupropion and hydroxybupropion are inhibitors of CYP2D6 isoenzyme in vitro. In a study of 15 male subjects (ages 19 to 35 years) who were extensive metabolizers of the CYP2D6 isoenzyme, daily doses of bupropion given as 150 mg twice daily followed by a single dose of 50 mg desipramine increased the $C_{max}$, AUC, and $t_{1/2}$ of desipramine by an average of approximately 2-, 5-, and 2-fold, respectively. The effect was present for at least 7 days after the last dose of bupropion. Concomitant use of bupropion with other drugs metabolized by CYP2D6 has not been formally studied.

Therefore, co-administration of bupropion with drugs that are metabolized by CYP2D6 isoenzyme including certain antidepressants (e.g., nortriptyline, imipramine, desipramine, paroxetine, fluoxetine, sertraline), antipsychotics (e.g., haloperidol, risperidone, thioridazine), beta-blockers (e.g., metoprolol), and Type 1C antiarrhythmics (e.g., propafenone, flecainide), should be approached with caution and be initiated at the lower end of the dose range of the concomitant medication. If bupropion is added to the treatment regimen of a patient already receiving a drug metabolized by CYP2D6, the need to decrease the dose of the original medication should be considered, particularly for those concomitant medications with a narrow therapeutic index.

***MAO Inhibitors:*** Studies in animals demonstrate that the acute toxicity of bupropion is enhanced by the MAO inhibitor phenelzine (see CONTRAINDICATIONS).

***Levodopa and Amantadine:*** Limited clinical data suggest a higher incidence of adverse experiences in patients receiving bupropion concurrently with either levodopa or amantadine. Administration of WELLBUTRIN XL Tablets to patients receiving either levodopa or amantadine concurrently should be undertaken with caution, using small initial doses and gradual dose increases.

***Drugs That Lower Seizure Threshold:*** Concurrent administration of WELLBUTRIN XL Tablets and agents (e.g., antipsychotics, other antidepressants, theophylline,

14

systemic steroids, etc.) that lower seizure threshold should be undertaken only with extreme caution (see WARNINGS). Low initial dosing and gradual dose increases should be employed.

**Nicotine Transdermal System:** (see PRECAUTIONS: Cardiovascular Effects).

**Alcohol:** In postmarketing experience, there have been rare reports of adverse neuropsychiatric events or reduced alcohol tolerance in patients who were drinking alcohol during treatment with bupropion. The consumption of alcohol during treatment with WELLBUTRIN XL should be minimized or avoided (also see CONTRAINDICATIONS).

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** Lifetime carcinogenicity studies were performed in rats and mice at doses up to 300 and 150 mg/kg/day, respectively. These doses are approximately 7 and 2 times the maximum recommended human dose (MRHD), respectively, on a mg/m$^2$ basis. In the rat study there was an increase in nodular proliferative lesions of the liver at doses of 100 to 300 mg/kg/day (approximately 2 to 7 times the MRHD on a mg/m$^2$ basis); lower doses were not tested. The question of whether or not such lesions may be precursors of neoplasms of the liver is currently unresolved. Similar liver lesions were not seen in the mouse study, and no increase in malignant tumors of the liver and other organs was seen in either study.

Bupropion produced a positive response (2 to 3 times control mutation rate) in 2 of 5 strains in the Ames bacterial mutagenicity test and an increase in chromosomal aberrations in 1 of 3 in vivo rat bone marrow cytogenetic studies.

A fertility study in rats at doses up to 300 mg/kg/day revealed no evidence of impaired fertility.

**Pregnancy: *Teratogenic Effects:*** Pregnancy Category B. Teratology studies have been performed with bupropion immediate-release formulation at dosages up to 450 mg/kg in rats, and at doses up to 150 mg/kg in rabbits (approximately 7 to 11 and 7 times the MRHD, respectively, on a mg/m$^2$ basis), and have revealed no evidence of harm to the fetus due to bupropion. There are no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed.

To monitor fetal outcomes of pregnant women exposed to WELLBUTRIN XL, GlaxoSmithKline maintains a Bupropion Pregnancy Registry. Health care providers are encouraged to register patients by calling (800) 336-2176.

**Labor and Delivery:** The effect of WELLBUTRIN XL Tablets on labor and delivery in humans is unknown.

**Nursing Mothers:** Like many other drugs, bupropion and its metabolites are secreted in human milk. Because of the potential for serious adverse reactions in nursing infants from WELLBUTRIN XL Tablets, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use:** Safety and effectiveness in the pediatric population have not been established (see BOX WARNING and WARNINGS: Clinical Worsening and Suicide Risk). Anyone

considering the use of WELLBUTRIN XL in a child or adolescent must balance the potential risks with the clinical need.

**Geriatric Use:** Of the approximately 6,000 patients who participated in clinical trials with bupropion sustained-release tablets (depression and smoking cessation studies), 275 were $\geq 65$ years old and 47 were $\geq 75$ years old. In addition, several hundred patients 65 and over participated in clinical trials using the immediate-release formulation of bupropion (depression studies). No overall differences in safety or effectiveness were observed between these subjects and younger subjects. Reported clinical experience has not identified differences in responses between the elderly and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

A single-dose pharmacokinetic study demonstrated that the disposition of bupropion and its metabolites in elderly subjects was similar to that of younger subjects; however, another pharmacokinetic study, single and multiple dose, has suggested that the elderly are at increased risk for accumulation of bupropion and its metabolites (see CLINICAL PHARMACOLOGY).

Bupropion is extensively metabolized in the liver to active metabolites, which are further metabolized and excreted by the kidneys. The risk of toxic reaction to this drug may be greater in patients with impaired renal function. Because elderly patients are more likely to have decreased renal function, care should be taken in dose selection, and it may be useful to monitor renal function (see PRECAUTIONS: Renal Impairment and DOSAGE AND ADMINISTRATION).

**ADVERSE REACTIONS** (See also WARNINGS and PRECAUTIONS.)

WELLBUTRIN XL has been demonstrated to have similar bioavailability both to the immediate-release formulation of bupropion and to the sustained-release formulation of bupropion (see CLINICAL PHARMACOLOGY). The information included under the Incidence in Controlled Trials subsection of ADVERSE REACTIONS is based primarily on data from controlled clinical trials with WELLBUTRIN SR Tablets, the sustained-release formulation of bupropion. WELLBUTRIN XL has not been studied in placebo-controlled trials, although it has been studied in non-placebo-controlled clinical bioavailability studies. Information on additional adverse events associated with the sustained-release formulation of bupropion in smoking cessation trials, as well as the immediate-release formulation of bupropion, is included in a separate section (see Other Events Observed During the Clinical Development and Postmarketing Experience of Bupropion).

**Incidence in Controlled Trials With Bupropion:** *Adverse Events Associated With Discontinuation of Treatment Among Patients Treated With Bupropion:* In placebo-controlled clinical trials, 9% and 11% of patients treated with 300 and 400 mg/day, respectively, of the sustained-release formulation of bupropion and 4% of patients treated with placebo discontinued treatment due to adverse events. The specific adverse events in these trials that led to discontinuation in at least 1% of patients treated with either 300 mg/day or 400 mg/day of WELLBUTRIN SR, the sustained-release formulation of bupropion, and at a rate at least twice the placebo rate are listed in Table 3.

16

**Table 3. Treatment Discontinuations Due to Adverse Events in Placebo-Controlled Trials**

| Adverse Event Term | WELLBUTRIN SR 300 mg/day (n = 376) | WELLBUTRIN SR 400 mg/day (n = 114) | Placebo (n = 385) |
|---|---|---|---|
| Rash | 2.4% | 0.9% | 0.0% |
| Nausea | 0.8% | 1.8% | 0.3% |
| Agitation | 0.3% | 1.8% | 0.3% |
| Migraine | 0.0% | 1.8% | 0.3% |

In clinical trials with the immediate-release formulation of bupropion, 10% of patients and volunteers discontinued due to an adverse event. Events resulting in discontinuation, in addition to those listed above for the sustained-release formulation of bupropion, include vomiting, seizures, and sleep disturbances.

**Adverse Events Occurring at an Incidence of 1% or More Among Patients Treated With Bupropion:** Table 4 enumerates treatment-emergent adverse events that occurred among patients treated with 300 and 400 mg/day of the sustained-release formulation of bupropion and with placebo in controlled trials. Events that occurred in either the 300- or 400-mg/day group at an incidence of 1% or more and were more frequent than in the placebo group are included. Reported adverse events were classified using a COSTART-based Dictionary.

Accurate estimates of the incidence of adverse events associated with the use of any drug are difficult to obtain. Estimates are influenced by drug dose, detection technique, setting, physician judgments, etc. The figures cited cannot be used to predict precisely the incidence of untoward events in the course of usual medical practice where patient characteristics and other factors differ from those that prevailed in the clinical trials. These incidence figures also cannot be compared with those obtained from other clinical studies involving related drug products as each group of drug trials is conducted under a different set of conditions.

Finally, it is important to emphasize that the tabulation does not reflect the relative severity and/or clinical importance of the events. A better perspective on the serious adverse events associated with the use of bupropion is provided in the WARNINGS and PRECAUTIONS sections.

**Table 4. Treatment-Emergent Adverse Events in Placebo-Controlled Trials\***

| Body System/ Adverse Event | WELLBUTRIN SR 300 mg/day (n = 376) | WELLBUTRIN SR 400 mg/day (n = 114) | Placebo (n = 385) |
|---|---|---|---|
| Body (General) | | | |
| Headache | 26% | 25% | 23% |
| Infection | 8% | 9% | 6% |

17

| | | | |
|---|---|---|---|
| Abdominal pain | 3% | 9% | 2% |
| Asthenia | 2% | 4% | 2% |
| Chest pain | 3% | 4% | 1% |
| Pain | 2% | 3% | 2% |
| Fever | 1% | 2% | — |
| **Cardiovascular** | | | |
| Palpitation | 2% | 6% | 2% |
| Flushing | 1% | 4% | — |
| Migraine | 1% | 4% | 1% |
| Hot flashes | 1% | 3% | 1% |
| **Digestive** | | | |
| Dry mouth | 17% | 24% | 7% |
| Nausea | 13% | 18% | 8% |
| Constipation | 10% | 5% | 7% |
| Diarrhea | 5% | 7% | 6% |
| Anorexia | 5% | 3% | 2% |
| Vomiting | 4% | 2% | 2% |
| Dysphagia | 0% | 2% | 0% |
| **Musculoskeletal** | | | |
| Myalgia | 2% | 6% | 3% |
| Arthralgia | 1% | 4% | 1% |
| Arthritis | 0% | 2% | 0% |
| Twitch | 1% | 2% | — |
| **Nervous system** | | | |
| Insomnia | 11% | 16% | 6% |
| Dizziness | 7% | 11% | 5% |
| Agitation | 3% | 9% | 2% |
| Anxiety | 5% | 6% | 3% |
| Tremor | 6% | 3% | 1% |
| Nervousness | 5% | 3% | 3% |
| Somnolence | 2% | 3% | 2% |
| Irritability | 3% | 2% | 2% |
| Memory decreased | — | 3% | 1% |
| Paresthesia | 1% | 2% | 1% |
| Central nervous system stimulation | 2% | 1% | 1% |
| **Respiratory** | | | |
| Pharyngitis | 3% | 11% | 2% |

| | | | |
|---|---|---|---|
| Sinusitis | 3% | 1% | 2% |
| Increased cough | 1% | 2% | 1% |
| **Skin** | | | |
| Sweating | 6% | 5% | 2% |
| Rash | 5% | 4% | 1% |
| Pruritus | 2% | 4% | 2% |
| Urticaria | 2% | 1% | 0% |
| **Special senses** | | | |
| Tinnitus | 6% | 6% | 2% |
| Taste perversion | 2% | 4% | — |
| Amblyopia | 3% | 2% | 2% |
| **Urogenital** | | | |
| Urinary frequency | 2% | 5% | 2% |
| Urinary urgency | — | 2% | 0% |
| Vaginal hemorrhage[†] | 0% | 2% | — |
| Urinary tract infection | 1% | 0% | — |

\* Adverse events that occurred in at least 1% of patients treated with either 300 or 400 mg/day of the sustained-release formulation of bupropion, but equally or more frequently in the placebo group, were: abnormal dreams, accidental injury, acne, appetite increased, back pain, bronchitis, dysmenorrhea, dyspepsia, flatulence, flu syndrome, hypertension, neck pain, respiratory disorder, rhinitis, and tooth disorder.

[†] Incidence based on the number of female patients.

— Hyphen denotes adverse events occurring in greater than 0 but less than 0.5% of patients.

Additional events to those listed in Table 4 that occurred at an incidence of at least 1% in controlled clinical trials of the immediate-release formulation of bupropion (300 to 600 mg/day) and that were numerically more frequent than placebo were: cardiac arrhythmias (5% vs 4%), hypertension (4% vs 2%), hypotension (3% vs 2%), tachycardia (11% vs 9%), appetite increase (4% vs 2%), dyspepsia (3% vs 2%), menstrual complaints (5% vs 1%), akathisia (2% vs 1%), impaired sleep quality (4% vs 2%), sensory disturbance (4% vs 3%), confusion (8% vs 5%), decreased libido (3% vs 2%), hostility (6% vs 4%), auditory disturbance (5% vs 3%), and gustatory disturbance (3% vs 1%).

**Incidence of Commonly Observed Adverse Events in Controlled Clinical Trials:** Adverse events from Table 4 occurring in at least 5% of patients treated with the sustained-release formulation of bupropion and at a rate at least twice the placebo rate are listed below for the 300- and 400-mg/day dose groups.

**300 mg/day of the Sustained-Release Formulation:** Anorexia, dry mouth, rash, sweating, tinnitus, and tremor.

***400 mg/day of the Sustained-Release Formulation:*** Abdominal pain, agitation, anxiety, dizziness, dry mouth, insomnia, myalgia, nausea, palpitation, pharyngitis, sweating, tinnitus, and urinary frequency.

**Other Events Observed During the Clinical Development and Postmarketing Experience of Bupropion:** In addition to the adverse events noted above, the following events have been reported in clinical trials and postmarketing experience with the sustained-release formulation of bupropion in depressed patients and in nondepressed smokers, as well as in clinical trials and postmarketing clinical experience with the immediate-release formulation of bupropion.

Adverse events for which frequencies are provided below occurred in clinical trials with the sustained-release formulation of bupropion. The frequencies represent the proportion of patients who experienced a treatment-emergent adverse event on at least one occasion in placebo-controlled studies for depression (n = 987) or smoking cessation (n = 1,013), or patients who experienced an adverse event requiring discontinuation of treatment in an open-label surveillance study with the sustained-release formulation of bupropion (n = 3,100). All treatment-emergent adverse events are included except those listed in Tables 1 through 4, those events listed in other safety-related sections, those adverse events subsumed under COSTART terms that are either overly general or excessively specific so as to be uninformative, those events not reasonably associated with the use of the drug, and those events that were not serious and occurred in fewer than 2 patients. Events of major clinical importance are described in the WARNINGS and PRECAUTIONS sections of the labeling.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions of frequency: Frequent adverse events are defined as those occurring in at least 1/100 patients. Infrequent adverse events are those occurring in 1/100 to 1/1,000 patients, while rare events are those occurring in less than 1/1,000 patients.

Adverse events for which frequencies are not provided occurred in clinical trials or postmarketing experience with bupropion. Only those adverse events not previously listed for sustained-release bupropion are included. The extent to which these events may be associated with WELLBUTRIN XL is unknown.

***Body (General):*** Infrequent were chills, facial edema, musculoskeletal chest pain, and photosensitivity. Rare was malaise. Also observed were arthralgia, myalgia, and fever with rash and other symptoms suggestive of delayed hypersensitivity. These symptoms may resemble serum sickness (see PRECAUTIONS).

***Cardiovascular:*** Infrequent were postural hypotension, stroke, tachycardia, and vasodilation. Rare was syncope. Also observed were complete atrioventricular block, extrasystoles, hypotension, hypertension (in some cases severe, see PRECAUTIONS), myocardial infarction, phlebitis, and pulmonary embolism.

***Digestive:*** Infrequent were abnormal liver function, bruxism, gastric reflux, gingivitis, glossitis, increased salivation, jaundice, mouth ulcers, stomatitis, and thirst. Rare was edema of

20

tongue. Also observed were colitis, esophagitis, gastrointestinal hemorrhage, gum hemorrhage, hepatitis, intestinal perforation, liver damage, pancreatitis, and stomach ulcer.

**Endocrine:** Also observed were hyperglycemia, hypoglycemia, and syndrome of inappropriate antidiuretic hormone.

**Hemic and Lymphatic:** Infrequent was ecchymosis. Also observed were anemia, leukocytosis, leukopenia, lymphadenopathy, pancytopenia, and thrombocytopenia. Altered PT and/or INR, infrequently associated with hemorrhagic or thrombotic complications, were observed when bupropion was coadministered with warfarin.

**Metabolic and Nutritional:** Infrequent were edema and peripheral edema. Also observed was glycosuria.

**Musculoskeletal:** Infrequent were leg cramps. Also observed were muscle rigidity/fever/rhabdomyolysis and muscle weakness.

**Nervous System:** Infrequent were abnormal coordination, decreased libido, depersonalization, dysphoria, emotional lability, hostility, hyperkinesia, hypertonia, hypesthesia, suicidal ideation, and vertigo. Rare were amnesia, ataxia, derealization, and hypomania. Also observed were abnormal electroencephalogram (EEG), aggression, akinesia, aphasia, coma, delirium, delusions, dysarthria, dyskinesia, dystonia, euphoria, extrapyramidal syndrome, hallucinations, hypokinesia, increased libido, manic reaction, neuralgia, neuropathy, paranoid ideation, restlessness, and unmasking tardive dyskinesia.

**Respiratory:** Rare was bronchospasm. Also observed was pneumonia.

**Skin:** Rare was maculopapular rash. Also observed were alopecia, angioedema, exfoliative dermatitis, and hirsutism.

**Special Senses:** Infrequent were accommodation abnormality and dry eye. Also observed were deafness, diplopia, and mydriasis.

**Urogenital:** Infrequent were impotence, polyuria, and prostate disorder. Also observed were abnormal ejaculation, cystitis, dyspareunia, dysuria, gynecomastia, menopause, painful erection, salpingitis, urinary incontinence, urinary retention, and vaginitis.

## DRUG ABUSE AND DEPENDENCE

**Controlled Substance Class:** Bupropion is not a controlled substance.

**Humans:** Controlled clinical studies of bupropion (immediate-release formulation) conducted in normal volunteers, in subjects with a history of multiple drug abuse, and in depressed patients showed some increase in motor activity and agitation/excitement.

In a population of individuals experienced with drugs of abuse, a single dose of 400 mg of bupropion produced mild amphetamine-like activity as compared to placebo on the Morphine-Benzedrine Subscale of the Addiction Research Center Inventories (ARCI), and a score intermediate between placebo and amphetamine on the Liking Scale of the ARCI. These scales measure general feelings of euphoria and drug desirability.

Findings in clinical trials, however, are not known to reliably predict the abuse potential of drugs. Nonetheless, evidence from single-dose studies does suggest that the recommended daily

dosage of bupropion when administered in divided doses is not likely to be especially reinforcing to amphetamine or stimulant abusers. However, higher doses that could not be tested because of the risk of seizure might be modestly attractive to those who abuse stimulant drugs.

**Animals:** Studies in rodents and primates have shown that bupropion exhibits some pharmacologic actions common to psychostimulants. In rodents, it has been shown to increase locomotor activity, elicit a mild stereotyped behavioral response, and increase rates of responding in several schedule-controlled behavior paradigms. In primate models to assess the positive reinforcing effects of psychoactive drugs, bupropion was self-administered intravenously. In rats, bupropion produced amphetamine-like and cocaine-like discriminative stimulus effects in drug discrimination paradigms used to characterize the subjective effects of psychoactive drugs.

## OVERDOSAGE

**Human Overdose Experience:** Overdoses of up to 30 g or more of bupropion have been reported. Seizure was reported in approximately one third of all cases. Other serious reactions reported with overdoses of bupropion alone included hallucinations, loss of consciousness, sinus tachycardia, and ECG changes such as conduction disturbances or arrhythmias. Fever, muscle rigidity, rhabdomyolysis, hypotension, stupor, coma, and respiratory failure have been reported mainly when bupropion was part of multiple drug overdoses.

Although most patients recovered without sequelae, deaths associated with overdoses of bupropion alone have been reported in patients ingesting large doses of the drug. Multiple uncontrolled seizures, bradycardia, cardiac failure, and cardiac arrest prior to death were reported in these patients.

**Overdosage Management:** Ensure an adequate airway, oxygenation, and ventilation. Monitor cardiac rhythm and vital signs. EEG monitoring is also recommended for the first 48 hours post-ingestion. General supportive and symptomatic measures are also recommended. Induction of emesis is not recommended. Gastric lavage with a large-bore orogastric tube with appropriate airway protection, if needed, may be indicated if performed soon after ingestion or in symptomatic patients.

Activated charcoal should be administered. There is no experience with the use of forced diuresis, dialysis, hemoperfusion, or exchange transfusion in the management of bupropion overdoses. No specific antidotes for bupropion are known.

Due to the dose-related risk of seizures with WELLBUTRIN XL, hospitalization following suspected overdose should be considered. Based on studies in animals, it is recommended that seizures be treated with intravenous benzodiazepine administration and other supportive measures, as appropriate.

In managing overdosage, consider the possibility of multiple drug involvement. The physician should consider contacting a poison control center for additional information on the treatment of any overdose. Telephone numbers for certified poison control centers are listed in the *Physicians' Desk Reference* (PDR).

## DOSAGE AND ADMINISTRATION

**General Dosing Considerations:** It is particularly important to administer WELLBUTRIN XL Tablets in a manner most likely to minimize the risk of seizure (see WARNINGS). Gradual escalation in dosage is also important if agitation, motor restlessness, and insomnia, often seen during the initial days of treatment, are to be minimized. If necessary, these effects may be managed by temporary reduction of dose or the short-term administration of an intermediate to long-acting sedative hypnotic. A sedative hypnotic usually is not required beyond the first week of treatment. Insomnia may also be minimized by avoiding bedtime doses. If distressing, untoward effects supervene, dose escalation should be stopped. WELLBUTRIN XL should be swallowed whole and not crushed, divided, or chewed. WELLBUTRIN XL may be taken without regard to meals.

**Initial Treatment:** The usual adult target dose for WELLBUTRIN XL Tablets is 300 mg/day, given once daily in the morning. Dosing with WELLBUTRIN XL Tablets should begin at 150 mg/day given as a single daily dose in the morning. If the 150-mg initial dose is adequately tolerated, an increase to the 300-mg/day target dose, given as once daily, may be made as early as day 4 of dosing. There should be an interval of at least 24 hours between successive doses.

**Increasing the Dosage Above 300 mg/day:** As with other antidepressants, the full antidepressant effect of WELLBUTRIN XL Tablets may not be evident until 4 weeks of treatment or longer. An increase in dosage to the maximum of 450 mg/day, given as a single dose, may be considered for patients in whom no clinical improvement is noted after several weeks of treatment at 300 mg/day.

**Switching Patients from WELLBUTRIN Tablets or from WELLBUTRIN SR Sustained-Release Tablets:** When switching patients from WELLBUTRIN Tablets to WELLBUTRIN XL or from WELLBUTRIN SR Sustained-Release Tablets to WELLBUTRIN XL, give the same total daily dose when possible. Patients who are currently being treated with WELLBUTRIN Tablets at 300 mg/day (for example, 100 mg 3 times a day) may be switched to WELLBUTRIN XL 300 mg once daily. Patients who are currently being treated with WELLBUTRIN SR Sustained-Release Tablets at 300 mg/day (for example, 150 mg twice daily) may be switched to WELLBUTRIN XL 300 mg once daily.

**Maintenance Treatment:** It is generally agreed that acute episodes of depression require several months or longer of sustained pharmacological therapy beyond response to the acute episode. It is unknown whether or not the dose of WELLBUTRIN XL needed for maintenance treatment is identical to the dose needed to achieve an initial response. Patients should be periodically reassessed to determine the need for maintenance treatment and the appropriate dose for such treatment.

**Dosage Adjustment for Patients With Impaired Hepatic Function:** WELLBUTRIN XL should be used with extreme caution in patients with severe hepatic cirrhosis. The dose should not exceed 150 mg every other day in these patients. WELLBUTRIN XL should be used with caution in patients with hepatic impairment (including mild to moderate hepatic cirrhosis) and a reduced frequency and/or dose should be considered in

23

patients with mild to moderate hepatic cirrhosis (see CLINICAL PHARMACOLOGY, WARNINGS, and PRECAUTIONS).

**Dosage Adjustment for Patients With Impaired Renal Function:** WELLBUTRIN XL should be used with caution in patients with renal impairment and a reduced frequency and/or dose should be considered (see CLINICAL PHARMACOLOGY and PRECAUTIONS).

## HOW SUPPLIED

WELLBUTRIN XL Extended-Release Tablets, 150 mg of bupropion hydrochloride, are creamy-white to pale yellow, round, tablets printed with "WELLBUTRIN XL 150" in bottles of 30 tablets (NDC 0173-0730-01) and 90 (NDC 0173-0730-02) tablets.

WELLBUTRIN XL Extended-Release Tablets, 300 mg of bupropion hydrochloride, are creamy-white to pale yellow, round, tablets printed with "WELLBUTRIN XL 300" in bottles of 30  (NDC 0173-0731-01).

**Store at 25°C (77°F); excursions permitted to 15-30°C (59-86°F) [see USP Controlled Room Temperature].**

**Medication Guide**
**WELLBUTRIN XL®(WELL byu-trin)**
**(bupropion hydrochloride extended-release tablets)**
**About Using Antidepressants in Children and Teenagers**

**What is the most important information I should know if my child is being prescribed an antidepressant?**

Parents or guardians need to think about 4 important things when their child is prescribed an antidepressant:
1. There is a risk of suicidal thoughts or actions
2. How to try to prevent suicidal thoughts or actions in your child
3. You should watch for certain signs if your child is taking an antidepressant
4. There are benefits and risks when using antidepressants

**1.  There is a Risk of Suicidal Thoughts or Actions**

Children and teenagers sometimes think about suicide, and many report trying to kill themselves.

Antidepressants increase suicidal thoughts and actions in some children and teenagers. But suicidal thoughts and actions can also be caused by depression, a serious medical condition that is commonly treated with antidepressants. Thinking about killing yourself or trying to kill yourself is called *suicidality or being suicidal*.

A large study combined the results of 24 different studies of children and teenagers with depression or other illnesses. In these studies, patients took either a placebo (sugar pill) or an antidepressant for 1 to 4 months. **No one committed suicide in these studies**, but some patients became suicidal. On sugar pills, 2 out of every 100 became suicidal. On the antidepressants, 4 out of every 100 patients became suicidal.

For some children and teenagers, the risks of suicidal actions may be especially high. These include patients with

- Bipolar illness (sometimes called manic-depressive illness)
- A family history of bipolar illness
- A personal or family history of attempting suicide

If any of these are present, make sure you tell your healthcare provider before your child takes an antidepressant.

## 2. How to Try to Prevent Suicidal Thoughts and Actions

To try to prevent suicidal thoughts and actions in your child, pay close attention to changes in her or his moods or actions, especially if the changes occur suddenly. Other important people in your child's life can help by paying attention as well (e.g., your child, brothers and sisters, teachers, and other important people). The changes to look out for are listed in Section 3, on what to watch for.

Whenever an antidepressant is started or its dose is changed, pay close attention to your child. After starting an antidepressant, your child should generally see his or her healthcare provider:

- Once a week for the first 4 weeks
- Every 2 weeks for the next 4 weeks
- After taking the antidepressant for 12 weeks
- After 12 weeks, follow your healthcare provider's advice about how often to come back
- More often if problems or questions arise (see Section 3)

You should call your child's healthcare provider between visits if needed.

## 3. You Should Watch For Certain Signs if Your Child is Taking an Antidepressant

Contact your child's healthcare provider *right away* if your child exhibits any of the following signs for the first time, or they seem worse, or worry you, your child, or your child's teacher:

- Thoughts about suicide or dying
- Attempts to commit suicide
- New or worse depression
- New or worse anxiety

- Feeling very agitated or restless
- Panic attacks
- Difficulty sleeping (insomnia)
- New or worse irritability
- Acting aggressive, being angry, or violent
- Acting on dangerous impulses
- An extreme increase in activity and talking
- Other unusual changes in behavior or mood

Never let your child stop taking an antidepressant without first talking to his or her healthcare provider. Stopping an antidepressant suddenly can cause other symptoms.

**4. There are Benefits and Risks When Using Antidepressants**

Antidepressants are used to treat depression and other illnesses. Depression and other illnesses can lead to suicide. In some children and teenagers, treatment with an antidepressant increases suicidal thinking or actions. It is important to discuss all the risks of treating depression and also the risks of not treating it. You and your child should discuss all treatment choices with your healthcare provider, not just the use of antidepressants.

Other side effects can occur with antidepressants (see section below).

Of all antidepressants, only fluoxetine (Prozac®)* has been FDA approved to treat pediatric depression.

For obsessive compulsive disorder in children and teenagers, FDA has approved only fluoxetine (Prozac®)*, sertraline (Zoloft®)*, fluvoxamine, and clomipramine (Anafranil®)*.

Your healthcare provider may suggest other antidepressants based on the past experience of your child or other family members.

**Is this all I need to know if my child is being prescribed an antidepressant?**

No. This is a warning about the risk of suicidality. Other side effects can occur with antidepressants. Be sure to ask your healthcare provider to explain all the side effects of the particular drug he or she is prescribing. Also ask about drugs to avoid when taking an antidepressant. Ask your healthcare provider or pharmacist where to find more information.

*The following are registered trademarks of their respective manufacturers: Prozac®/Eli Lilly and Company; Zoloft®/Pfizer Pharmaceuticals; Anafranil®/Mallinckrodt Inc.

This Medication Guide has been approved by the U.S. Food and Drug Administration for all antidepressants.

January 2005                                              MG-WX:1



Manufactured by:
Biovail Corporation
Mississauga, ON L5N 8M5, Canada for
GlaxoSmithKline
Research Triangle Park, NC 27709

©2005, GlaxoSmithKline. All rights reserved.

November 2005            RL-2228

---

**PHARMACIST--DETACH HERE AND GIVE LEAFLET TO PATIENT. ALSO PROVIDE AN APPROVED MEDICATION GUIDE ABOUT USING ANTIDEPRESSANTS IN CHILDREN AND TEENAGERS.**

---

**Patient Information**
**WELLBUTRIN XL® (WELL byu-trin)**
**(bupropion hydrochloride extended-release tablets)**

**Read the Patient Information that comes with WELLBUTRIN XL before you start taking WELLBUTRIN XL and each time you get a refill.** There may be new information. This leaflet does not take the place of talking with your doctor about your medical condition or your treatment.

**What is the most important information I should know about WELLBUTRIN XL?**
**There is a chance of having a seizure (convulsion, fit) with WELLBUTRIN XL, especially in people:**
- with certain medical problems.
- who take certain medicines.

The chance of having seizures increases with higher doses of WELLBUTRIN XL. For more information, see the sections "Who should not take WELLBUTRIN XL?" and "What should I

27

tell my doctor before using WELLBUTRIN XL?" Tell your doctor about all of your medical conditions and all the medicines you take. **Do not take any other medicines while you are using WELLBUTRIN XL unless your doctor has said it is okay to take them.**

**If you have a seizure while taking WELLBUTRIN XL, stop taking the tablets and call your doctor right away.** Do not take WELLBUTRIN XL again if you have a seizure.

### What is important information I should know and share with my family about taking antidepressants?

Patients and their families should watch out for worsening depression or thoughts of suicide. Also watch out for sudden or severe changes in feelings such as feeling anxious, agitated, panicky, irritable, hostile, aggressive, impulsive, severely restless, overly excited and hyperactive, not being able to sleep, or other unusual changes in behavior. If this happens, especially at the beginning of antidepressant treatment or after a change in dose, call your doctor. A patient Medication Guide will be provided to you with each prescription of WELLBUTRIN XL entitled "About Using Antidepressants in Children and Teenagers." WELLBUTRIN XL is not approved for use in children and teenagers.

### What is WELLBUTRIN XL?

WELLBUTRIN XL is a prescription medicine used to treat adults with a certain type of depression called major depressive disorder.

### Who should not take WELLBUTRIN XL?
**Do not take WELLBUTRIN XL if you:**
- have or had a seizure disorder or epilepsy.
- **are taking ZYBAN® (used to help people stop smoking) or any other medicines that contain bupropion hydrochloride, such as WELLBUTRIN® Tablets or WELLBUTRIN SR® Sustained-Release Tablets.** Bupropion is the same active ingredient that is in WELLBUTRIN XL.
- drink a lot of alcohol and abruptly stop drinking, or use medicines called sedatives (these make you sleepy) or benzodiazepines and you stop using them all of a sudden.
- have taken within the last 14 days medicine for depression called a monoamine oxidase inhibitor (MAOI), such as NARDIL®*(phenelzine sulfate), PARNATE®(tranylcypromine sulfate), or MARPLAN®*(isocarboxazid).
- have or had an eating disorder such as anorexia nervosa or bulimia.
- are allergic to the active ingredient in WELLBUTRIN XL, bupropion, or to any of the inactive ingredients. See the end of this leaflet for a complete list of ingredients in WELLBUTRIN XL.

### What should I tell my doctor before using WELLBUTRIN XL?
- Tell your doctor about your medical conditions. Tell your doctor if you:

28

- **are pregnant or plan to become pregnant.** It is not known if WELLBUTRIN XL can harm your unborn baby. If you can use WELLBUTRIN XL while you are pregnant, talk to your doctor about how you can be on the Bupropion Pregnancy Registry.
- **are breastfeeding.** WELLBUTRIN XL passes through your milk. It is not known if WELLBUTRIN XL can harm your baby.
- **have liver problems,** especially cirrhosis of the liver.
- have kidney problems.
- have an eating disorder such as anorexia nervosa or bulimia.
- have had a head injury.
- have had a seizure (convulsion, fit).
- have a tumor in your nervous system (brain or spine).
- have had a heart attack, heart problems, or high blood pressure.
- are a diabetic taking insulin or other medicines to control your blood sugar.
- drink a lot of alcohol.
- abuse prescription medicines or street drugs.

- **Tell your doctor about all the medicines you take,** including prescription and non-prescription medicines, vitamins and herbal supplements. Many medicines increase your chances of having seizures or other serious side effects if you take them while you are using WELLBUTRIN XL.

WELLBUTRIN XL has not been studied in children under the age of 18 years.

**How should I take WELLBUTRIN XL?**
- Take WELLBUTRIN XL exactly as prescribed by your doctor.
- **Do not chew, cut, or crush WELLBUTRIN XL tablets.** You must swallow the tablets whole. **Tell your doctor if you cannot swallow medicine tablets.**
- Take WELLBUTRIN XL at the same time each day.
- Take your doses of WELLBUTRIN XL at least 24 hours apart.
- You may take WELLBUTRIN XL with or without food.
- If you miss a dose, do not take an extra tablet to make up for the dose you forgot. Wait and take your next tablet at the regular time. **This is very important.** Too much WELLBUTRIN XL can increase your chance of having a seizure.
- If you take too much WELLBUTRIN XL, or overdose, call your local emergency room or poison control center right away.
- The WELLBUTRIN XL tablet is covered by a shell that slowly releases the medicine inside your body. You may notice something in your stool that looks like a tablet. This is normal. This is the empty shell passing from your body.
- **Do not take any other medicines while using WELLBUTRIN XL unless your doctor has told you it is okay.**

- It may take several weeks for you to feel that WELLBUTRIN XL is working. Once you feel better, it is important to keep taking WELLBUTRIN XL exactly as directed by your doctor. Call your doctor if you do not feel WELLBUTRIN XL is working for you.
- Do not change your dose or stop taking WELLBUTRIN XL without talking with your doctor first.

**What should I avoid while taking WELLBUTRIN XL?**
- Do not drink a lot of alcohol while taking WELLBUTRIN XL. If you usually drink a lot of alcohol, talk with your doctor before suddenly stopping. If you suddenly stop drinking alcohol, you may increase your chance of having seizures.
- Do not drive a car or use heavy machinery until you know how WELLBUTRIN XL affects you. WELLBUTRIN XL can impair your ability to perform these tasks.
-
- **What are possible side effects of WELLBUTRIN XL?**
- **Seizures.** Some patients get seizures while taking WELLBUTRIN XL. **If you have a seizure while taking WELLBUTRIN XL, stop taking the tablets and call your doctor right away.** Do not take WELLBUTRIN XL again if you have a seizure.
- **Hypertension (high blood pressure).** Some patients get high blood pressure, sometimes severe, while taking WELLBUTRIN XL. The chance of high blood pressure may be increased if you also use nicotine replacement therapy (for example, a nicotine patch) to help you stop smoking.
- **Severe allergic reactions. Stop taking WELLBUTRIN XL and call your doctor right away** if you get a rash, itching, hives, fever, swollen lymph glands, painful sores in the mouth or around the eyes, swelling of the lips or tongue, chest pain, or have trouble breathing. These could be signs of a serious allergic reaction.
- **Unusual thoughts or behaviors.** Some patients have unusual thoughts or behaviors while taking WELLBUTRIN XL, including delusions (believe you are someone else), hallucinations (seeing or hearing things that are not there), paranoia (feeling that people are against you), or feeling confused. If this happens to you, call your doctor.

The most common side effects of WELLBUTRIN XL are weight loss, loss of appetite, dry mouth, skin rash, sweating, ringing in the ears, shakiness, stomach pain, agitation, anxiety, dizziness, trouble sleeping, muscle pain, nausea, fast heartbeat, sore throat, and urinating more often.

If you have nausea, take your medicine with food. If you have trouble sleeping, do not take your medicine too close to bedtime.

Tell your doctor right away about any side effects that bother you.

30

These are not all the side effects of WELLBUTRIN XL. For a complete list, ask your doctor or pharmacist.

**How should I store WELLBUTRIN XL?**
- Store WELLBUTRIN XL at room temperature. Store out of direct sunlight. Keep WELLBUTRIN XL in its tightly closed bottle.
- WELLBUTRIN XL tablets may have an odor.

**General Information about WELLBUTRIN XL.**
- Medicines are sometimes prescribed for conditions that are not mentioned in patient information leaflets. Do not use WELLBUTRIN XL for a condition for which it was not prescribed. Do not give WELLBUTRIN XL to other people, even if they have the same symptoms you have. It may harm them. Keep WELLBUTRIN XL out of the reach of children.

This leaflet summarizes important information about WELLBUTRIN XL. For more information, talk with your doctor. You can ask your doctor or pharmacist for information about WELLBUTRIN XL that is written for health professionals or you can visit www.wellbutrin-xl.com or call toll-free 888-825-5249.

**What are the ingredients in WELLBUTRIN XL?**
Active ingredient: bupropion hydrochloride.

Inactive ingredients: ethylcellulose aqueous dispersion (NF), glyceryl behenate, methacrylic acid copolymer dispersion (NF), polyvinyl alcohol, polyethylene glycol, povidone, silicon dioxide, and triethyl citrate. The tablets are printed with edible black ink.

*The following are registered trademarks of their respective manufacturers: Nardil®/Warner Lambert Company; Marplan®/Oxford Pharmaceutical Services, Inc.

R<sub>X</sub> only



Manufactured by:
Biovail Corporation
Mississauga, ON L5N 8M5, Canada for
GlaxoSmithKline
Research Triangle Park, NC 27709

31

©2005, GlaxoSmithKline. All rights reserved.

November 2005                    RL-2228

The study listed may include approved and non-approved uses, formulations or treatment regimens. The results reported in any single study may not reflect the overall results obtained on studies of a product. Before prescribing any product mentioned in this Register, healthcare professionals should consult prescribing information for the product approved in their country.

| |
|---|
| **Study No:** AK1BIOVAIL2548 |
| **Title :** A two-way, crossover, open-label, single dose, food-effect, comparative bioavailability study of bupropion HCl extended release 300mg tablets in normal healthy non-smoking male and female subjects |
| **Rationale:** In a general trend to improve treatment convenience and patient compliance, many products are being developed for once-daily administration. Bupropion hydrochloride extended release tablets have been formulated to provide a product which is bioequivalent to bupropion immediate release and, by inference, to other approved formulations of the compound. This study sought to evaluate the effect of food on the performance of the once daily product. |
| **Phase:** I |
| **Study Period:** 26 January 2002 – 15 February 2002 |
| **Study Design:** Two-period, randomized, single-dose, open-label, two-way crossover study |
| **Centres:** One centre in Canada |
| **Indication:** None |
| **Treatment:** Screening was conducted on an outpatient basis, subjects who met the inclusion/exclusion criteria were randomized according to a randomization schedule to one of two treatment sequences (AB or BA), where A and B are defined below. Subjects attended the study clinic the evening before dosing and received one of the following treatments at 0.0 h on Day 1 after an overnight fast of at least 10 h. <br> Treatment A: one bupropion HCl extended release 300 mg tablet with 240 mL water following an overnight fast of at least 10 h. <br> Treatment B: one bupropion HCl extended release 300 mg tablet with 240 mL water within 5 minutes following the complete ingestion of a high-fat content breakfast. <br> Blood samples were collected from each of the subjects for 120 h following the single dose. <br> After a 2-week washout period subjects underwent a second treatment sequence with the alternate treatment regimen. |
| **Objectives:** The objective of this study was to evaluate the effect of food on the rate and extent of absorption of a once daily formulation of bupropion hydrochloride (HCl) extended release tablets (300 mg) under single-dose conditions. |
| **Statistical Methods:** Information on adverse events (AEs) reported by subjects was listed and summarized. <br> For pharmacokinetic data an analysis of variance (ANOVA) was performed on log-transformed AUClast, AUCinf, and Cmax. The ANOVA used a mixed-effects model with subject (sequence) as a random effect. The fixed effects were sequence, period, and treatment. To evaluate the effect of food on the pharmacokinetics of newly formulated once daily bupropion HCl 300mg extended release tablets, the 90% confidence interval for the ratio of means for the test treatment (bupropion HCl 300 mg extended release tablet in the fed state) to the reference treatment (bupropion HCl 300 mg extended release tablet in the fasted state) for AUClast, AUCinf, and Cmax was calculated. For lack of food effect to be concluded, the 90% confidence intervals (CIs) for the ratio of means for AUClast, AUCinf, and Cmax were to fall within 0.80 to 1.25. <br> Descriptive statistics were calculated for all pharmacokinetic parameters including AUClast, AUCinf, Cmax, tmax, t½, MRT, and M/P ratios, Clast, and tlast. <br> With: <br> AUClast: area under the plasma concentration-time curve from time zero to the time of the last quantifiable concentration, <br> AUCinf: area under the plasma concentration-time curve from time zero extrapolated to the infinite time, <br> Cmax: maximum observed plasma concentration, <br> tmax: time to reach Cmax, <br> t½: apparent terminal half-life, <br> MRT: mean residence time, <br> M/P ratio: metabolite to parent ratio based on AUCinf <br> Clast: last observed plasma concentration <br> tlast: time of the last observed plasma concentration. |
| **Study Population:** Normal, healthy, non-smoking males and females with a minimum age of 18 years with a body weight not more than ±15% of the ideal weight for the subject's height and frame. Subjects were also required not to |

have any known history of hypersensitivity to bupropion hydrochloride and/or related drugs any clinical laboratory or concomitant medical conditions or findings on examination, history of alcohol or drug abuse or any psychiatric or psychological disease, history of serious head injuries, seizures, any eating disorders such as bulimia or anorexia nervosa, frequent headaches or migraines.

**Number of Subjects:**

| Number of Subjects: | |
|---|---|
| Planned Total N | 36 |
| Dosed N per Treatment | 34 |
| Completed n (%) | 32 (89) |
| Total Number Subjects Withdrawn N (%) | 4 (11) |
| Withdrawn due to Adverse Events n (%) | 2 (6) |
| Withdrawn due to Lack of Efficacy n (%) | 0 |
| Withdrawn for Other Reasons n (%) | 2 (6) |
| **Demographics** | |
| N (ITT) | 36 |
| Females: Males | 10 ): 26 |
| Mean Age in Years (SD) | 31.4 (6.8) |
| Mean Weight in Kg (SD) | 75.0 (9.1) |
| White n (%) | 26 (72) |

**Pharmacokinetics Endpoints:** Blood samples for PK assessment were collected for 120h after dosing. The pharmacokinetic parameters of bupropion were similar irrespective of the presence or absence of food. The pharmacokinetic parameters of the metabolites of bupropion and the pharmacological activity-weighted composite (PAWC) were also similar regardless of food intake.
The results of the ANOVA to assess food effect are shown in the table below.

| Bupropion Food Effects Analysis | | |
|---|---|---|
| Pharmacokinetic Parameter | Geometric Least Squares Mean Ratio (Fed/Fasted) | 90% Confidence Interval |
| AUClast | 1.10 | 1.04, 1.17 |
| AUCinf | 1.10 | 1.04, 1.16 |
| Cmax | 0.92 | 0.84, 1.01 |
| **Hydroxybupropion Food Effects Analysis** | | |
| AUClast | 1.04 | 0.96, 1.12 |
| AUCinf | 1.05 | 0.97, 1.13 |
| Cmax | 1.10 | 1.03, 1.17 |
| **Threohydrobupropion Food Effects Analysis** | | |
| AUClast | 1.12 | 1.04, 1.21 |
| AUCinf | 1.15 | 1.04, 1.27 |
| Cmax | 1.18 | 1.11, 1.25 |
| **Erythrohydrobupropion Food Effects Analysis** | | |
| AUClast | 1.13 | 1.04, 1.24 |
| AUCinf | 1.15 | 1.05, 1.27 |
| Cmax | 1.18 | 1.10, 1.26 |

The AUClast, AUCinf, and Cmax ratios for bupropion and hydroxybupropion, together with AUClast and Cmax for threohydrobupropion and AUClast for erythrohydrobupropion were bioequivalent (0.8 – 1.25) in the presence and absence of food. The upper bound of the CI for AUCinf for threohydrobupropion (1.26) and for AUCinf and Cmax for erythrohydrobupropion (1.27 and 1.26, respectively) lay just outside up the upper bioequivalence bound of 1.25, but this was not considered clinically significant as these were marginal, particularly in the case of erythrohydrobupropion, which has only a minor contribution to the overall pharmacological activity due to its low potency.
In light of the multiplicity of parameters used in the assessment of bioequivalence for extended release bupropion tablets, the PAWC of bupropion and its metabolites, was recommended by the US Food and Drug Administration as an additional measure of bioequivalence. This parameter was used historically in the evaluation of the approval of bupropion SR since over 90% of systemic exposure to the drug involves metabolites rather than parent drug and was noted by the FDA as potentially important in evaluating the bioequivalence of bupropion. The results of bioequivalence analysis on this parameter are shown in the table below.

Pharmacological Activity-Weighted Composite Bioequivalence Analysis

| Pharmacokinetic Parameter | Geometric Least Squares Mean Ratio (Fed/Fasted) | 90% Confidence Interval |
|---|---|---|
| AUClast | 1.05 | 0.98, 1.13 |
| AUCinf | 1.06 | 0.99, 1.14 |
| Cmax | 1.02 | 0.97, 1.08 |

The pharmacological activity-weighted composite of bupropion and it metabolites demonstrated that confidence intervals for AUClast, AUCinf and Cmax were within the accepted bioequivalence criteria, thereby demonstrating the absence of a food effect.

**Safety results:** Information on AEs was collected from pre-dose on the day of administration of investigational product; all AEs were followed until resolution, until the condition stabilized, until the event was otherwise explained or the subject was lost to follow-up.

| Adverse Events: | Group A | Group B |
|---|---|---|
| N (ITT) | 34 | 34 |
| No. subjects with AEs n (%) | 11 (32%) | 7 (21%) |
| Most Frequent AEs | | |
| Hypocalcemia | 3 (9%) | 2 (6%) |
| Headache | 3 (9%) | 1 (3%) |
| Serious Adverse Events: | 0 | 0 |

| Publications: |
|---|
| No Publication |

Date Updated: 02-Sept-2005

# GPhA Proposed Pathway for Quality by Design Dissolution Testing and Setting of Specifications for Generic Drugs

## Comments for the Advisory Committee for Pharmaceutical Science
### October 2005

### Introduction

Over the past few years FDA has initiated a number of challenges to the pharmaceutical industry as well as its own scientific staff to move to a quality by design approach for product development and evaluation. The focus of this quality by design approach is based on developing a keen understanding of the formulation, critical manufacturing parameters, rational tests and specifications, among other attributes. Therefore, it is recognized that product design ultimately dictates product specifications. The intent of this document is to provide a proposed rational pathway for developing new dissolution methods for solid oral dosage forms. It does not cover oral suspensions or non-oral dosage forms.

As a result of this initiative, dissolution has become one of the critical tests that require reexamination. Establishing acceptable regulatory dissolution methods and specifications is an area that is problematic for the generic industry. Currently, generic applicants are required to utilize the compendial dissolution method when it exists. For non-USP products, generic applicants are frequently required to use an "OGD" (Office of Generic Drugs) method and associated specifications. Whether the method is a USP or OGD method, it may be ill suited for the particular formulation.

Generic products are often manufactured using excipients that are different than the brand counterpart. Manufacturing processes may also differ significantly. As such, dissolution methods and specifications that are appropriate for the brand product may not be suitable for the generic product and yet the two products are bioequivalent. This has led to significant problems for the generic industry since tests and specifications have been unilaterally imposed in cases for which those tests and specifications are not appropriate. Therefore, moving to a regulatory process that encourages quality by design principles and dissolution methods and specifications that are based on product relevant characteristics is supported by the members of the Generic Pharmaceutical Association.

Please note that these comments are intended to stimulate discussion and consideration by the Food and Drug Administration Advisory Committee for Pharmaceutical Science. Revision and modification to these recommendations may be needed as the dialogue on this topic proceeds.

**Rationale for Change**

In most cases, dissolution testing is used as a quality control tool to monitor batch-to-batch consistency of the drug release from a product. There are many factors, however, that may affect dissolution tests and results. Each of these factors can lead to variability in test procedures and outcomes leaving questions about a product's quality attributes.

Much attention has been paid to the inherent variability associated with dissolution methodology. During the May 2005 meeting of the Advisory Committee for Pharmaceutical Science, Lucinda Buhse, Ph.D., outlined the variability commonly associated with current dissolution test methods. Examples of such areas of variability include instrumentation, media, degassing, method for sample withdrawal, analysis as well as others. As a result of these variable parameters, the variability in dissolution results may be due to methodology instead of drug product variability.

Additionally, as noted in the introduction, USP or OGD dissolution requirements oftentimes are not appropriate for a particular formulation. As a result, firms may be forced to destroy or recall batches that fail to meet dissolution specifications even though the batch remains bioequivalent and meets all other regulatory standards approved in the ANDA. Therefore, the current system follows a one-size fits all approach. Using scientific evidence based on a drug product to establish methods and set specifications will allow adoption of appropriate dissolution criteria.

One must also consider the result of inherent variability that can be experienced from current methods or uses of methods that are not appropriate for a particular formulation may lead to over-discriminating or non-discriminating dissolution tests and specifications. Therefore, current approaches for dissolution testing clearly have known limitations. Many of these limitations can be addressed by applying more evolved scientific principles inherent with quality by design principles.

Developing a process that considers the critical attributes of each product at the drug development stage and establishing dissolution methodologies and specifications to monitor those attributes is consistent with FDA's desire to have a better mechanistic understanding of the drug product and develop a quality by design approach to dissolution. This approach should also allow for substantial use of prior knowledge of excipients and manufacturing processes in addition to the critical product performance characteristics.

Some of the key underpinnings of a science based approach to dissolution are the design or type of the formulation, such as immediate release (IR), enteric coated, delayed-release, etc., and the biopharmaceutics classification system (BCS). Both of these considerations incorporate important, well-grounded concepts, into the decision making process.

## Biopharmaceutics Classification System

While BCS is well established, its principles have not been fully integrated into quality testing schemes. BCS concepts allow a scientifically rational approach to assess whether dissolution testing serves any quality control function at all. For example, for BCS Class I immediate release products, dissolution testing could be unnecessary, thus reducing needless testing and regulatory burden. In other cases, BCS can help determine the proper testing scheme for a product. Therefore, a comprehensive understanding of the critical attributes of a product combined with use of BCS, a change from the current dissolution scheme can be accomplished.

Based on FDA's proposal to move forward with a more scientifically relevant approach for establishing dissolution methods and specifications, GPhA provides specific recommendations in the following section.

## Dissolution Testing

GPhA recognizes the complexity of this issue. There are many product specific issues that must be considered in the drug development phase. However, linking product design to setting of specifications should permit development of the most relevant test to assure product quality. GPhA also acknowledges that there may be cases when USP or OGD tests and specifications are appropriate. In these cases the applicant may choose to provide scientific support for adopting those tests and specifications in order to benefit from the regulatory latitude afforded by taking a scientific approach to establishing acceptance criteria for dissolution

As noted above, GPhA recommends that design or type of the formulation and the BCS classifications serve as key determinants in the decision process for dissolution testing. Embodied within these considerations are the primary factors that influence the rate and extent of drug absorption for immediate-release dosage forms. For generic formulations, the dissolution specifications should be based on the performance of batches of the drug product which have been shown to be bioequivalent to the reference listed drug (RLD). A dissolution specification different from the RLD may be set for a generic product, which is bioequivalent to the RLD reflecting the fact that the dissolution is formulation specific.

For the generic industry, the quality by design approach creates the advantage of using "prior knowledge" that might include the following: (a) *in vivo* and *in vitro* performance of the reference product obtainable from the literature and/or experimental studies by the firm; (b) biopharmaceutic, physico-chemical, formulation and dissolution characteristics of structurally related representatives of the same class of drugs. Many generic firms also have a large portfolio consisting of a wide range of product families. This prior knowledge should be leveraged as a resource to aid in the development and justification of tests and specifications for new products.

**General Principles of Developing a Dissolution Method**

Aspects that may be considered by the firm when developing a suitable dissolution method may include the following:

- The drug is sufficiently stable in the medium/media for the duration and conditions of the dissolution test.

- The drug substance exhibits adequate dynamic solubility in the dissolution medium so as not to unduly limit the dissolution rate under the dissolution test conditions.

- The proposed dissolution medium, volume, and number of dosage units charged into a single dissolution vessel must provide for adequate analytical sensitivity.

- The proposed test or tests should be suitable for all desired strengths of a product.

- The proposed dissolution test must yield a reasonable dissolution rate under reasonable agitation/time conditions.

If, during the development of a dissolution method, a condition is found that does not meet one or more of these requirements, then no further development work should be done on that condition. In other words, a traditional factorial design, in which every possible combination of test conditions is evaluated, is not recommended. For example, if a drug does not exhibit sufficient stability at pH 4.5, then no further work should be done at that pH.

**Development of a Dissolution of Generic Drug Product**

If there is an available OGD/USP method for a particular product, it can be adopted. However, if this method is not available or if a firm decides to develop an internal method, the applicant should provide scientific justification. (Refer to the Attachment 1 for the Decision Tree)

1. Bioequivalence/biowaiver batches should be used as the basis for justification of the dissolution method.
2. Determine whether the product is an immediate release or extended release product.
3. If the product is an immediate release product, the solubility characteristics of the drug substance should be evaluated. A BCS approach might commonly be chosen.
4. If the drug substance is highly soluble, it should be determined if dissolution testing is appropriate. Alternate approaches such as disintegration or other technology should be justified.

5. If the drug substance is not highly soluble then the development approach should be similar to that for an ER product.(ER development follows)
6. The dissolution profiles should be characterized in multiple media and/or hydrodynamic conditions.
7. Scientific justification should be provided for the dissolution method chosen. Any information about the physical and chemical characteristics of the drug substance and drug product may be provided as supportive scientific information. Any additional information about the manufacturing process may be provided to support the choice of dissolution methods.
8. If the available USP/OGD is the most scientifically justified approach the firm should provide information to support this. This evaluation should provide the same benefits to the firm as any scientifically justified method.
9. Specifications should be based upon sound science principles. Alternate approaches where appropriate (i.e. PAT or disintegration) should be justified.

**Setting Acceptance Criteria**

The goal or ultimate specification of a generic drug manufacturer is to market a product which is pharmaceutically equivalent and bioequivalent to the reference listed drug. Tests and specifications are put in place to monitor critical product attributes to ensure future batches are consistently manufactured batch to batch.

As outlined above, dissolution may be used as one of these tests. When this is the case, there is no one-size-fits-all approach to setting dissolution specifications. This process will vary from product to product. Dissolution specifications should be set and justified based upon data obtained by the firm. This can include conventional specifications (Q values) and/or adoption of the OGD or USP method. Alternative specifications can be based on scientific rationale taking into account the data generated by the firm. Novel approaches may be developed internally or derived from the scientific literature. Critical performance attributes, implication of in vivo performance, and variability of the biobatch should be considered regardless of the approach. In all cases, the firm will detail their justification in the development report.

One example of a new approach to setting dissolution specifications was put forth by Hauck, et al [1]. The main proposal is that the dissolution specifications should account for variability observed within the exhibit batch. This variability, which for an ANDA is acceptable due to the demonstrated bioequivalence of the batch, is then used as a baseline for future batches. This type of an approach fits well for the generic industry. It allows manufacturers to ensure that variability does not increase to unacceptable levels. Additionally, as process knowledge increases during the life of the product, it sets a path for continuous improvement that can be measured. A firm may decide to proceed further to identify, quantify, and control the individual components of variability. This can include items such as mechanical calibration in lieu of calibrator tablets and Design of Experiments (DOE) to further characterize the process. However, this will be done on a

---

1    Oral Dosage Form Performance Tests: New Dissolution Approaches, Walter W. Hauck, et al

GPhA Proposed Pathway for Quality by Design Dissolution Testing and Setting of Specifications for Generic Drugs

case by case basis that is consistent with the business model of the firm.

## Recommendation

GPhA recommends that FDA carefully consider the comments provided above. GPhA supports adoption of sound scientific principles in developing dissolution methodology and establishing relevant specifications for generic drug products. GPhA believes that the concepts outlined in this document provide a scientifically rational framework for dissolution testing. GPhA looks forward to working closely with FDA in fully developing this framework.

## Attachment 1. Decision Tree: Dissolution Specification Development



GPhA Proposed Pathway for Quality by Design Dissolution Testing and Setting of Specifications for Generic Drugs



June 10, 2005

Dockets Management Branch
Food and Drug Administration
5630 Fishers Lane
Room 1061
Rockville, MD  20852

Docket No. 2005D-0021
Draft Consensus Guideline: Pharmaceutical Development Q8

Comments by the Generic Pharmaceutical Association

Dear Sir or Madam:

The Generic Pharmaceutical Association (GPhA) appreciates the opportunity to
comment on the above referenced Draft Consensus Guideline.  GPhA represents 98% of
generic drug manufacturers whose drugs are dispensed for over half of all prescriptions
filled in the United States, but representing less than 10% of all drug expenditures.
GPhA is the united voice of the generic drug industry and is committed to pharmaceutical
quality.   GPHA would like to thank the Agency for this opportunity to provide input on
the issue of Pharmaceutical Development (Q8).

The Draft Consensus Guideline for Pharmaceutical Development Q8 outlines a
strategy and general approach to provide a more comprehensive understanding of the
product and manufacturing process for regulators.  This draft guideline addresses
numerous issues and concerns related to a development of new or novel drug products.
However, many aspects of this guideline do not necessarily apply to development of
generic drug products as explained below.

Generic drug products must be formulated to be bioequivalent to the innovator
product and in many cases exhibit other similar characteristics of the innovator product.
As such, generic drug products are often formulated to be essentially the same as the
innovator.  Therefore, selection of the optimal formulation is often based on the innovator
product which dictates the excipients and processing options.  Generic drug products for
parenteral, ophthalmic and otic dosage forms, by regulation, must be quantitative and
qualitative the same formulation as the innovator with minor exceptions.  Thus,
development of these products is essentially mandated by regulation.  Additionally,



topical/nasal drug products typically use a formulation that is essentially the same as the innovator product to assure bioequivalence. Thus, comprehensive product development reports would be of little value to the FDA reviewer.

The Draft Guideline also mentions justification of special design features such as tablet scoring. This is another example of when the generic drug must utilize the same special design feature (scoring) as the innovator product, hence there is little information gleaned for extensive background on such features.

The majority of formulations for generic drug products are dictated by the necessity to demonstrate in vivo bioequivalence to the innovator product, or are required to be quantitatively and qualitatively the same as the innovator. In these cases, product development reports will provide little, if any, critical information that will facilitate a better understanding by Food and Drug Administration (FDA) of product development. If product development reports are required when formulations are the same, or essentially the same, as the innovator product development reports should be very abbreviated. For those generic products that utilize a substantially different formulation or complex manufacturing process, the value of product development reports may be justified.

It should also be recognized that product development reports are already being prepared by generic manufacturers and are currently being reviewed by field inspectors at the manufacturing site. The major change being suggested is that product development reports will be included in the ANDA, requiring extensive evaluation by OGD review staff. It is not clear how this information will assist FDA in the review and approval of most drug products submitted as ANDAs.

Given the dramatic increase in the workload of the Office of Generic Drugs, and with OGD resources already stretched to the limit, GPhA requests that the Food and Drug Administration review ANDA product development requirements carefully. The information requested in the Draft Guideline will add significantly to the amount of information that OGD reviewers must evaluate. GPhA recommends that full product development reports be limited to those products for which this type of information will provide the intended insight for the FDA review staff. GPhA further encourages FDA to issue a guidance to industry that outlines the expectations for product development reports for ANDAs taking into consideration the above concerns.

Thank you for your consideration of these comments.

Sincerely,

Gordon Johnston
Vice President Regulatory Affairs

**Paul J. MAES**

**19 bis Chemin des petites brosses**
**Caluire et Cuire, F-69300, France**

Fax: [33]-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

Home: [33]-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
Work: [33]-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

Cell: [33]-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
Pager: [1]-416-358-4571

# CURRICULLUM VITAE

## CARREER SUMMARY:

Pharmaceutical development expert with experience in all aspects of pharmaceutical formulations in Europe and North America, M&E startup, licensing [in & out] and intellectual property & litigation in the United states and Canada.

## EMPLOYMENT EXPERIENCE:

### Maes Pharm@Consult:                              Aug 2005- Present

**Director and President:** of a Belgian based Consulting firm specialized in Lifesciences.

### Biovail Technologies Ltd. & Biovail Corporation,          1998-Nov 2005
USA & Canada

**Vice President Pharmaceutical Technology; Biovail Corp.**     August 2003- Present
Mississauga, Ontario

- Responsible for technology and Pharmaceutical. Tech. Company acquisitions
- Advisor to the Chief Scientific Officer
- Responsible for coordination of corporate IP Portfolio
- Advisor to Commercial and Venture groups
- Ad hoc member of the BD Due Diligence and Negotiation Teams.
- Responsible for Line Extension/Future project team.

**Vice President Pharmaceutics; Biovail Technologies**     August 2000- July 2003
Chantilly, VA

Lead the restrucuration of Pharmaceutics R&D from the acquisition of Fuisz technologies into Biovail own operations. Actively involved in creating an integrated R&D department from 24 employees in 1999 to more than 200 in 2002.

- Developed a multi site Pharmaceutical development concept including 3 formulation laboratories [USA, Canada, Ireland], 2 full-scale clinical batch manufacturing plants, one central technology services laboratory and one centralized quality control and analytical method development system.

- Provided Scientific and Intellectual property support as part of full M&A valuation analysis. Active Part of the acquisition of PharmaPass assets.
- Initiated an integrated Intellectual Property system as well as scientific expertise in litigation.
- Created a technology transfer department in line with the R&D and manufacturing structures.
- Participated in the creation of a Project management system initially designed in Research and development, then applied to the whole company structure.
- Integrated third party development and adapted Biovail structure to receive external products at various stages of development [from concept to commercial].
- Lead the teams having developed: Biovail-GSK Wellbutrin XL, Tramadol ER, Metformin ER, Tramadol Flash tab, Venlafaxine EA, Zolpidem Flash dose…

**Director of technology transfer and Manufacturing liaison; Biovail Corp.**
Mississauga, Ontario                                    May 1998- July 2000

- Created a system enabling Biovail to scale up Generic controlled release drugs within the shortest time with minimal risk.
- Lead the Manufacturing Launch of 5 Biovail Generic controlled release marketed by Teva North America
- Prepared the company to move to NDA technology based pharmaceuticals
- Participated in the development of a specific manufacturing strategy and supported the acquisition of a third Manufacturing plant [Dorado, PR]
- Integrated third party development within Biovail R&D program without interfering with other internal processes.
- Involved in due diligences and Licensing activities.

**SMB Laboratoires S.A. & Galephar Group**                        **1984-1998**
Brussels, Belgium;

*Research and Development Director*                              *1994-1998*

- Manage 35 full time people, including 18 University (post-graduates), and supervising 5 ongoing post-graduates in Pharmacy as lecturer in 3 Belgian Universities.
- Coordinated the R&D and Regulatory work done in four sites: Brussels, Belgium; Marche En Famenne, Belgium; Strasbourg, France & Carolina, Puerto-Rico.
- Pharmaceutical technology (Galenics)
- 1 New drug entity in Pneumology (Phase III)
- Follow-up of Toxicological studies made by CROs
- Organization of PK and PK/PD studies
- Follow-up of clinical studies in EU by CROs in: Cardiology (hypertension, angina…)
  : Pneumology (CF, COPD, and Asthma)
  : Rheumatology (NSAIDs, Osteoporosis): Pain management
- Regulatory affairs (mainly nationals and EU)

- Biotechnology (1 Federal grant for Research project on metabolism)
- Chemical synthesis (mainly metabolites)

*R&D technical manager*                                    1988-1994
Responsible for all pharmaceutical aspects of R&D

- Controlled release (coated beads, matrix systems…)–Developed Tiazac (Viazem in Europe] and about 25 generic + and OTCs in European Market.
- New salts of Actives
- Liquid and semi-solid forms in capsules (Licaps- Lidose)
- Topical delivery

*R&D and QC lab. Manager.*                                 1984-1988
Involved as "Specialist" in Technology transfer and scale-up of solid dosage forms (mainly tablets) in the new production unit.
Involved in RD development of some new dosage forms; especially Lidose® technology, effervescent tablets, micro emulsions, spray drying.
Responsible for R&D analytical laboratory techniques developed: HPLC, GLC, DSC, TMA, Spectrophotometry, Dissolution, GC-MS, Coulter®
    Main substrates: Chemistry, Pharmaceuticals and Biological fluids.


## EDUCATION:

1984:        Special Certificate of HPLC analysis of analytes in biological fluids obtained in June 1984 at the University of Liège with mention "Très Bien" (18/20)". Service Analyse des Médicaments "Drug Analysis": Prof. J. Bosly & Prof. J. Crommen. (2nd equiv. Master in Med. Sci.)

1982-1983:   Specialization at the University of Liège, Industrial Pharmacy Diploma (DEA equiv. MS) with Distinction obtained in December 1983.
             (Option Galénique: Prof, Jaminet)

1977-1982:   Undergraduate Studies at the University of Liège, Pharmacy Legal Degree with Merit (>= 16/20) obtained in June 1982.

1971-1977:   Secondary education at the Athenée Royal in Visé,
             Section: Latin, Science, Mathematics A.
             Diploma and Maturity Exam obtained in 1977. (e.g. College)

**ADDITIONNAL INFORMATION:**

- Co-Author of 12 patents in pharmaceutical technology (8 published)
- "Pharmacien d'Industrie":  listed on the Belgian Health Ministry Registry
- (Equivalent to EU qualified QP).
- Co-Author of more than 39 scholarly/scientific articles in field
- Co-Author of an official European Pharmacopoeia monograph.
- Scientific consultant to the General Management and registered Expert to the German Ministry of Health (BfArM) for Part II files.
- co
- Member of the AAPS [American Association of Pharmaceutical Sciences]

U.S. Food and Drug Administration

May 25, 2001

# STATEMENT BY

## GARY BUEHLER, RPh

## ACTING DIRECTOR, OFFICE OF GENERIC DRUGS

## CENTER FOR DRUG EVALUATION AND RESEARCH

## FOOD AND DRUG ADMINSTRATION

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## BEFORE THE

## UNITED STATES SENATE

## COMMITTEE ON THE JUDICIARY

## MAY 24, 2001

### INTRODUCTION

Mr. Chairman and Members of the Committee, I am Gary Buehler, RPh, Acting Director of the Office of Generic Drugs in the Center for Drug Evaluation and Research (CDER), at the Food and Drug Administration (FDA or Agency). I am here today to discuss FDA's implementation of provisions of the Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch-Waxman Amendments) which govern the generic drug approval process. These provisions give 180 days of marketing exclusivity to certain generic drug applicants. The 180-day generic drug exclusivity provision is one component of the complex patent listing and certification process, which also provides for a 30-month stay on generic drug approvals while certain patent infringement issues are litigated.

The Hatch-Waxman amendments are intended to balance two important public policy goals. First, drug manufacturers need meaningful market protection incentives to encourage the development of valuable new drugs. Second, once the statutory patent protection and marketing exclusivity for these new drugs has expired, the public benefits from the rapid availability of lower priced generic versions of the innovator drug.

### STATUTORY PROVISIONS

The Hatch-Waxman Amendments amended the Federal Food, Drug, and Cosmetic (FD&C) Act and created section 505(j). Section 505(j) established the abbreviated new drug application (ANDA) approval process, which permits generic versions of previously approved innovator drugs to be approved without submission of a full new drug application (NDA). An ANDA refers to a previously approved new drug application (the "listed drug") and relies upon the Agency's finding of safety and effectiveness for that drug product.

The timing of an ANDA approval depends in part on patent protections for the innovator drug. Innovator drug

STATEMENT BY GARY BUEHLER, RPh, May 24, 2001

applicants must include in an NDA information about patents for the drug product that is the subject of the NDA. FDA publishes patent information on approved drug products in the Agency's publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (the Orange Book) (described in more detail below). The FD&C Act requires that an ANDA contain a certification for each patent listed in the Orange Book for the innovator drug. This certification must state one of the following:

I.   that the required patent information relating to such patent has not been filed;

II.  that such patent has expired;

III. that the patent will expire on a particular date; or

IV.  that such patent is invalid or will not be infringed by the drug, for which approval is being sought.

A certification under paragraph I or II permits the ANDA to be approved immediately, if it is otherwise eligible. A certification under paragraph III indicates that the ANDA may be approved on the patent expiration date.

A paragraph IV certification begins a process in which the question of whether the listed patent is valid or will be infringed by the proposed generic product may be answered by the courts prior to the expiration of the patent. The ANDA applicant who files a paragraph IV certification to a listed patent must notify the patent owner and the NDA holder for the listed drug that it has filed an ANDA containing a patent challenge. The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's opinion that the patent is not valid or will not be infringed. The submission of an ANDA for a drug product claimed in a patent is an infringing act if the generic product is intended to be marketed before expiration of the patent, and therefore, the ANDA applicant who submits an application containing a paragraph IV certification may be sued for patent infringement. If the NDA sponsor or patent owner files a patent infringement suit against the ANDA applicant within 45 days of the receipt of notice, FDA may not give final approval to the ANDA for at least 30 months from the date of the notice. This 30-month stay will apply unless the court reaches a decision earlier in the patent infringement case or otherwise orders a longer or shorter period for the stay.

The statute provides an incentive of 180 days of market exclusivity to the "first" generic applicant who challenges a listed patent by filing a paragraph IV certification and running the risk of having to defend a patent infringement suit. The statute provides that the first applicant to file a substantially complete ANDA containing a paragraph IV certification to a listed patent will be eligible for a 180-day period of exclusivity beginning either from the date it begins commercial marketing of the generic drug product, or from the date of a court decision finding the patent invalid, unenforceable or not infringed, whichever is first. These two events - first commercial marketing and a court decision favorable to the generic - are often called "triggering" events, because under the statute they can trigger the beginning of the 180-day exclusivity period.

In some circumstances, an applicant who obtains 180-day exclusivity may be the sole marketer of a generic competitor to the innovator product for 180 days. But 180-day exclusivity can begin to run - with a court decision - even before an applicant has received approval for its ANDA. In that case, some, or all, of the 180-day period could expire without the ANDA applicant marketing its generic drug. Conversely, if there is no court decision and the first applicant does not begin commercial marketing of the generic drug, there may be prolonged or indefinite delays in the beginning of the first applicant's 180-day exclusivity period. Approval of an ANDA has no effect on exclusivity, except if the sponsor begins to market the approved generic drug. Until an eligible ANDA applicant's 180-day exclusivity period has expired, FDA cannot approve subsequently submitted ANDAs for the same drug, even if the later ANDAs are otherwise ready for approval and the sponsors are willing to immediately begin marketing. Therefore, an ANDA applicant who is eligible for exclusivity is often in the position to delay all generic competition for the innovator product.

Only an application containing a paragraph IV certification may be eligible for exclusivity. If an applicant changes from a paragraph IV certification to a paragraph III certification, for example upon losing its patent infringement litigation, the ANDA will no longer be eligible for exclusivity.

## COURT DECISIONS AND FDA ACTIONS

This 180-day exclusivity provision has been the subject of considerable litigation and administrative review in

STATEMENT BY GARY BUEHLER, RPh, May 24, 2001                                  Page 3 of 4

recent years, as the courts, industry, and FDA have sought to interpret it in a way that is consistent both with the statutory text and with the legislative goals underlying the Hatch-Waxman Amendments. A series of Federal court decisions beginning with the 1998 *Mova*[1] case describe acceptable interpretations of the 180-day exclusivity provision, identify potential problems in implementing the statute, and establish certain principles to be used by the Agency in interpreting the statute.

In light of the court decisions finding certain FDA regulations inconsistent with the statute, the Agency proposed new regulations in August 1999 to implement the 180-day exclusivity. Since then many comments have been submitted and there have been additional court decisions further interpreting the 180-day exclusivity provision and complicating the regulatory landscape. The Agency has not yet published a final rule on 180-day exclusivity. As described in a June 1998 guidance for industry, until new regulations are in place, FDA is addressing on a case-by-case basis those 180-day exclusivity issues not addressed by the existing regulations.

One of the most fundamental changes to the 180-day exclusivity program that has resulted from the legal challenges to FDA's regulations is the determination by the courts of the meaning of the phrase "court decision." The courts have determined that the "court decision" that can begin the running of the 180-day exclusivity period may be the decision of the district court, if it finds that the patent at issue is invalid, unenforceable, or will not be infringed by the generic drug product. FDA had interpreted the "court decision" that could begin the running of 180-day exclusivity (and the approval of the ANDA) as the final decision of a court from which no appeal can be or has been taken - generally a decision of the Federal Circuit. FDA's interpretation had meant that an ANDA applicant could wait until the appeals court had finally resolved the patent infringement or validity question before beginning the marketing of the generic drug. FDA had taken this position so that the generic manufacturer would not have to run the risk of being subject to potential treble damages for marketing the drug, if the appeals court ruled in favor of the patent holder. The current interpretation means that if the 180-day exclusivity is triggered by a decision favorable to the ANDA applicant in the district court, the ANDA sponsor who wishes to market during that exclusivity period now may run the risk of treble damages if the district court decision is reversed on appeal to the Federal Circuit. As a practical matter, it means that many generic applicants may choose not to market the generic and thus the 180-day exclusivity period could run during the pendency of an appeal.

In one of the cases rejecting FDA's interpretation of the "court decision" language in the statute, the court determined that the applicant who relied in good faith on FDA's interpretation of the 180-day exclusivity provision should not be punished by losing its exclusivity. The court, therefore, refused to order FDA to begin the running of 180-day exclusivity upon the decision of the district court in the patent litigation at issue. FDA has taken a similar approach in implementing the courts' decisions: the new "court decision" definition will apply only for those drugs for which the first ANDA was submitted subsequent to March 30, 2000. In adopting this course, a primary concern for the Agency was to identify an approach that would minimize further disruption and provide regulated industry with reasonable guidance for making future business decisions.

To advise the public and industry of this position, FDA published a Guidance for Industry in March 2000. FDA intends to incorporate the courts' interpretation of the "court decision" trigger for 180-day exclusivity into the final rule implementing the changes in 180-day exclusivity.

## ORANGE BOOK LISTINGS

There have been concerns expressed over FDA's role in the listing of patents in the Orange Book which can have an impact on generic drug approvals by delaying approval and 180-day exclusivity. Under the FD&C Act, pharmaceutical companies seeking to market innovator drugs must submit, as part of an NDA or supplement, information on any patent that 1) claims the pending or approved drug or a method of using the approved drug, and 2) for which a claim of patent infringement could reasonably be asserted against an unauthorized party. Patents that may be submitted are drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method of use patents. Process (or manufacturing) patents may not be submitted to FDA.

When an NDA applicant submits a patent covering the formulation, composition, or method of using an approved drug, the applicant must also submit a signed declaration stating that the patent covers the formulation, composition, or use of the approved product. The required text of the declaration is described in FDA's regulations. FDA publishes patent information on approved drug products in the Orange Book.

—

STATEMENT BY GARY BUEHLER, RPh, May 24, 2001                                    Page 4 of 4

The process of patent certification, notice to the NDA holder and patent owner, a 45-day waiting period, possible patent infringement litigation and the statutory 30-month stay mean there is the possibility of a considerable delay in the approval of ANDAs as a result of new patent listings. Therefore, these listings are often closely scrutinized by ANDA applicants. FDA regulations provide that, in the event of a dispute as to the accuracy or relevance of patent information submitted to and subsequently listed by FDA, an ANDA applicant must provide written notification of the grounds for dispute to the Agency. FDA then requests the NDA holder to confirm the correctness of the patent information and listing. Unless the patent information is withdrawn or amended by the NDA holder, FDA will not change the patent information listed in the Orange Book. If a patent is listed in the Orange Book, an applicant seeking approval for an ANDA must submit a certification to the patent. Even an applicant whose ANDA is pending when additional patents are submitted by the sponsor must certify to the new patents, unless the additional patents are submitted by the patent holder more than 30 days after issuance by the U.S. Patent and Trademark Office.

FDA does not undertake an independent review of the patents submitted by the NDA sponsor. FDA does not assess whether a submitted patent claims an approved drug and whether a claim of patent infringement could reasonably be made against an unauthorized use of the patented drug. FDA has implemented the statutory patent listing provisions by informing interested parties what patent information is to be submitted, who must submit the information, and when and where to submit the information. As the Agency has stated, since the implementation of the 1984 Hatch-Waxman Amendments began, FDA has no expertise or resources with which to resolve complex questions of patent coverage, and thus the Agency's role in the patent-listing process is ministerial. The statute requires FDA to publish patent information upon approval of the NDA. The Agency relies on the NDA holder or patent owner's signed declaration stating that the patent covers an approved drug product's formulation, composition or use. Generic and innovator firms may resolve any disputes concerning patents in private litigation. As noted above, if the generic applicant files a paragraph IV certification and is sued for patent infringement within 45 days, there is an automatic stay of 30 months, substantially delaying the approval of the generic drug and, thus, the availability of lower cost generic drug products.

## CONCLUSION

FDA continues to implement the Hatch-Waxman Amendments exclusivity provisions in the best manner possible given the text of the legislation, the history of the legislation and the numerous court challenges. Again, as previously noted, FDA has tried to balance innovation in drug development and expediting the approval of lower-cost generic drugs.

[1]*Mova Pharmaceutical Corp. v. Shalala,*140 F.3d 1060, 1065 (D.C. Cir. 1998).

Recent Testimonies

---

FDA Home Page | Search | A-Z Index | Site Map | Contact FDA

FDA/Office of Legislation
Web page created by ue 2001-MAY-25.

**MINUTES OF MEETING WITH FIRM**
**Wellbutrin SR (Major Depressive Disorder), IND 28,676**
**GlaxoSmithKline (GSK) / BIOVAIL**
**Type B (Pre-IND) Meeting**

**DATE:** October 26, 2001          **LOCATION:** WOC II Rm. 4034
**PARTICIPANTS:** *GSK:* J. Ascher, R. Fleck, A. Johnston, L. Lucisano, K. Muir, J. Murray.
*BIOVAIL:* P. Desjardins, O. Eradiri, W. Kreppner, P. Maes
*FDA:* R. Katz, T. Laughren, P. Andreason, R. Seevers, H. Zhao, D. Bates

**Background:** Wellbutrin and Wellbutrin SR (bupropion) are the subject of two active INDs in HFD-120 and two in HFD-170:

| IND # | Active Since | Indication | Division |
|-------|-------------|-----------|----------|
| 13,845 | Oct. 3, 1987 | antidepressant | 120 |
| 28,676 | Nov. 5, 1987 | antidepressant (Wellbutrin SR) | 120 |
| 36,571 | Mar. 27, 1991 | cocaine dependence | 170 |
| 45,794 | Jul. 19, 1994 | smoking cessation | 170 |

GSK, manufacturer of Wellbutrin, has entered a development partnership with BIOVAIL to develop a new once-daily extended release formulation for bupropion (150 and 300 mg tablets). The firm expects a more benign side effect profile with a slower release rate for the drug substance. A briefing book was submitted on September 17, 2001.

**Discussion:** The course of discussion followed the sequence of questions as presented in the briefing book. These questions and the Agency responses are summarized below.

*Questions, Briefing Book*

**1. Does the attached Bupropion Hydrochloride Extended-Release Tablets Pharmacokinetic Study Plan support approval of the extended release products based on a demonstration of bioequivalence to Wellbutrin Tablets? If not, what modifications would be necessary?**

GSK further explained that the results of a pilot biostudy (UK) will be available in approximately one month. Based on the release profiles observed in this study, pivotal product development will proceed.

*FDA Response.* Dr. Katz explained that the current Wellbutrin SR product was approved based on bioequivalence of the IR form dosed tid to the SR form dosed bid. Two of the three pharmacokinetic parameters for parent drug (AUC, Cmax, Cmin) met Agency guidelines (80 – 125%) for the SR form, but the third parameter did not. The final approval was based on comparison of pharmacokinetic profiles for the three major metabolites [hydroxybupropion, threohydrobupropion, and erythrohydrobupropion].

The Division is concerned that the once-daily ER form may encounter similar difficulties in matching Cmax, Cmin, and AUC, which would necessitate either a similar study of metabolites or a clinical trial. Use of the IR form as reference for the biostudy is acceptable to FDA since clinical data were obtained on the IR form initially.

IND 28,676          Wellbutrin SR (bupropion hydrochloride)                    p. 2
                    GSK/BIOVAIL Pre-IND Meeting, October 26, 2001

Following discussion it was agreed that GSK and BIOVAIL would seek to match all three parameters (Cmax, Cmin, and AUC) within the standard Agency guidelines, for parent drug plus metabolites (hydroxybupropion, threohydrobupropion, and erythrohydrobupropion), with the understanding that a single positive well-controlled study would be needed if the bioequivalence study does not meet these objectives. Metabolite pharmacokinetics will be crucial, since over 90% of systemic exposure involves metabolites rather than parent drug.

In addition, FDA and GSK agreed that dosing above 300 mg, as provided for in current labeling, can be supported by use of the 150 mg BIOVAIL tablet in combination with the 300 mg tablet, as long as the 300 mg and 150 mg BIOVAIL products show dose proportionality. Dose proportionality will need to be demonstrated; FDA advised that the dose proportionality study can either be performed separately or included as an additional arm in the food effect study.

**2. Based on the attached description of the proposed formulation, manufacturing process and pilot-scale stability and dissolution data, does the Agency have any specific concerns that should be addressed in the development program (e.g., scale and number of stability batches)?**

*FDA Response.* Because of the steep dose-response curve for seizures with bupropion, dose dumping (accelerated release rates for aged product) is the primary stability concern. Prior experience with Wellbutrin SR indicates that accelerated storage conditions are not likely to be stability indicating. Real time data will be needed to establish the product shelf life.

GSK proposed an initial submission package of 12 months' data on three batches at 10% of commercial production scale and asked whether this could support an 18 month expiration date. The Division agreed that the basic ICH dataset of 12 months' data would be acceptable at time of submission, but in order to obtain an 18 month shelf life with these data, additional data showing no stability failures at 40°C and 75%RH would be necessary. Alternatively, a prior approval supplement may be submitted with real time data to extend the expiration date (prior approval rather than CBE due to the lack of commercial-scale batch data at initial submission).

FDA agreed that bracketing/matrixing would be acceptable for packaging configurations and dosage strengths, pointing out that the 300 mg strength would pose the greatest risk to patients if stability failures caused rapid release of drug substance. GSK will submit a stability protocol as a Special Protocol for CMC review; this topic will be revisited at the end of Phase 2.

In addition, FDA stated that the drug substance specifications should match those for the drug substance used in the SR and IR formulations, with the exception of particle size (critical to release rate). The supplement will need to document retention of the existing specifications and to explain the basis on which the different particle size specification is proposed. [Post meeting note: the production of bulk drug substance with different particle sizes will also be a GMP, pre-approval inspection issue.]

Finally, FDA indicated that dissolution specification development should include the following media: 0.1N HCl (proposed by GSK), pH 6.2 buffer (proposed), pH 7.4 to 6.2 buffer [15 minutes at pH 7.4, then pH 6.2] (proposed), but also water (not proposed, but in use for current SR form) and pH 4.5 buffer (not proposed).

**3. It is proposed that the bioequivalence/PK studies be delegated and conducted by BIOVAIL under the sponsorship of GSK's IND for Wellbutrin SR Tablets (IND 28,676), this**

application contains the pertinent historical safety, efficacy, and PK data with the understanding that this application would be appropriately updated with the CMC data to support the proposed bioequivalence studies. Is this acceptable to the Agency?

*FDA Response.* Yes.

**4. Upon favorable completion of the development program, we request that the submission for approval be processed as a supplement to NDA 20-358 for Wellbutrin SR Tablets with a corresponding PDUFA user fee action date of 4 months. Does the Agency agree with this proposal?**

*FDA Response.* The proposed QD extended release dosage form utilizes Eudragit® to control drug release; the currently approved Wellbutrin SR tablet utilizes hydroxypropylmethylcellulose (HPMC). The release mechanism for the SR tablet is a combined diffusion / erosion mechanism; the BIOVAIL tablet drug release mechanism will be purely diffusion controlled (semi-permeable Eudragit® membrane).

The Agency advised that, due to the different drug delivery principles for the new BIOVAIL vs. the established Wellbutrin SR dosage forms, a new NDA would be required. The anticipated review time frame would be 10 months.

**Conclusions / actions:** The discussion concluded cordially. GSK has provided copies of slides used during the meeting, which are included in these minutes as an attachment.

PLEASE SEE ELECTRONIC SIGNATURE PAGE.
DRS. BATES AND LAUGHREN ARE SIGNING THESE MINUTES FOR THE ATTENDEES;
DR. KATZ WILL SIGN THEM TO INDICATE ACCEPTANCE FOR DIVISION INTERNAL RECORDS
AND FOR EXTERNAL RELEASE.
NOTE: ELECTRONIC SIGNATURES WILL APPEAR ON LAST PAGE OF DOCUMENT,
FOLLOWING ANY ATTACHMENTS.

Doris J. Bates, Ph.D.                          Thomas P. Laughren, M.D.
Regulatory Project Manager                     Team Leader, Psychiatric Drugs Group

# IND 28,676 Wellbutrin SR
## FDA/GSK/Biovail Meeting
### October 26, 2001

- Objective/Desired Outcome:

  - To confirm approval of Wellbutrin Extended-Release Tablets for Once-Daily administration may be based on demonstration of bioequivalence to Wellbutrin Tablets (IR).

  - To agree the scope and design of bio/pk studies to support approval

  - Allow FDA to comment on CMC requirements and administrative filing process

# Regulatory Background: Considerations for Approval Based on Bioequivalence

- **Regulation: 21CFR320.23(b):** "Some pharmaceutical...alternatives may be equivalent in the **extent** of their absorption but not the **rate**...and yet may be considered **bioequivalent** because such differences in the rate of their absorption are intentional, and are reflected in the labeling, are not essential to the attainment of effective body drug concentrations on chronic use and are considered medically insignificant..."

## PROPOSED ACCEPTANCE CRITERIA FOR PIVOTAL BIOEQUIVALENCE AND FOOD-EFFECT STUDIES ON BUPROPION HCl ER TABLETS, 300 mg

### STEADY-STATE BIOEQUIVALENCE STUDY

- The 90% geometric confidence interval for systemic exposure (AUC0-$\tau$) will be between 80 – 125%

- The point estimate of peak exposure (Cmax) will not be greater than 100% and upper limit of the associated 90% geometric confidence interval will not be greater than 115%

-

### FOOD-EFFECT STUDY

-Lack of food-effect will be claimed if the geometric AUC and Cmax point estimates are within 80 – 125%

Primary bioequivalence and food-effect assessments will be based on parent drug. Metabolite data will be provided as additional supportive information.

# Proposed Acceptance Criteria (Cont.)

## STEADY-STATE PILOT & BIOEQUIVALENCE STUDIES

- Drug administration times for the IR reference product, Wellbutrin® Tablets, should read 7AM, 1PM and 7 PM , i.e., 6, 6, 12 h, in agreement with package insert.

## IVIVC STUDY

- Wellbutrin® Tablets, 100 mg, will be used to provide the impulse function for deconvolution procedure in place of the solution of the drug.

# 26 Oct FDA/GSK/Biovail Meeting
## Participants

**Biovail:**

| | |
|---|---|
| Paul Desjardins Ph.D. | VP Product Development Operations |
| Paul Maes | VP Pharmaceutics |
| Okpo Eradiri Ph.D. | Sr. Dir., Pharmacokinetics and Tox |
| Wayne Kreppner | Mgr. Regulatory Affairs |

**GSK:**

| | |
|---|---|
| Keith Muir Ph.D. | Dir., Clical Pharamcokinetics |
| Rick Fleck Pharm.D. | Dir., Clinical Development |
| John Ascher M.D. | Dir., Clinical Research |
| Andy Johnston Pharm.D. | Dir., Psychiatry Clinical Development |
| Leo Lucisano | Dir., CMC Regulatory Affairs |
| Jim Murray | VP., Regulatory Affairs, Neur. & Psy. |

# 26 Oct FDA/GSK/Biovail Meeting Participants

**FDA:**

Russ Katz, M.D. — Director DNDP

Tom Laughren, M.D. — Psychiatry Team Leader & Deputy Director

Bob Seevers, Ph.D. — Chemistry Team Leader

Paul Andreason, M.D. — Medical Officer

Doris Bates, Ph.D. — Project Manager

Hong Zaho, Ph.D. — Biopharmaceutics Reviewer

# 26 Oct FDA/GSK/Biovail Meeting Questions

1. Does the PK study plan support approval based on a demonstration of bioequivalence to Wellbutrin Tablets? If not, what modification would be necessary?

2. Based on the description of the proposed formulation, manufacturing process and pilot-scale stability and dissolution data, does the Agency have any specific concerns that should be addressed in the development program (e.g.., scale and number of stability batches)?

3. It is proposed that the bio/pk studies be delegated and conducted by Biovail under the sponsorship of GSK IND for Wellbutrin SR Tablets (IND 28,676). This application contains the pertinent historical safety, efficacy and pk data with the understanding that this application would be appropriately updated with the CMC data to support the proposed bio studies. Is this acceptable to the Agency?

4. Upon favorable completion of the development program, we request that the submission for approval be processed as a sNDA to NDA 20-358 for Wellbutrin SR Tablets with a corresponding PDUFA user fee action date of 4 months. Does the Agency concur with this proposal?



---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
 /s/
----------------------
Doris Bates
11/26/01 10:59:39 AM


Thomas Laughren
11/26/01 01:22:46 PM


Russell Katz
11/26/01 04:06:30 PM
```

### FDA's ACPS Meeting, October 2005
### Awareness Topic: Mitigating the Risks of Ethanol Induced Dose Dumping from Oral Sustained/Controlled Release Dosage Forms

Robert J. Meyer, M.D. and Ajaz S. Hussain, Ph.D.
Office of New Drugs and Office of Pharmaceutical Science
Center for Drug Evaluation and Research, FDA

**Background Information**

Unintended, rapid drug release in a short period of time of the entire amount or a significant fraction of the drug contained in a modified release dosage form is often referred to as "dose dumping". Depending on the therapeutic indication and the therapeutic index of a drug, dose-dumping can pose a significant risk to patients, either due to safety issues or diminished efficacy or both. Generally dose-dumping is observed due to a compromise of the release-rate-controlling mechanism. The likelihood of dose-dumping for certain modified release products when administered with food has been recognized for about twenty years and a regulatory process established to address it (1-2).

Some modified-release oral dosage forms contain drugs and excipients that exhibit higher solubility in ethanolic solutions compared to water. Such products can be expected to exhibit a more rapid drug dissolution and release rate in the presence of ethanol. Therefore, in theory, concomitant consumption of alcoholic beverages along with these products might be expected to have the potential to induce dose dumping. This potential mechanism leading to dose-dumping from an oral modified-release dosage form has not previously attracted attention in the pharmaceutical science literature or in regulatory assessment process. There are many reasons this may not have previously been considered, amongst these reasons is that there may have existed a general assumption that a clinically insignificant difference in drug release rate would be expected with concomitant ethanol consumption *in vivo*. A study conducted over twenty years ago (3) and the absence of a clear post-marketing signal pointing to alcohol inducing dose dumping may have reinforced the latter assumption.

However, a recent observation of alcohol-induced dose dumping and the potential risk it posed (4) necessitates a reexamination of this issue. In July 2005, FDA concluded that the overall risk versus benefit profile of a hydromorphone modified-release drug product was unfavorable due to alcohol induced dose dumping. This decision was based, in part, on an a pharmacokinetic study in healthy subjects (utilizing a naltrexone block), which demonstrated that co-ingestion of this product with 240 mL (8 ounces) of 40% (80 proof) alcohol resulted in an average peak hydromorphone concentration approximately six times greater than when taken with water. Furthermore, one subject in this study experienced a 16-fold increase when the drug was ingested with 40% alcohol compared with water. This study also showed that 8 ounces of 4% alcohol (equivalent to 2/3 of a typical serving of beer) could in some subjects result in almost twice the peak plasma hydromorphone concentration than when the drug was ingested with water (4).

1

Concomitant alcohol use is warned against or contraindicated for many drugs due to the potential for pharmacokinetic (e.g., altered clearance) or pharmacodynamic interactions (e.g., effects on the central nervous system). In these cases, product labels warn physicians and patients on the adverse consequence of alcohol consumption while on a drug regimen. For other drugs moieties, those that do not have a pharmacokinetic or pharmacodynamic interaction with alcohol, a warning on the adverse consequence of alcohol consumption due to potential for dose dumping may not be included in the product label. However, especially for certain narrow therapeutic index drugs (including hydromorphone), it may be prudent to consider the consequences of concomitant alcohol use, even in the face of significant alcohol warnings in product labeling because alcohol use would still be likely. For instance, with regard to the consideration for the consequences implied by the alcohol-drug interaction study with the hydromorphone product, the following data were considered:

- Data from the Behavioral Risk Factor Surveillance System indicates that 1 in 3 drinkers in the U.S. reported binge drinking, defined as 5 drinks in a short period of time (4 drinks for women)] (5)
- Survey data in chronic low back pain show no reduction in opiate use in heavy drinkers, despite current warnings about concomitant use of alcohol and opiates based on known pharmacodynamic interactions. (6)

**Topic Introduction**

The FDA's recent finding (4) of an unfavorable risk versus benefit profile of a hydromorphone product due to alcohol-induced dose dumping necessitates development of a general regulatory approach to address the issue of whether alcohol undermines the release characteristics of the drug for new drug applications and currently marketed products that utilize a controlled-release mechanism. The goal of the regulatory approach should be to minimize the risk of alcohol-induced dose dumping from modified-release dosage forms, irrespective of any warnings on product labeling and instructions by health care providers.

A regulatory decisional framework to minimize the risk of alcohol-induced dose dumping could be modeled on existing regulatory decision criteria for food-drug or drug-drug interactions. However, unlike the guidance provided for these interactions, a routine recommendation for a pharmacokinetic study examining whether there is an alcohol-formulation interaction may not be the preferred approach for a number of reasons. Pharmacokinetic studies in healthy subjects that involve co-administration of high alcohol loads (to emulate a "worst case" scenario) and a modified-release product may pose a risk, either due to the alcohol load itself and because of the potential for dose dumping in cases where the high exposure itself may be dangerous. For some drugs a pharmacologic antagonist can be used to reduce risks posed by dose dumping (e.g., for opiates, a naltrexone or nalaxone block), however this approach may not be feasible or provide an adequate protection for most drugs. In case of food-induced dose dumping, the FDA guidance clearly recognizes that (unless the product is well designed) food effect studies can pose a risk to study subjects - "co-administration with food can result in

2

*dose dumping*, in which the complete dose may be more rapidly released from the dosage form than intended, creating a potential safety risk for the study subjects" (2). One can, therefore, argue that the current food-effect study requirements for modified release dosage forms are not primarily intended to assess dose-dumping; these studies have much broader utility in terms of how the information generated is used for clinical study design and dosing regimen recommendations. To be consistent with these FDA principles - intended to minimize risk to subjects – reliable alternate approaches to an *in vivo* evaluation are preferred.

The underlying principle in risk minimization efforts is to prevent the occurrence of undesirable outcomes. Since regulatory experience suggests labeling and other means of informing patients about potential interactions with alcohol may be incompletely effective, to minimize risks of alcohol leading to dose-dumping, the regulatory goal should be to promote the design of rugged modified-release dosage forms that are not sensitive to alcohol. To achieve this goal, it is necessary to have an objective means to evaluate the dose dumping potential of a product design early in the product development phase so that only "rugged" product designs are developed and progressed in the clinical development program, and this generalized, risk-based regulatory approach needs to be developed for both new and generic drug products. In fact, if the reference listed product is rugged and no labeling cautions are therefore warranted, it would be highly desirable for any generic products to be similarly rugged, even if their modified-release mechanism was different from the innovator products.

A regulatory decision framework that facilitates a risk-based "quality by design" would need to integrate these principles into the assessment of dose dumping potential and the criteria for defining the regulatory consequence of developing a "vulnerable" product. A regulatory approach to gauge the potential for dose dumping from formulation and manufacturing process information and to classify products into "vulnerable" and "rugged" categories is being developed. The proposed classification approach identifies product and process failure modes based on the mechanism of drug release and the class membership verified using a suitable *in vitro* test of alcohol induced dose dumping potential. A reliable classification system based on mechanism of drug release may be sufficient in some cases, or in case of class uncertainty, this may need to be supplemented with a suitable *in vitro* test. It is anticipated that in most cases an *in vivo* pharmacokinetic study may not be necessary. The choice of tools for assessing dose dumping potential and the regulatory consequence of developing a "vulnerable" product would be guided by clinical risk-benefit assessment criteria. At the October 2005 ACPS meeting our efforts on developing this regulatory decision system will be outlined.

## References

1.  Hendeles L, Wubbena P, Weinberger M. Food-induced dose dumping of once-a-day theophylline. Lancet. 22: 1471 (1984).
2.  Guidance for Industry: Food effect guidance Food-Effect Bioavailability and Fed Bioequivalence Studies (Issued 12/2002, Posted 1/30/2003). http://www.fda.gov/cder/guidance/5194fnl.pdf

3

3. Wills RJ, Crouthamel WG, Iber FL, Perkal MB. Influence of alcohol on the pharmacokinetics of diazepam controlled-release formulation in healthy volunteers. J. Clin. Pharm. 22: 557-561 (1982).
4. FDA Alert for Healthcare Professionals (July 2005): Hydromorphone Hydrochloride Extended-Release Capsules (marketed as Palladone™). http://www.fda.gov/cder/drug/InfoSheets/HCP/hydromorphoneHCP.pdf
5. Serdula MK, Brewer RD, Gillespie C, Denny CH, Mokdad A. Trends in Alcohol Use and Binge Drinking, 1985-1999 Results of a Multi-State Survey. Am J. Prev Med. 2004;26(4);294-8
6. Booker EA, Haig AJ, Geisser ME, Yamakawa K Alcohol use self report in chronic back pain--relationships to psychosocial factors, function performance, and medication use. Disabil Rehabil. 2003 Nov 18;25(22):1271-7

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

                                                            Food and Drug Administration
                                                            Rockville, MD  20857

NDA 21-515


GlaxoSmithKline
Attention: Mary E. Martinson
Director, Regulatory Affairs, Psychiatry
P.O. Box 13398
Five Moore Drive
Research Triangle Park, NC 27709


Dear Ms. Martinson:


Please refer to your new drug application (NDA) dated August 26, 2002, received August 26, 2002, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Wellbutrin XL (bupropion hydrochloride extended-release) Tablets.

We acknowledge receipt of your submissions dated July 3, 2003, August 21, 2003, and August 28, 2003.  The July 3, 2003 submission constituted a complete response to our June 24, 2003 action letter.

This new drug application provides for the use of Wellbutrin XL (bupropion hydrochloride extended-release) tablets as a new extended-release formulation of bupropion.

We have completed our review of this application, as amended.  It is approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.

**Labeling**
The final printed labeling (FPL) must be identical to the enclosed labeling (text for the package insert, text for the patient package insert, and immediate container and carton labels).  Marketing the product(s) with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDA*.  Alternatively, you may submit 20 paper copies of the FPL as soon as it is available but no more than 30 days after it is printed.  Individually mount 15 of the copies on heavy-weight paper or similar material.  For administrative purposes, designate this submission **"FPL for approved NDA 21-515."**  Approval of this submission by FDA is not required before the labeling is used.

**Drug Product Expiry**
The expiration date presently approved for Wellbutrin XL 150 mg and 300 mg Tablets in the 7 and 30 count bottle is 12 months.

NDA 21-515
Page 2

**Dissolution Specifications**

Following is the approved *in vitro* dissolution specifications for both strengths of Wellbutrin XL 150 mg and 300 mg tablets:

| | | |
|---|---|---|
| Apparatus: | USP Apparatus 1 (Basket) at 75 RPM | |
| Medium: | 900mL of 0.1N hydrochloric acid at $37 \pm 0.5°C$ | |
| Specifications: | 2 hours: | (b)(4) |
| | 4 hours: | (b)(4) |
| | 8 hours: | (b)(4) |
| | 16 hours: | (b)(4) |
| Sample size: | 12 tablets for each time point in the dissolution profile | |

**Risk Management Plan and Post-Marketing Commitment**

We have reviewed your proposed risk management plan included in the July 3, 2003 submission and overall, find your proposal to be acceptable. However, as discussed with you, we consider the Healthcare Practitioner letters and Educational Communication Plan to be essential components of this risk management plan and remind you of your postmarketing commitment dated August 28, 2003. This commitment is listed below.

> Educational Communication Plan: We note your agreement to provide all components of your Educational Communication Plan for Wellbutrin XL (bupropion hydrochloride extended-release tablets) on or before December 15, 2003.
>
> Please submit these educational materials as a package to the NDA. In addition, under 21 CFR 314.81(b)(2)(vii) and 314.81(b)(2)(viii), you should include a status summary of this commitment in your annual report to this NDA. The status summary should include expected completion dates and any changes in plans since the last annual report. All submissions, including supplements, relating to this postmarketing commitment must be prominently labeled **"Postmarketing Study Protocol", "Postmarketing Study Final Report", or "Postmarketing Study Correspondence."**

Finally, we recommend the following labeling revisions for your companion NDA for Wellbutrin SR Tablets (NDA# 20-358) to minimize potential errors with the use of Wellbutrin XL Tablets since there is a potential for confusion between the two products:

- Include "twice-a-day" text on container labels and carton labeling of the marketed product Wellbutrin SR Tablets (NDA 20-358). (Due to the 150 mg daily initial dosing for Wellbutrin SR Tablets, we recommend that this labeling statement be accompanied by a reference to full dosing information [e.g., "See package insert for full dosage information."])

**Patient Education**

We also have the following recommendations regarding patient education and related materials:

- All patient information materials (e.g., tear-off sheets, brochures, website, etc.) should contain language that is consistent with the patient package insert (PPI).
- Healthcare providers should be encouraged to provide appropriate education regarding Wellbutrin XL Tablets to their patients, and to reinforce this information by providing the patient with a PPI. Our rationale for this recommendation is below.

> With a few exceptions, PPIs are not required by law to be distributed at time of dispensing. PPIs are discretionary and usually do not accompany prescription medicines at the time of

NDA 21-515
Page 3

dispensing for various reasons. Wellbutrin XL will be supplied in bottles of 30 as 150 mg or 300 mg tablets. Even if the PPI is packaged with these bottles, the following factors may diminish the percentage of patients receiving a PPI. The dose of Wellbutrin XL ranges from 150 mg to 450 mg per day. Pharmacies may repackage medications from these packaged amounts when the prescribed amount differs from the packaged amount, or when they have a low supply of the medication on hand and can only dispense a partial prescription.

**Methods Validation**
We have not completed validation of the regulatory methods. However, we expect your continued cooperation to resolve any problems that may be identified.

**Promotional Materials**
In addition, submit three copies of the introductory promotional materials that you propose to use for this product. Submit all proposed materials in draft or mock-up form, not final print. Send one copy to this division/ the Division of Neuropharmacological Drug products and two copies of both the promotional materials and the package inserts directly to:

> Division of Drug Marketing, Advertising,
> and Communications, HFD-42
> Food and Drug Administration
> 5600 Fishers Lane
> Rockville, MD 20857

**MedWatch-to-Manufacturer Program**
The MedWatch-to-Manufacturer Program provides manufacturers with copies of serious adverse event reports that are received directly by the FDA. New molecular entities and important new biologics qualify for inclusion for three years after approval. Your firm is eligible to receive copies of reports for this product. To participate in the program, please see the enrollment instructions and program description details at www.fda.gov/medwatch/report/mmp.htm.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Doris J. Bates, Ph.D., Regulatory Project Manager, at (301) 594-2850.

> Sincerely,
>
> {See appended electronic signature page}
>
> Russell Katz, M.D.
> Director
> Division of Neuropharmacological Drug Products
> Office of Drug Evaluation I
> Center for Drug Evaluation and Research

Enclosure

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
 /s/
---------------------
Russell Katz
8/28/03 03:22:12 PM
```

# ANDA Bioequivalence Studies That Fail to Meet FDA's Current Bioequivalence Criteria

Dale P. Conner, Pharm.D.

Division of Bioequivalence

Office of Generic Drugs

OPS, CDER, FDA

# Introduction -- BE Studies

- Usually two-way crossover, single-dose study
- Normal volunteers
- Fasting
  - BE criteria: 90% CI between 80 and 125%
    - AUC
    - Cmax
- Fed (point-estimate between 80 and 125)



# Introduction

- Definition of "failed"

- Sponsors often choose not to submit "failed" studies in ANDAs

- Sometimes these contain important information on the to-be-marketed ANDA product

# Background

- For NDAs all human investigations made to show whether or not such drug is safe for use and whether such drug is effective must be submitted (F.D.&C. 505 (b)(1)(A))

- For ANDAs (F.D.&C. 505 (j)) similar language was not included in the Act

- Sponsors have interpreted this to mean that "failed" BE studies need not be submitted in ANDAs

# Background

- Other important considerations
  - Application may not contain untrue statements of material fact (F.D.&C. 505(j) (3) (K); 21 CFR 314.127 (a) (13))
  - Selective reporting of data may constitute untrue statements of material fact (example FR 32982 June 26,1995)
  - Failure to report failed studies may be considered selective reporting

# Reasons for "Failure" of BE Studies

- Under-powered study
- Unusual study designs
- "Outlier" response from one or more subjects
- Assay issues
- Wrong reference

# Reasons for "Failure" of BE Studies

- Baseline-corrected vs. not corrected
- Incorrect statistical analysis
- Compliance issues
- Formulation that is not truly bioequivalent to the reference

# Example 1 - Drug X Oral Liquid

- Liquid dosage form mixed with beverage prior to administration

- ANDA studies performed with one beverage

- Additional study in another beverage completed before ANDA approval

- Product was not bioequivalent under this labeled administration condition

- Study was not submitted before ANDA was approved

# Example 2 - Drug Y Solid Oral MR

- Discovered by Compliance on inspection of another study

- First study against a lot (A) of brand product failed -- Cmax (105, 130)

- Second study against another lot (B) of brand passed (submitted in ANDA)

- Third study performed testing lot A vs. lot B -- failed: Cmax (111, 131)

- Problem with RLD

# Example 3 "Outlier" Response Example

- Solid oral dosage form
- Standard BE study with 24 normal subjects
- One subject's T/R was ~4
- Point-estimate of other subjects T/R ~1.1
- Study did not pass CI criteria with all subjects
- Restudy of subject with 4 other original subjects
- Subject's new T/R = 1.05 ==> subject data dropped from original study

# Questions

- Should sponsors submit the results of all BE studies performed on the to-be-marketed ANDA formulation?

- Full reports or complete summaries?

- What should FDA do with this information?
  - Complete review
  - Brief, but careful, examination



**STATEMENT OF**

**DANIEL E. TROY, CHIEF COUNSEL**

**U.S. FOOD AND DRUG ADMINISTRATION**

**BEFORE THE**

**COMMITTEE ON THE JUDICIARY**

**UNITED STATES SENATE**

**JUNE 17, 2003**

**INTRODUCTION**

Mr. Chairman and Members of the Subcommittee, I am Daniel E. Troy, Chief Counsel for the United States Food and Drug Administration (FDA or the Agency). I am pleased to be with you today to discuss the Federal Trade Commission's July 2002 report entitled *Generic Drug Entry Prior to Patent Expiration: An FTC Study* (FTC Report) and FDA's implementation of the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Amendments.

This testimony will discuss a number of issues that affect the timely introduction of generic drugs into the U.S. marketplace. It will focus in particular on whether certain "later-listed" patents or inappropriate patent submissions by the sponsors of innovator drug products have resulted in the delay of generic drug approvals. These matters were the subject of the FTC Report, which FDA has found to be invaluable in informing the Agency's response to the delays to generic drug approvals. As you may know, on June 12, 2003, FDA announced its final rule intended to speed access to and increase the availability of generic drugs by limiting the use of 30-month stays by brand-name drug sponsors and by clarifying the types of patents that must be submitted to FDA for listing in the Orange Book.

The Hatch-Waxman Amendments were intended to balance two important public policy goals. First, Congress wanted to ensure that brand-name (also known as innovator) drug manufacturers would have meaningful patent protection and a period of marketing exclusivity to enable them to recoup their investments in the development of valuable new drugs. Second, Congress sought to ensure that, once the statutory patent protection and marketing exclusivity for these new drugs has expired, consumers would benefit from the rapid availability of lower priced generic versions of innovator drugs.

Since its enactment in 1984, Hatch-Waxman has governed the generic drug approval process. In general, the law has been working well. Since 1984, over 10,000 generic drugs have entered the market, and generics now account for close to 50 percent of prescriptions. Attention has recently focused on two key provisions of the law that allow for 180 days of marketing exclusivity to certain generic drug applicants, and for the 30-month stay on generic approvals. Both of these provisions are discussed in detail below.

FDA's objective is to enhance the ability of innovators, generic firms and the Agency to achieve the goals embodied in Hatch-Waxman. While the new rule will improve FDA's implementation of the law, this is only one part of a set of FDA initiatives that will reduce drug costs by encouraging innovation and speeding up the drug development and approval process, while maintaining FDA's high standards for safety and effectiveness. Our reforms in the generic approval process will generally shave months off the time to availability of generic drugs across the board. Similarly, new pathways for approving inhaled and topical drugs will potentially affect many products. This broad improvement in drug availability, both new drugs and generic drugs, will have a positive impact on all patients, not just those affected by imperfections in the operation of Hatch-Waxman.

**STATUTORY PROVISIONS**

The Hatch-Waxman Amendments amended the Federal Food, Drug, and Cosmetic (FD&C) Act and created a statutory generic drug approval process with section 505(j). Section 505(j) established the abbreviated new drug application (ANDA) approval process, which permits generic versions of previously approved innovator drugs to be approved without submitting a full new drug application (NDA). An ANDA refers to the clinical research and data in a previously approved NDA (the "listed drug") and relies on the Agency's finding of safety and effectiveness for the listed drug product.

The timing of an ANDA approval depends in part on patent protections for the innovator drug. Innovator drug applicants must include, in an NDA, information about patents relating to the drug product that is the subject of the NDA. FDA is required to publish the patent information submitted. The statute establishes a process that requires that ANDA applicants certify to the patents listed, provide notice to the NDA holder and patent owner, and, if patent infringement litigation is filed, imposes a 30-month stay on the approval of an ANDA. The Hatch-Waxman Amendments also created a period of market exclusivity for certain generic applicants.

**"ORANGE BOOK" LISTINGS**

Only certain types of patent information can be submitted to FDA. FDA publishes patent information on approved drug products in the Agency's publication Approved Drug Products with Therapeutic Equivalence Evaluations, also known as the "Orange Book." The Orange Book is available on FDA's website and is updated every few weeks. The book is printed in hardcover yearly by the Government Printing Office, updated monthly and available to the public. It lists all approved drug products with their therapeutic equivalence codes in addition to the products' patent and exclusivity information (if such information exists).

Concerns have been expressed over FDA's role in the listing of patents in the "Orange Book," which can have an impact on generic drug approvals by delaying their approval and the initiation of 180-day exclusivity. Under the FD&C Act, pharmaceutical companies seeking to market innovator drugs must submit, as part of an NDA or supplement, information on any patent that: 1) claims the pending or approved drug or a method of using the approved drug, and 2) for which a claim of patent infringement could reasonably be asserted against an unauthorized party. Patents that may be submitted are drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method of use patents. Process (or manufacturing) patents may not be submitted to FDA.

When an NDA applicant submits a patent covering the formulation, composition, or method of using an approved drug, the applicant must also submit a signed declaration stating that the patent covers the formulation, composition, or use of the approved product. The required text of the declaration is described in FDA's regulations.

The process of patent certification, notice to the NDA holder and patent owner, a 45-day waiting period, possible patent infringement litigation and the statutory 30-month stay may result in a considerable delay in the approval of ANDAs when an innovator company submits a new patent listing to FDA. Therefore, ANDA applicants often closely scrutinize these listings. FDA's regulations provide that, in the event of a dispute as to the accuracy or relevance of patent information submitted to and subsequently listed by FDA, an ANDA applicant must provide written notification of the grounds for dispute to the Agency. FDA will then ask the NDA holder to confirm the correctness of the patent information and listing. Unless the patent information is withdrawn or amended by the NDA holder, FDA does not change the patent information in the "Orange Book."

If a patent is listed in the "Orange Book," an applicant seeking approval for an ANDA must submit a certification to the patent. Even an applicant whose ANDA is pending when additional patents are submitted for listing by the sponsor must certify to the new patents, unless the additional patents are submitted by the patent holder more than 30-days after issuance by the U.S. Patent and Trademark Office. Until the final rule effective date, pending generic drug applications are subject to multiple overlapping 30-month stays if new patents are listed for the innovator drug.

FDA does not undertake an independent review of the patents submitted by the NDA sponsor. The statute requires FDA to publish patent information upon approval of the NDA. This strongly suggests – and FDA has long held – that the Agency's role in the patent-listing process is intended to be ministerial. Issues of patent claim and infringement are matters of patent law, and FDA lacks the authority, the resources, and the capability to assess whether a submitted patent claims an approved drug and whether a claim of patent infringement could reasonably be made against an unauthorized use of the patented drug. As such, FDA has implemented the statutory patent listing provisions by informing interested parties of what patent information is to be submitted, who must submit the information, and when and where to submit the information. Generic and innovator firms may resolve any disputes concerning patents in private litigation[1].

Over the past few years, new patents have occasionally been submitted to FDA for listing in the "Orange Book" shortly before patents already listed in the "Orange Book" were scheduled to expire. These new patents have been submitted to FDA within the required 30-days of issuance by the Patent and Trademark Office. If the NDA sponsor complies with the requirements of the statute and regulations in submitting a patent for listing in the "Orange Book," the Agency may not reject a patent merely on the basis that, but for the filing of the patent, ANDAs would be eligible for final approval.

It has been suggested that FDA should review drug patents to determine if they should be listed in the "Orange Book" as protection for innovator drug products – that is, FDA should assess whether a submitted patent properly claims the approved drug product and could support a claim of patent

infringement. The Agency believes that, even if it had the authority and expertise (which it does not), such a review would not speed the availability of generic drugs. Rather, it would instead add a layer of complexity and delay, leading to litigation between FDA and the generic or innovator, in addition to any litigation between the generic and innovator.

Moreover, FDA review of patents would be unlikely to speed approval and marketing of generic drugs in a meaningful way, even if FDA were to decide not to list a patent, the innovator company could obtain an injunction against approval or marketing of the generic drug until the patent listing question is resolved. In such a case, FDA's review of the patents would have done nothing to speed approval of generic drugs. Patent reviews would lead to substantial litigation that will impose a new and substantial burden on FDA's Office of the Chief Counsel and Department of Justice litigation resources. Finally, the Agency does not have the resources or expertise to review patents and, even with additional funding, is unlikely to be able to obtain the expert resources to do so.

**DELAYS IN GENERIC DRUG APPROVALS – 30-MONTH STAYS**

The FD&C Act requires that generic drug applicants include, in their ANDAs, a certification for each patent listed in the "Orange Book" for the innovator drug. Similar information is required for applicants filing 505(b)(2) applications under section 505(b)(2) of the FD&C Act. This certification must state one of the following:

> (I) that the required patent information relating to such patent has not been filed;
> (II) that such patent has expired;
> (III) that the patent will expire on a particular date; or
> (IV) that such patent is invalid or will not be infringed by the drug, for which approval is being sought.

A certification under paragraph I or II permits the ANDA to be approved immediately, if it is otherwise eligible. A certification under paragraph III indicates that the ANDA may be approved when the patent expires.

A paragraph IV certification, however, begins a process in which the question of whether the listed patent is valid or will be infringed by the proposed generic product may be answered by the courts before the expiration of the patent. The ANDA applicant who files a paragraph IV certification to a listed patent must notify the patent owner and the NDA holder for the listed drug that it has filed an ANDA containing a patent challenge. Until the effective date of FDA's final rule, all patents submitted and listed in the Orange Book, which are the subject of a paragraph IV certification, require notice to the NDA holder and patent owner. The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's opinion that the patent is not valid or will not be infringed.

The submission of an ANDA for a drug product claimed in a patent is an infringing act if the generic product is intended to be marketed before expiration of the patent. Accordingly, the ANDA applicant who submits an application containing a paragraph IV certification may be sued for patent infringement. If the NDA holder or patent owner files a patent infringement suit against the ANDA applicant within 45 days of the receipt of notice, FDA may not give final approval to the ANDA for at least 30 months from the date of that notice.

This 30-month stay will delay approval of the generic drug product unless the court reaches a decision earlier in the patent infringement case or otherwise orders a longer or shorter period for the stay. A court may modify the length of a stay, under the FD&C Act, "if either party in the action failed to reasonably cooperate in expediting the action." (21 U.S.C. 335(j)(5)(iii))

Under FDA's traditional interpretation of the Hatch-Waxman Amendments, multiple 30-month stays have been possible. Submission of newly issued patents after an ANDA application has been filed with FDA has required the appropriate certification and notice to the NDA holder and patent owner with the possibility of a 30-month stay if patent infringement litigation resulted. As a result, there have been a number of instances in which delays in ANDA approval have exceeded 30-months.

A recent review of FDA's records indicates that of the 442 active ANDAs that contained paragraph IV certifications, only 17 have had multiple 30-month stays, representing 3.8 percent of all applications with patent challenges. However, we note that a significant number of these products have high dollar value annual sales, and we are aware of some instances where multiple stays have resulted in the delay of a generic drug approval for a number of years.

**180-DAY EXCLUSIVITY**

The Hatch-Waxman Amendments provide an incentive of 180 days of market exclusivity to the "first" generic applicant who challenges a listed patent by filing a paragraph IV certification and thereby runs the risk of having to defend a patent infringement suit. The statute provides that the first applicant to file a substantially complete ANDA containing a paragraph IV certification to a listed

patent will be eligible for a 180-day period of exclusivity beginning either from the date it begins commercial marketing of the generic drug product, or from the date of a court decision finding the patent invalid, unenforceable or not infringed, whichever is first. These two events — first commercial marketing and a court decision favorable to the generic — are often called "triggering" events, because under the statute they can trigger the beginning of the 180-day exclusivity period.

In some circumstances, an applicant who obtains 180-day exclusivity may be the sole marketer of a generic competitor to the innovator product for 180 days. But 180-day exclusivity can begin to run — with a court decision — even before an applicant has received approval for its ANDA. In that case, some, or all of the 180-day period, could expire without the ANDA applicant marketing its generic drug. Conversely, if there is no court decision and the first applicant does not begin commercial marketing of the generic drug, there may be prolonged or indefinite delays in the beginning of the first applicant's 180-day exclusivity period. Approval of an ANDA has no affect on exclusivity, except if the sponsor begins to market the approved generic drug. Until an eligible ANDA applicant's 180-day exclusivity period has expired, FDA cannot approve subsequently submitted ANDAs for the same drug. This is true even if the later ANDAs are otherwise ready for approval and the sponsors are willing to begin marketing immediately. Therefore, an ANDA applicant who is eligible for exclusivity can often delay all generic competition for the innovator product.

Only an ANDA containing a paragraph IV certification may be eligible for exclusivity. If an applicant changes from a paragraph IV certification to a paragraph III certification, for example, upon losing its patent infringement litigation, the ANDA will no longer be eligible for exclusivity.

The 180-day exclusivity provision has been the subject of considerable litigation and administrative review in recent years, as the courts, industry, and FDA have sought to interpret it in a way that is consistent both with the statutory text and with the legislative goals underlying the Hatch-Waxman Amendments. A series of Federal court decisions beginning with the 1998 Mova[2] case describe acceptable interpretations of the 180-day exclusivity provision, identify potential problems in implementing the statute, and establish certain principles to be used by the Agency in interpreting the statute. As described in a June 1998 guidance for industry, FDA currently is addressing on a case-by-case basis those 180-day exclusivity issues not addressed by existing regulations.

One of the most fundamental changes to the 180-day exclusivity program, resulting from the legal challenges to FDA's regulations, is the determination by the courts of the meaning of the phrase "court decision." The courts have determined that the "court decision" that can begin the running of the 180-day exclusivity period may be the decision of the district court, if it finds that the patent at issue is invalid, unenforceable, or will not be infringed by the generic drug product. FDA had previously interpreted the "court decision" that could begin the running of 180-day exclusivity (and the approval of the ANDA) as the final decision of a court from which no appeal can be or has been taken - generally a decision of the Federal Circuit. FDA's interpretation had meant that an ANDA applicant could wait until the appeals court had finally resolved the patent infringement or validity question before beginning the marketing of the generic drug.

FDA had taken this position so that the generic manufacturer would not have to run the risk of being subject to potential treble damages for marketing the drug, if the appeals court ruled in favor of the patent holder. The current interpretation means that if the 180-day exclusivity is triggered by a decision favorable to the ANDA applicant in the district court, the ANDA sponsor who begins to market during that exclusivity period now may run the risk of treble damages if the district court decision is reversed on appeal to the Federal Circuit. As a practical matter, it means that many generic applicants may choose not to market the generic and thus the 180-day exclusivity period could run during the pendency of an appeal.

**FEDERAL TRADE COMMISSION STUDY**

In response to reports of brand-name and generic drug companies engaging in anti-competitive behavior, the FTC conducted a study to determine if the 180-day exclusivity and the 30-month stay provisions of the Hatch-Waxman Amendments have been used strategically to delay consumer access to generic drugs. In July 2002, FTC published the findings of their study and provided two primary recommendations.

FTC recommended that only one automatic 30-month stay per drug product per ANDA be permitted to resolve infringement disputes over patents listed in the "Orange Book" prior to the filing date of the generic applicant's ANDA. FDA agrees with FTC's conclusion that recently, more ANDAs have been subject to 30-month stays, and more multiple 30-month stays, than in years past, and more patents on average are now being litigated per generic drug application than in the past.

FTC's second recommendation was to pass legislation to require brand-name companies and first generic applicants to provide copies of certain agreements to FTC. This is a response to FTC's finding that brand-name companies and first generic applicants have on occasion entered into agreements to delay generic competition. FDA has no objection to this recommendation.

FDA agrees with many of the conclusions of the FTC study and has found the factual information provided in the report to be extremely valuable in our own deliberations regarding the generic drug approval process. One example of this is the compilation of information on the disposition of litigation surrounding patents filed after NDA approval.

Finally, we note that FTC's report recognized that FDA does not have the capacity to review the appropriateness of patent listings.

**FDA RULEMAKING**

On June 12, 2003, President Bush, HHS Secretary Thompson and FDA Commissioner McClellan announced a new regulation to be effective in 60 days that will streamline the process for making safe, effective generic drugs available to consumers. This rule was first proposed on October 24, 2002, in response, in part, to the FTC recommendations and other changes the Agency identified as being useful in improving generic competition. The new rule will limit an innovator drug company to only one 30-month stay of a generic drug applicant's entry into the market for resolution of a patent challenge. The changes in the regulations will save consumers an estimated $35 billion over ten years by making generic alternatives to certain more costly brand-name drugs available more quickly, by avoiding time-consuming legal delays. The new regulations will be published as a final rule in the *Federal Register* on June 18, 2003. The rule will be effective on August 18, 2003.

The rule provides a full opportunity for only one 30-month stay per ANDA or 505(b)(2) application; prohibits the submission of patents claiming packaging, intermediates, or metabolites; requires the submission of certain patents claiming a different polymorphic form of the active ingredient described in the NDA; adds a requirement that, for submission of polymorph patents, the NDA holder must have test data demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the NDA; makes changes to the patent information required to be submitted and provides declaration forms for submitting that information to FDA, both with the NDA and after NDA approval; and does not require claim-by-claim listing on the declaration form except for method-of-use patents claiming approved methods of use.

<u>30-Month Stay Provisions</u>
The final rule limits brand-name companies to only one 30-month stay. The rule accomplishes this by establishing when generic companies must provide notice of a paragraph IV patent challenge to a brand-name sponsor and the patent owner (which initiates the 30-month stay process). Notice of a paragraph IV certification must be provided with an initial paragraph IV certification and when a previous certification and notice did not result in a full opportunity for a single 30-month stay.

If an ANDA or 505(b)(2) application is amended to include a paragraph IV certification, notice must be provided to the NDA holder and patent owner only if the application did not already contain a paragraph IV certification or there was not a full opportunity for a 30-month stay. If an ANDA or 505 (b)(2) applicant changes its paragraph IV certification before the 45-day period after notice to the NDA holder and patent owner has expired, and the NDA holder or patent owner has not initiated patent litigation, such paragraph IV certification and related notice are not considered to have satisfied the requirement of providing one notice of a paragraph IV certification and a full opportunity for a 30-month stay.

Generic drug applicants will still have to file paragraph IV certifications to FDA, and the ability of brand-name firms to obtain patents and to challenge alleged infringement in court is undiminished. They will not, however, be able to forestall approval of a generic version of a drug by engaging in submitting later-issued patents or repeated patent filings. These later submissions will no longer result in multiple 30-month stays.

<u>Requirements for Drug Patent Submissions</u>
Under the final rule, drug manufacturers will not be allowed to submit patent information for listing in the Orange Book for drug packaging, drug metabolites, and intermediate forms of a drug. Permitted submissions include patent information on drug product (active ingredients), drug substance (formulation/composition), and approved uses of a drug.

In addition, patent submission declarations will be more detailed. There are mandatory forms that must be used to submit patent information to FDA. The forms include a series of questions with check-off boxes to be completed that provide details on the type of patent information submitted. The questions request information on whether the patent is one of the type permitted or not under the regulations, whether the patent is a product-by-process patent and the product claimed is novel, whether the method of use is an approved method of use and the relevant indication included in the approved labeling, and other relevant information.

The declarations must be filed with the NDA, amendment, or supplement, and for patent information submitted after NDA approval. The check-off questions are designed so that FDA does not have to do anything more than quickly review the form to determine whether the patent information is eligible for listing. A signed attestation is required on the declaration form that requires that the submitter

attest to the familiarity with the regulations and the information submitted. A warning is included that a willfully and knowingly false statement in the attestation can lead to criminal charges. These changes will significantly reduce opportunities to submit inappropriate patents for listing in order to delay approval of generic drugs and prevent fair competition.

**INITIATIVE ON IMPROVING ACCESS TO GENERIC DRUGS**

Concurrent with FDA's June 12, 2003, announcement on publication of its final rule, President Bush announced an initiative on Improving Access to Generic Drugs, which includes the following components:

- A proposed increase of $13 million in Fiscal Year 2004 in FDA resources devoted to improving access to generic drugs.

The proposed addition in the President's fiscal year 2004 budget of an additional $13 million in spending for FDA's generic drug programs would be the largest annual infusion of resources into the generic drug program ever, increasing the program's size by about one-third. FDA will be able to hire about 40 additional staff in generic drugs and expand the new chemistry review division in the Office of Generic Drugs. This expansion should help reduce the average review time by at least two months, increase the percentage of reviews that are completed within 180 days, approach the goal of reviewing 100 percent within 180 days and further reduce the time it takes FDA to review.

- New processes to reduce the time and cost of generic drug approvals.

Beginning in the next fiscal year, FDA will make significant changes in its processes for approving generic drugs. In particular, the FDA will implement early communications with generic drug manufacturers to discuss their applications. FDA will increase the number of guidances available for generic manufacturers regarding what is required to prepare and submit quality, complete applications. FDA will also institute regular meetings with generic trade associations to discuss the process for improving the quality of applications and to impart information on changes in policies and procedures. Studies of FDA processes for new drugs indicate that early communications and more explicit guidances can often improve drug applications and allow deficiencies to be corrected while an application is under review, rather than having to wait for additional review cycles to fix problems. This can significantly reduce the time it takes to approve a drug.

- Enhanced public education and scientific study of generic drugs.

FDA will expand its educational programs and partnerships involving generic drugs to help health care practitioners and consumers get accurate information about the availability of generic drugs for health care needs. FDA will also undertake additional scientific studies of certain types of generic drugs where adequate bioavailability methods have not been adequately developed, to make it easier to approve these generic drugs. FDA will also enhance the monitoring of the safety of generic drugs currently on the market.

These steps to improve access to generic drugs are expected to reduce the average time for most generic drug approvals by three months or more. Because this approach to increase availability will apply to all generic drugs, it can have a substantial impact on health care costs. In particular, faster access and a lower-cost approval process for the hundreds of generic drugs expected to come on the market would be expected to save consumers many billions. Improved consumer education and generic drug science is also intended to lead to additional savings from greater confidence and use of generic drugs.

**OTHER SIGNIFICANT BARRIERS TO GENERIC DRUG AVAILABILITY**

Although patent-related challenges have delayed approval of generic drugs in a number of high-profile cases, there are a number of other important barriers to generic competition. These barriers, which usually result from insufficient scientific knowledge and standards, are likely to become even more significant as scientific advances in drug development lead to new forms of therapy.

Currently, some classes of drug products entirely lack generic versions because scientific methods for evaluating their bioequivalence are not available. Examples include the nasal and inhaled corticosteroids used for allergy and asthma treatment. Prospective manufacturers of inhaled or topical generic drugs face uncertainty and high development costs, and thus few such products have been developed. Other widely used drugs, such as conjugated estrogens (available since the 1940s), lack generic competition due to scientific uncertainty about the composition of the active ingredient (s). Disputes over composition and bioequivalence standards also have caused delays in approval of many generic drugs while innovator challenges to the standards are evaluated. Scientific research to support the development of additional standards in these areas would enable FDA to approve drugs in additional classes, and also to deal with scientific challenges to pending generic drug approvals more expeditiously.

Innovations in drug therapy are leading to new methods of drug delivery, including via liposomes, implantable systems, transcutaneous or transmucosal products, and inhalation methods. At the same time, due to innovations in chemistry, drugs with very complex molecular structures are possible. If generic copies of such innovative therapies are eventually to be made available, standards must be developed to accommodate these products within the Hatch-Waxman framework. This includes not issues of composition, formulation and bioequivalence. Scientific research in each of these areas is needed to support new standards.

Some of the FY 2004 budget increase for the generic drug program noted above will allow for additional bioequivalence research on inhalers, topical generics, and other dosage forms, so that in the future, new classes of generics can be made possible. This is a long-term research need that will take time and a lot of effort, but FDA is dedicated to opening up these new product areas.

**RECENT SENATE ACTION ON GENERICS LEGISLATION**

We are pleased to note that in addition to our actions designed to speed access to generic drugs, last week the Senate Committee on Health, Education, Labor and Pensions by unanimous consent ordered reported legislation on generic drug access. This agreement is an important step forward. We recognize and appreciate Chairman Gregg's leadership in achieving a bipartisan agreement with the other original sponsors of the bill. We are pleased that the proposed legislation includes key ideas embodied in FDA's regulation to improve access to generic drugs, and does not include certain other problematic provisions contained in legislation (S. 812) that passed the Senate last year. In this highly complex and technical area of law, we do have some concerns with the workability of the bill that we believe must be resolved for the legislation to achieve its intended effect, and we are working with the original sponsors and other Members to address the various technical and policy issues.

**CONCLUSION**

Greater access to generic drugs will reduce health care costs because the price of generic drugs is typically much lower than the brand-name drug. Reducing expensive lawsuits over drug patents and making the approval process more efficient will also help to lower national health care costs by reducing the cost of bringing safe and effective generic drugs to market. Thanks to the President's leadership, we are making real progress to build on his initiatives on speeding access to generic drugs by finalizing a generic drug rule that will save consumers $35 billion over 10 years by increasing access and availability to generic drugs.

FDA continues to implement the Hatch-Waxman Amendments exclusivity provisions in the best manner possible given the text and history of the legislation, and the numerous court challenges. In doing so, FDA has tried to maintain a balance between innovation in new drug development and expediting the approval of lower-cost generic drugs, as Congress sought to do in enacting this statute. We are confident that the President's initiative and the Agency's regulatory changes will go far towards achieving these goals, and improving health care outcomes as a result.

Thank you for the opportunity to discuss these important issues with you, and I will be happy to answer any questions you may have.

*Footnote*

[1] *Mylan v. Thompson*, 268 F.3d 1323 (Fed Cir. 2001)—A generic's claim of improper listing "is not a recognized defense to patent infringement."

[2] *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1065 (D.C. Cir. 1998).

---

FDA/Office of Legislation
Web page created by mn 2003-JUN-17. Design by zwr.