# EXHIBIT 5

**Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction,**
*Biovail Corporation, et al. v. U.S. Food & Drug Administration, et. al.*

## DECLARATION OF CHARLES A. ROWLAND, JR. PURSUANT TO 28 U.S.C. 1746

I, Charles A. Rowland, Jr., declare that the following facts are true and accurate:

1. I am the Senior Vice President and Chief Financial Officer of Biovail Corporation ("Biovail"). I have held that position for two years and I have approximately 20 years of experience in the pharmaceutical industry.

2. Biovail, together with its subsidiaries, is a fully integrated pharmaceutical company that, among other things, tests, develops, manufactures, and sells prescription drugs, either directly or to other pharmaceutical companies for marketing and distribution primarily in the U.S. and Canadian markets. The company is listed and publicly traded on the New York and Toronto Stock Exchanges.

3. Biovail developed and manufactures the anti-depressive medication bupropion in a formulation known as WELLBUTRIN XL®. It is used to treat Major Depressive Disorder and Seasonal Affective Disorder and is the only once-daily bupropion drug that is available in the United States. Biovail's wholly-owned subsidiary, Biovail Laboratories International SRL, is the assigned owner of the patents to WELLBUTRIN XL®.

4. Biovail manufactures WELLBUTRIN XL® for the U.S. market and supplies it exclusively to GlaxoSmithKline, Inc. (GSK), one of the largest pharmaceutical companies in the world. GSK is responsible for all the marketing, advertising, sales, promotion, and distribution of WELLBUTRIN XL® in the United States, including detailing and other contacts with physicians.

5. WELLBUTRIN XL® is a product of immense importance to Biovail, as I show below, and if an unsafe generic version of WELLBUTRIN XL® is allowed to reach the market, it will harm WELLBUTRIN XL® immediately and irreparably.

**WELLBUTRIN XL®'s Importance to Biovail**

6. Biovail's publicly distributed revenue guidance, issued during August 2006, showed that the company expected to receive $425 to $435 million in revenue from the sale of WELLBUTRIN XL® during calendar year 2006. Based on Biovail's total revenue as set forth in its guidance, that projected revenue from WELLBUTRIN XL® represented approximately 42 percent of projected total revenue for the company for 2006. Due to GSK bearing all marketing costs, Biovail's profit margin on WELLBUTRIN XL® sales is more than 75 percent. Numerous reports by qualified equity research analysts have concluded that more than 70 percent of Biovail's total profits are tied to WELLBUTRIN XL®. It is thus clear that Biovail's present success has to a large extent been dependent upon WELLBUTRIN XL®.

**The Threatened Harm to Biovail**

7. In an effort to insure that any generic version of WELLBUTRIN XL® truly is bioequivalent to WELLBUTRIN XL®, and therefore is as safe as WELLBUTRIN XL®, Biovail filed a Citizen Petition (Exhibit B to the accompanying Perra Declaration) with FDA urging FDA to employ certain criteria for evaluating applications for approval of generic versions of WELLBUTRIN XL®. In that Citizen Petition, Biovail lays out the risk that, unless FDA employs the criteria urged by Biovail, the public will be exposed to unacceptable increased rates of seizures. If a generic drug posing these serious risks reaches the market, the potential harm to Biovail is enormous. An increase in seizures in patients treated with bupropion will have

impacts not limited to the generic manufacturer, but will inevitably reach WELLBUTRIN XL® as well. In many states, for example, prescriptions written for "WELLBUTRIN XL" will be filled with the generic and the consumer is not even informed that a pharmacy has provided a generic product rather than Biovial's product. The association of "WELLBUTRIN" with "risk of seizure" in these circumstances will be unavoidable, will tarnish Biovail's product, and will reduce the value of its immensely important product in a manner that can never be recompensed.

8. Physicians too will inevitably be affected by the marketing of an unsafe generic version of WELLBUTRIN XL®. Some as a result will prescribe other bupropion products; some will be driven to try competitive products that do not contain bupropion. There is no reason to expect that even the prompt removal of the unsafe product from the market will enable WELLBUTRIN XL® to regain its reputation and market share in full.

9. It is common for generic drug manufactures that are prepared to manufacture and distribute generic substitutes to gear up in anticipation of FDA approval of their products so that they are able to, and do, begin making substantial shipments immediately upon FDA approval. Thus, the harm to Biovail from an unsafe generic (and to the public as well) will be immediately consequent to FDA approval of the generic.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of August, 2006.

_____
Charles A. Rowland, Jr.

3