EXHIBIT 3

Plaintiffs' Second Motion for a Temporary Restraining Order and Preliminary Injunction,
*Biovail Corporation, et al. v. U.S. Food & Drug Administration, et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BIOVAIL CORPORATION, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) |
| U.S. FOOD & DRUG ADMINISTRATION, *et al.*, | ) |
| Defendants. | ) |

### DECLARATION OF KENNETH G. HOWLING

I, KENNETH G. HOWLING, hereby declare as follows:

1. I am the Senior Vice President and Chief Financial Officer of Biovail Corporation ("Biovail"). I have approximately 18 years of experience in the pharmaceutical industry.

2. Biovail, together with its subsidiaries, is a fully integrated pharmaceutical company that, among other things, tests, develops, manufactures and sells prescription drugs, either directly or to other pharmaceutical companies for marketing and distribution primarily in the United States and Canadian markets. The company is listed and publicly traded on the New York and Toronto Stock Exchanges.

3. Biovail developed and manufactures the anti-depressive medication bupropion in a formulation known as WELLBUTRIN XL®. It is used to treat Major Depressive Disorder and Seasonal Affective Disorder and, until recently, was the only once-daily bupropion drug approved for marketing in the United States. Biovail's wholly owned subsidiary, Biovail Laboratories International SRL, is the assigned owner of the patents to WELLBUTRIN XL®.

4. Biovail manufactures WELLBUTRIN XL® for the United States market and supplies it exclusively to GlaxoSmithKline, Inc. ("GSK"), one of the largest pharmaceutical companies in the world. GSK is responsible for all the marketing, advertising, sales, promotion and distribution of WELLBUTRIN XL® in the United States, including detailing and other contacts with physicians.

5. WELLBUTRIN XL® is a product of immense importance to Biovail, as I show below, and if a misleadingly labeled or potentially unsafe generic version of WELLBUTRIN XL® is allowed to reach or remain on the market, it will harm WELLBUTRIN XL® immediately and irreparably.

## WELLBUTRIN XL®'S IMPORTANCE TO BIOVAIL

6. Based on qualified equity research analyst estimates, Biovail is expected to receive $434.8 million in revenue from the sale of WELLBUTRIN XL® during calendar year 2006. Based on these estimates, WELLBUTRIN XL® represents approximately 42 percent of the midpoint of total revenue guidance for the company for 2006.

7. Due to GSK bearing all marketing costs, reports by qualified equity research analysts estimate that over 75 percent of Biovail's total profits are tied to WELLBUTRIN XL®. Accordingly, it is clear that Biovail's present success has to a large extent been dependent upon WELLBUTRIN XL®.

## BIOVAIL'S CITIZEN PETITION

8. In an effort to ensure that any generic version of WELLBUTRIN XL® truly is bioequivalent to WELLBUTRIN XL®, and therefore is as safe as WELLBUTRIN XL®, Biovail

2

filed a Citizen Petition (Exhibit B to the Perra Declaration)[1] with the United States Food and Drug Administration ("FDA") urging FDA to employ certain criteria for evaluating applications for approval of generic versions of WELLBUTRIN XL®. In that Citizen Petition, Biovail explained the risk that, unless FDA employs the criteria urged by Biovail, the public will be exposed to unacceptable increased rates of seizures.

9. On December 14, 2006, FDA issued a decision denying in part and granting in part Biovail's Citizen Petition (Exhibit 1 to the accompanying Segroves Declaration).[2] Although FDA agreed with Biovail's contention that certain information should be considered in the evaluation of applications to market a generic version of WELLBUTRIN XL®, the agency ultimately rejected the majority of concerns raised in Biovail's Citizen Petition.

10. That same day, FDA granted Anchen Pharmaceuticals, Inc. ("Anchen") approval to manufacture and sell a generic version of WELLBUTRIN XL®. (*See* Exhibit 2 to the accompanying Segroves Declaration.)

### THE THREATENED HARM TO THE PUBLIC

11. As explained in the accompanying declaration of Dr. Peter H. Silverstone, a major side-effect of bupropion is the risk of seizures. Even in a large number of individuals who have never had a seizure, bupropion will cause seizures if administered in a high enough dosage. The risk of seizures in those who drink alcohol while taking bupropion is significantly higher.

---

[1] References to the "Perra Declaration" are to the August 21, 2006 Declaration of Kevin J. Perra, a copy of which was attached as Exhibit 3 to Plaintiffs' first motion for preliminary injunctive relief.

[2] References to the "Segroves Decl." are to the December 18, 2006 Declaration of James F. Segroves, a copy of which is attached as Exhibit 3 to Plaintiffs' second motion for preliminary injunctive relief.

12. Accurate warnings are therefore critical to the safe use of bupropion. However, in approving Anchen to market a generic form of WELLBUTRIN XL®, FDA has allowed Anchen to manufacture and sell a product that is inaccurately labeled as likely having an incidence of seizures similar to that of prior versions of bupropion.

13. When FDA originally approved WELLBUTRIN XL®, it did so on Biovail's showing that WELLBUTRIN XL® was bioequivalent to the immediate-release and sustained-release formulations of bupropion, known respectively as WELLBUTRIN IR and WELLBUTRIN SR. WELLBUTRIN XL®'s labeling therefore contains the following accurate warning: "As both WELLBUTRIN XL and the sustained-release formulation of bupropion (WELLBUTRIN SR) are bioequivalent to the immediate-release formulation of bupropion, the seizure incidence with WELLBUTRIN XL, while not formally evaluated in clinical trials, may be similar to that presented below for the immediate-release and sustained-release formulations of bupropion."

14. Anchen's ANDA, on the other hand, was approved based solely on the proposed generic's bioequivalence to WELLBUTRIN XL®. Federal law requires that except for minor changes caused because of a difference in manufacturers, the label of a generic must be the same as that of the pioneer. Although the Anchen product is required to use the same labeling as WELLBUTRIN XL®, this labeling would be inherently false and misleading because Anchen has not demonstrated bioequivalency with the immediate-release and sustained-release formulations of bupropion.

4

## THE THREATENED HARM TO BIOVAIL

15. It is common for generic drug manufacturers that are prepared to manufacture and distribute generic substitutes to gear up in anticipation of FDA approval of their products so that they are able to, and do, begin making substantial shipments immediately upon FDA approval. The harm to Biovail from a mislabeled and potentially unsafe generic is immediate given that on December 14, 2006, FDA granted Anchen approval to market a generic version of WELLBUTRIN XL®.

16. Based on my experience and data from other introductions of generic products in the United States, total revenue to Biovail from WELLBUTRIN XL® will be significantly diminished by the introduction of a generic version of the medication. WELLBUTRIN XL® will begin to lose market share immediately after the announcement of the approval of a generic, not to mention when the drug becomes available at the retail level. (In some states, pharmacists are required to substitute the generic for the innovator drug unless instructed by the physician not to do so.)

17. Based on my experience and data from other introductions of generic products in the United States, the introduction of a generic version of WELLBUTRIN XL® could cause Biovail to lose hundreds of millions of dollars of product revenue in the first 12 months. This would represent a very significant portion of the company's total revenues, profitability and cash flow. Additionally, GSK is likely to stop its promotion of WELLBUTRIN XL® upon the introduction of a generic and, as a consequence, wholesalers will immediately stop buying our branded product to reduce inventory. Such reactions to generic introductions have become

5

widespread in the industry. Thus, the effect of the generic's introduction will be immediate, dramatic and significant.

18. More specifically, based on the actual results for the first nine months of 2006, Biovail's sales revenue from WELLBUTRIN XL® is $33.6 million per month on average. It is reasonable to assume that inventory of that drug in the distribution channel will be reduced at least by one to two months (based on the actual results for the first nine months of 2006, approximately $34 to $67 million of Biovail's revenue), shortly after announcement of a generic version being approved. As the generic product gains market share soon thereafter, equity research analysts estimate that Biovail likely will lose approximately 60 to 65 percent of its total revenue base from the introduction of a generic version of WELLBUTRIN XL®.

19. Moreover, an increase in seizures in patients treated with a generic form of WELLBUTRIN XL® will have impacts not limited to the generic manufacturer, but will inevitably reach WELLBUTRIN XL® as well. In many states, for example, prescriptions written for "WELLBUTRIN XL" will automatically be filled with the generic. The association of "WELLBUTRIN" with "risk of seizure" in these circumstances will be unavoidable, will tarnish Biovail's product, and will reduce the value of its immensely important product in a manner that can never be recompensed.

20. Physicians too will inevitably be affected by the marketing of a mislabeled and potentially unsafe generic version of WELLBUTRIN XL®. Some as a result will prescribe other bupropion products; some will be driven to try competitive products that do not contain bupropion. There is no reason to expect that even the prompt removal of the unsafe product

from the market will enable WELLBUTRIN XL® to regain its reputation and market share in full.

21. Marketing of a generic version of WELLBUTRIN XL® at this time also would harm Biovail's marketing relationships to the detriment of our company and the public in general. Biovail develops drugs for other companies at considerable expense, and not all attempts to do so are successful. Companies expect to recoup their losses and make a sufficient profit to warrant such risks before facing competition from a generic manufacturer that has not made such an investment. If a generic version of WELLBUTRIN XL® is allowed to enter the market, the harm will be immediate and will not be remedied by an eventual court order that results in later removal of that generic from the market. Such a precedent will make drug companies reluctant in partnering to produce needed drugs and will confuse physicians and their patients, perhaps even driving them to try competitive products that do not contain bupropion.

22. In summary, the substantial harm to Biovail that will flow from FDA's approval of a generic version of WELLBUTRIN XL® is irreparable given the highly competitive prescription drug market. The harm to Biovail will not only be irreparable, but disproportionately enormous. We are a relatively small company in which WELLBUTRIN XL®, a much-needed source of relief for many people, is a significant percentage of our business.

23. Furthermore, it is my understanding that Biovail would likely not be able to sue FDA or Anchen for monetary damages related to FDA's decision to approve a generic form of WELLBUTRIN XL® that is misleadingly labeled and potentially dangerous.

7

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 17, 2006

*Kenneth G. Howling*