
DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville MD 20857

December 14, 2006

John B. Dubeck
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, DC 20001

Re:  Docket No. 2005P-0498/CP1

Dear Mr. Dubeck:

This letter responds to your citizen petition received on December 20, 2005 (Petition), and your letter received on June 29, 2006 (Letter), both submitted on behalf of Biovail Corporation (Biovail). The Petition requests that the Food and Drug Administration (FDA or the Agency) require that any applicant for an abbreviated new drug application (ANDA) for a generic[1] version of Wellbutrin XL (bupropion hydrochloride (HCl) extended-release tablets)[2] meet certain bioequivalence criteria. Specifically, you request that FDA require the ANDA applicant to (1) demonstrate that the generic formulation is bioequivalent to Wellbutrin (the immediate-release formulation of bupropion HCl), Wellbutrin SR (the sustained-release formulation of bupropion HCl), and Wellbutrin XL; (2) calculate and evaluate parameters in all of its bioequivalence trials based on concentrations of the parent drug and active metabolites; and (3) conduct its bioequivalence trials at steady-state, evaluating the performance of the dosage form based on the area under the plasma concentration versus time curve (AUC), the maximum drug concentration ($C_{max}$), and the minimum drug concentration ($C_{min}$). The Petition also requests that FDA require the ANDA applicant to provide in vitro data demonstrating the absence of *dose dumping* if generic bupropion HCl extended-release tablets are consumed with alcohol. In addition, the Letter requests that FDA take final action on the Petition no fewer than 2 business days before finally approving any ANDA for generic bupropion HCl extended-release tablets. We have carefully considered the Petition and the Letter, as well as all comments filed in the

---

[1] As used herein, the term *generic* drug refers to a new drug product for which approval is sought in an ANDA submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 355(j)).

[2] In this response, we will generally refer to the ANDA applicants' proposed products as generic bupropion HCl extended-release tablets. Although sustained-release products are considered to be extended-release products, for ease of reference, the term extended-release will not be used in this response to refer to sustained-release formulations. When referring specifically to sustained-release formulations, we will use the term *sustained-release*.

docket.[3] For the reasons stated below, the Petition is granted in part and denied in part and the request in your Letter is denied.

## I.    BACKGROUND

### A.    Wellbutrin

Wellbutrin (bupropion HCl[4]) was first approved as an immediate-release (IR) tablet on December 30, 1985 (new drug application (NDA) 18-644), and is available in 75- and 100-milligram (mg) tablets. Wellbutrin was subsequently approved in a sustained-release (SR) formulation (referred to as Wellbutrin SR) on October 4, 1996 (NDA 20-358), and is available in 50-, 100-, 150-, and 200-mg tablets. On August 28, 2003, Wellbutrin was approved as an extended-release (XL) formulation (referred to as Wellbutrin XL) (NDA 21-515) and is available in 150- and 300-mg tablets.[5]

Wellbutrin XL is manufactured by Biovail for NDA holder GlaxoSmithKline[6] and is indicated for the treatment of major depressive disorder and for the prevention of seasonal major depressive episodes in patients with a diagnosis of seasonal affective disorder (SAD).[7] FDA has

---

[3] In its comments dated February 23, 2006, Impax Laboratories, Inc. asserts that "Biovail's Petition is nothing more than a last-minute petition seeking to extend a monopoly on an overpriced brand name drug in a crowded therapeutic field through the abuse of governmental processes to slow the market entry of equivalent but more affordable generic versions of the branded product" (Comments at 1). On December 21, 2004, Biovail Corporation instituted legal proceedings for patent infringement after Anchen Pharmaceuticals Inc. and Abrika Pharmaceuticals LLP submitted ANDAs for generic bupropion HCl extended-release tablets (2005 Annual Report of Biovail Corporation). However, it was not until December 20, 2005, that you submitted the Petition. You also submitted a letter to FDA on June 29, 2006, requesting that FDA take final action on the Petition no fewer than 2 business days before finally approving any ANDA for generic bupropion HCl extended-release tablets. You stated that failure to do so would impair effective judicial review. FDA issued a tentative response to the December 20, 2005, Petition in accordance with its regulations (21 CFR 10.30(e)(2)). However, before receiving FDA's substantive response to the Petition or to the June 29, 2006, letter, on August 23, 2006, Biovail filed a Motion for a Temporary Restraining Order with the District Court of the District of Columbia alleging that the Agency violated the Administrative Procedure Act and Biovail's right to due process by failing to substantively respond to the Petition within 180 days. The court denied the motion in an order issued on August 25, 2006 (*Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920 (D.D.C. Sept. 6, 2006)).

[4] Bupropion HCl is an antidepressant of the aminoketone class and is not chemically related to tricyclic, tetracyclic, selective serotonin re-uptake inhibitor, or other known antidepressant agents. It is designated as (±)-1-(3-chlorophenyl)-2-[(1,1-dimethylethyl)amino]-1-propanone hydrochloride (see the Wellbutrin XL labeling approved June 2006 (and revised July 2006)).

[5] See FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations*, 26th Ed., 2006 (commonly referred to as the Orange Book).

[6] Petition at 1.

[7] FDA approved Wellbutrin XL for the new indication of prevention of seasonal major depressive episodes in patients with SAD on June 12, 2006.

2

designated Wellbutrin XL, 150 mg, as the reference listed drug (RLD)[8] for generic bupropion HCl extended-release tablets.

B.   Statutory and regulatory basis for ANDA approval

The Drug Price Competition and Patent Term Restoration Act of 1984 (the Hatch-Waxman Amendments) created section 505(j) of the Act, which established the current ANDA approval process. To obtain approval, an ANDA applicant is not required to submit evidence to establish the clinical safety and effectiveness of the drug product; instead, an ANDA relies on FDA's previous finding that the RLD is safe and effective. Under the Hatch-Waxman scheme, to rely on a previous finding of safety and effectiveness, an ANDA applicant must demonstrate, among other things, that its generic drug product is bioequivalent[9] to the RLD.[10] In addition, a drug product described in an ANDA generally must contain the same active ingredient,[11] conditions of use,[12] route of administration, dosage form, strength,[13] and (with certain permissible differences) labeling[14] as the RLD, unless a petition for certain changes is approved by the Secretary[15] (sections 505(j)(2)(A), (j)(2)(C), and (j)(4) of the Act). The scientific premise underlying the Hatch-Waxman Amendments is that drug products that are both bioequivalent

---

[8] A reference listed drug or RLD is "the listed [i.e. approved] drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application" (21 CFR 314.3). RLDs are identified in the Orange Book.

[9] Section 505(j)(8)(B) of the Act states that a generic drug product is bioequivalent to the RLD if:

> (i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses (see also 21 CFR 320.1(e) and 320.23(b)).

[10] See e.g., section 505(j)(2)(A)(iv) of the Act (requiring "information to show that the new drug is bioequivalent to the listed drug referred to in clause (i) [i.e., listed drug]..."); 21 CFR 314.3 (defining *reference listed drug*); 21 CFR 314.94(a)(7) (requiring, as part of ANDA content and format, information to show that the drug product is bioequivalent to the reference listed drug upon which the applicant relies); 21 CFR 314.127(a)(6)(i)(providing that FDA will refuse to approve an ANDA if information submitted is insufficient to show that the drug product is bioequivalent to the listed drug referred to in the ANDA); and the Orange Book at ix (defining *reference listed drug*).

[11] See e.g., 21 CFR 314.94(a)(5).

[12] See e.g., 21 CFR 314.94(a)(4).

[13] See e.g., 21 CFR 314.94(a)(6).

[14] See e.g., 21 CFR 314.94(a)(8).

[15] An applicant may submit an ANDA for a drug that has a different active ingredient, route of administration, dosage form, or strength from the RLD if the applicant has submitted a petition to the Agency (known as a *suitability petition*) requesting permission to file such an application and received the Agency's approval (see section 505(j)(2)(C) of the Act and 21 CFR 314.93).

3

and pharmaceutically equivalent[16] are therapeutically equivalent, meaning that the drugs generally may be substituted for each other.[17]

Based on these statutory and regulatory requirements, FDA classifies as therapeutically equivalent those products that:

- are approved as safe and effective;

- are pharmaceutical equivalents in that they (1) contain identical amounts of the same active drug ingredient in the same dosage form and route of administration, and (2) meet compendial or other applicable standards of strength, quality, purity, and identity;

- are bioequivalent in that (1) they do not present a known or potential bioequivalence problem and they meet an acceptable in vitro standard, or (2) if they do present such a known or potential problem, they are shown to meet an appropriate bioequivalence standard;

- are adequately labeled; and

- are manufactured in compliance with current good manufacturing practice regulations.[18]

FDA regulations at 21 CFR 320.24 establish acceptable methodologies for determining the bioequivalence of drug products in descending order of accuracy, sensitivity, and reproducibility. These tests include studies such as pharmacokinetic studies, pharmacodynamic studies, comparative clinical trials, and in vitro studies. The selection of the method used to meet an in vivo testing requirement depends upon the purpose of the study, the analytical methods available, and the nature of the drug product.[19] The appropriate approach for ANDA applicants for generic bupropion HCl extended-release tablets is "an in vivo test in humans in which the concentration of the active ingredient or active moiety, and, when appropriate, its active

---

[16] Pharmaceutically equivalent drug products have identical dosage forms that contain identical amounts of the identical active drug ingredient and meet the identical compendial or other applicable standard of identity, strength, quality, and purity, including potency and, where applicable, content uniformity, disintegration times, and/or dissolution rates. They do not necessarily contain the same inactive ingredients and may also differ in characteristics such as shape, scoring, release mechanism, and, within certain limits, labeling (see 21 CFR 320.1 and the Orange Book, Introduction at p. vii).

[17] A generic drug that establishes bioequivalence as well as pharmaceutical equivalence is coded A, which indicates that the drug is therapeutically equivalent to the RLD in the Orange Book. Drug products that the Agency does not currently consider therapeutically equivalent to other pharmaceutically equivalent products are coded B.

[18] The Orange Book, Introduction at p. vi.

[19] 21 CFR 320.24(a).

metabolite(s), in whole blood, plasma, serum, or other appropriate biological fluid is measured as a function of time. This approach is particularly applicable to dosage forms intended to deliver the active moiety to the bloodstream for systemic distribution within the body."[20]

The choice of which study design to use is based on the ability of the design to compare the drug delivered by the two products at the particular site of action of the drug. The preferred design for oral dosage forms is a single-dose, fasting, two-treatment, two-sequence crossover design with a *washout* period between treatments.[21] In a crossover study, the subjects receive the test (generic) and reference (innovator) products in separate sequences (either test before reference or reference before test), with a period between treatments of no drug administration (the washout period) to ensure the previous dose is cleared from the body before the second dose is administered. FDA recommends that the study be conducted in healthy subjects, usually 24 to 36 adults. The courts have expressly upheld FDA's regulatory implementation of the Act's bioequivalence requirements (see, e.g., *Schering Corp. v. FDA*, 51 F.3d 390 at 397-400 (3rd Cir. 1995); *Fisons Corp. v. Shalala*, 860 F. Supp. 859 (D.D.C. 1994)).

## II.    DISCUSSION

You assert that because a generic drug's labeling must be identical to the RLD's labeling (subject to exceptions under the Act and FDA regulations),[22] the labeling for generic bupropion HCl extended-release tablets would need to include the same information as Wellbutrin XL regarding specific test results or other scientific findings (Petition at 3, 5). Therefore, you argue that any ANDA applicant must duplicate the conditions in the labeling of Wellbutrin XL (Petition at 4). Specifically, you argue that the ANDA applicant must (1) demonstrate that generic bupropion HCl extended-release tablets are bioequivalent to Wellbutrin XL, Wellbutrin SR, and Wellbutrin; (2) consider in its evaluation of generic bupropion HCl extended-release tablets the metabolites of bupropion; (3) conduct its bioequivalence trials at steady-state, evaluating the performance of the dosage form based on AUC, $C_{max}$, and $C_{min}$; and (4) provide in vitro data confirming the absence of dose dumping when the dosage form is consumed with alcohol. We discuss each of these criteria in further detail below.

A.    **Demonstrate that generic bupropion HCl extended-release tablets are bioequivalent to Wellbutrin XL, Wellbutrin SR, and Wellbutrin.**

---

[20] 21 CFR 320.24(b)(1)(i).

[21] See FDA's guidance for industry on *Bioavailability and Bioequivalence Studies for Orally Administered Drug Products – General Considerations* (the BA/BE Guidance, available on the Internet at http://www.fda.gov/cder/guidance/index.htm) at p. 17. We note that we also expect ANDA applicants for generic bupropion HCl extended-release tablets to conduct a fed bioequivalence study (see section II.A of this response).

[22] See section 505(j)(2)(A)(v) of the Act and 21 CFR 314.94(a)(8).

You cite certain sections of the approved labeling for Wellbutrin XL that mention the bioequivalence or equivalence of Wellbutrin XL to the sustained-release and immediate-release formulations of Wellbutrin (Petition at 5).[23] You argue that for a generic drug to appropriately use this labeling, an ANDA applicant must demonstrate bioequivalence of its product not only to the extended-release formulation of Wellbutrin, but also to the sustained-release and immediate-release formulations to ensure that the seizure risk and bioequivalence information in the labeling would not be false or misleading. You also argue that unless the ANDA applicant demonstrates this bioequivalence, the relevance and accuracy of the data regarding seizure incidence and other side effects is open to question (Petition at 5-6). Finally, you argue that the assessment of bioequivalence would require a demonstration of the absence of a "food effect" on the release of the active ingredient in the generic product (Petition at 6, footnote 9).

An ANDA applicant is required to demonstrate that its generic bupropion HCl extended-release tablets are bioequivalent to Wellbutrin XL (the RLD) as part of the ANDA approval process. However, an ANDA applicant for generic bupropion HCl extended-release tablets is not required to demonstrate bioequivalence to Wellbutrin SR and Wellbutrin. As described in section I.B. of this response, under the Act and FDA regulations, to obtain approval ANDA applicants are required to demonstrate bioequivalence to the RLD.

Although you contend that the information in the labeling would be false or misleading if an ANDA applicant does not conduct additional studies addressing the equivalence of its generic bupropion HCl extended-release tablets to the sustained-release and immediate-release formulations of Wellbutrin, this claim is without merit. The fact that there is equivalency information in the approved labeling of Wellbutrin XL does not, as you claim, require the ANDA applicant to independently demonstrate bioequivalence or equivalence to sustained-release and immediate-release formulations of Wellbutrin in addition to the RLD.

To obtain approval, an ANDA applicant relies upon the Agency's finding of safety and effectiveness for the RLD.[24] To rely on this finding, the ANDA applicant must demonstrate that

---

[23] You cite, as an example, the "Warnings--Seizures" section of Wellbutrin XL's approved labeling. In the current approved labeling, this section states, "As Wellbutrin XL is bioequivalent to both the immediate-release formulation of bupropion and to the sustained-release formulation of bupropion, the seizure incidence with Wellbutrin XL, while not formally evaluated in clinical trials, may be similar to that [information] presented below for the immediate-release and sustained-release formulations of bupropion" (Wellbutrin XL labeling approved June 2006 (and revised July 2006)). You also cite, as an example, the "Clinical Pharmacology--Pharmacokinetics" section of Wellbutrin XL's approved labeling (Petition at 5). In the current approved labeling, this section states that in studies comparing Wellbutrin XL 14-day dosing with the immediate- and sustained-release formulations of bupropion, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the three metabolites. (Wellbutrin XL labeling approved June 2006 (and revised July 2006)).

[24] *See Zeneca v. Shalala*, 213 F.3d 161, 163 (4th Cir. 2000) (noting that "[t]he ANDA procedure 'permits generic drug applications to piggy-back on clinical findings that [the] FDA has already embraced' in the NDA...and thus, the ANDA applicant need not duplicate the clinical safety studies that supported the pioneer drug's NDA." (internal

its generic drug product is bioequivalent to the RLD -- Wellbutrin XL -- and meets all other requirements for ANDA approval, including appropriate labeling.[25] Once an ANDA applicant has established that its generic bupropion HCl extended-release tablets are (among other things) bioequivalent to Wellbutrin XL, the Wellbutrin XL labeling, including equivalence and seizure information, would be applicable to the generic extended-release product.

Generic bupropion HCl extended-release tablets that are bioequivalent and pharmaceutically equivalent to the RLD are considered to be therapeutically equivalent and thus can be substituted for Wellbutrin XL.[26] These two drugs would be expected to have the same clinical effect and safety profile when administered to patients under the conditions for use prescribed, recommended, or suggested in the labeling. You have not submitted any data or information to suggest otherwise.

The underlying purpose of demonstrating bioequivalence of a generic drug to the RLD is to, among other things, ensure that the two drugs will be substitutable for each other. We note that, in comparison, the purpose of the equivalency information that you cite in Wellbutrin XL's approved labeling regarding the immediate-release, sustained-release, and extended-release formulations is not to demonstrate substitutability among the three formulations, as these formulations are not therapeutically equivalent and therefore are not substitutable.[27] Instead, the equivalency information in the labeling is intended to assist prescribers in administering the drug product if they want to convert their patients from one formulation to another.[28] This equivalency information in the generic drug labeling (like the innovator labeling) would also similarly assist prescribers in converting a patient from the immediate-release or sustained-release formulations of bupropion HCl to the extended-release formulation of bupropion HCl. It

---

cite omitted)). We note that to require the ANDA applicants, as you request, to conduct all the clinical studies necessary to demonstrate safety and efficacy and, in this case equivalence studies, would vitiate the purpose of the Hatch-Waxman Amendments.

[25] Section 505(j)(2)(A)(v) of the Act states that an ANDA shall contain information to show that the labeling proposed for a generic drug is the same as the labeling approved for the RLD, except for changes required because of differences approved under an ANDA suitability petition or because the generic drug and the RLD are produced or distributed by different manufacturers. Such differences between the generic applicant's proposed labeling and the RLD's labeling may include differences in expiration date, formulation, bioavailability, or pharmacokinetics; labeling revisions made to comply with current FDA labeling guidelines or other guidance; or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity (see 21 CFR 314.94(a)(8)(iv); see also 21 CFR 314.127(a)(7)).

[26] See section I.B. of this response for a discussion of *bioequivalent* and *pharmaceutically equivalent*.

[27] These three formulations are not AB rated to each other (see the Prescription Drug Product List of the Orange Book).

[28] See the "Switching Patients from Wellbutrin Tablets or from Wellbutrin SR Sustained-Release Tablets" section of Wellbutrin XL's labeling approved June 2006 (and revised July 2006).

would also be useful for prescribers to refer to the information regarding seizure risk among the three formulations.[29]

You also assert that an assessment of the bioequivalence of generic bupropion HCl extended-release tablets to the immediate-release, sustained-release, and extended-release formulations of Wellbutrin would require a demonstration of the absence of a "food effect" on the release of the active ingredient in the generic product (Petition at 6, footnote 9). As noted earlier in this subsection, an ANDA applicant is not required to demonstrate that its generic bupropion HCl extended-release tablets are bioequivalent to the immediate-release and sustained-release formulations of Wellbutrin. However, with respect to the assessment of the bioequivalence of the generic bupropion HCl extended-release tablets to Wellbutrin XL, we would expect an ANDA applicant to conduct a fed bioequivalence study in addition to a fasted study.

FDA's guidance on *Food-Effect Bioavailability and Fed Bioequivalence Studies* (the Food Effect Guidance)[30] states that fed bioequivalence studies are conducted for ANDAs to demonstrate their bioequivalence to the RLD under fed conditions. For all orally administered modified-release drug products such as Wellbutrin XL, the Agency indicates that food effects are most likely to result from a complex combination of factors that influence the in vivo dissolution of the drug product and/or the absorption of the drug substance (the Food-Effect Guidance at 2). In the Food-Effect Guidance, FDA recommends that food-effect bioavailability and fed bioequivalence studies be performed for all modified-release dosage forms of drugs and, for ANDA applicants, recommends that fasting and fed bioequivalence studies be conducted for all orally administered modified-release drug products (the Food-Effect Guidance at 4). Consequently, we expect ANDA applicants for generic bupropion HCl extended-release tablets to conduct both fed and fasted bioequivalence studies. As noted previously, we expect an ANDA applicant to demonstrate bioequivalence of its generic bupropion HCl extended-release tablets to Wellbutrin XL, and not the immediate-release and/or sustained-release versions. The Agency expects an ANDA applicant to demonstrate that the generic bupropion HCl extended-release tablets exhibit equivalent in vivo performance to Wellbutrin XL in the presence or absence of food.

B.  **Calculate and evaluate parameters in all of the bioequivalence trials based on concentrations of the parent drug and active metabolites.**

You claim that the metabolites of bupropion play a significant role in the clinical performance of Wellbutrin XL, and FDA therefore should require any ANDA applicant to demonstrate similar results to assure that the generic version will provide similar effects (Petition at 7). You state

---

[29] As noted in the BA/BE Guidance, bioequivalence documentation can be useful during the NDA period to establish links between certain formulations (p. 4).

[30] The Food-Effect Guidance is available on the Internet at http://www.fda.gov/cder/guidance/index.htm.

that the "Clinical Pharmacology--Pharmacokinetics" section of Wellbutrin XL's labeling indicates the importance of such observations and discusses the specific findings and methodology as follows:

> In a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the immediate-release formulation of bupropion at 100 mg 3 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites (hydroxybupropion, threohydrobupropion, and erythrohydrobupropion). Additionally, in a study comparing 14-day dosing with WELLBUTRIN XL Tablets 300 mg once daily to the sustained-release formulation of bupropion at 150 mg 2 times daily, equivalence was demonstrated for peak plasma concentration and area under the curve for bupropion and the 3 metabolites.

In comparing an extended-release formulation with an immediate-release formulation, the information on metabolites may be of interest and this is reflected in the cited section of labeling. In comparing generic bupropion HCl extended-release tablets to Wellbutrin XL for the purposes of bioequivalence, however, it is not necessary to measure all of the metabolites. With respect to your request that generic bupropion HCl extended-release tablets show results similar to Wellbutrin XL for all metabolites, we grant your request in part. We currently expect an ANDA applicant for generic bupropion HCl extended-release tablets to measure the hydroxybupropion metabolite, but not the threohydrobupropion and erythrohydrobupropion metabolites in its bioequivalence studies. (Your related assertion that bioequivalence trials should be conducted at steady-state is discussed in section II.C. of this response.)

The BA/BE Guidance provides recommendations concerning the measurement of either the drug's active ingredient or its active moiety in the administered dosage form (parent drug) and, when appropriate, its active metabolite or metabolites in the determination of the drug's bioequivalence (the BA/BE Guidance at 17-18). For bioequivalence studies, the BA/BE Guidance generally recommends measurement of only the parent drug (the moiety released from the dosage form), rather than the metabolite (the BA/BE Guidance at 18). The basis for this recommendation is that the "concentration-time profile of the parent drug is more sensitive to changes in formulation performance than a metabolite, which is more reflective of metabolite formation, distribution, and elimination" (the BA/BE Guidance at 18).

The BA/BE Guidance describes two situations when it may be appropriate to measure metabolites (and therefore the general recommendation (i.e., measuring the parent drug only) does not apply). The first situation is when the parent drug levels are too low to allow reliable analytical measurement in blood, plasma, or serum for an adequate length of time. This first situation does not apply in the case of Wellbutrin XL. The second situation is when a metabolite may be formed as a result of gut wall or other presystemic metabolism and the metabolite contributes meaningfully to safety and/or efficacy. The BA/BE Guidance (p. 18) explains the second situation as follows:

9

> A metabolite may be formed as a result of gut wall or other presystemic metabolism. If the metabolite contributes meaningfully to safety and/or efficacy, we also recommend that the metabolite and the parent drug be measured. When the relative activity of the metabolite is low and does not contribute meaningfully to safety and/or efficacy, it does not have to be measured. We recommend that the parent drug measured in these BE studies be analyzed using a confidence interval approach. The metabolite data can be used to provide supportive evidence of comparable therapeutic outcome.

This second situation does apply to bupropion HCl extended-release tablets with respect to hydroxybupropion only. We conclude that based on the currently available scientific evidence, hydroxybupropion is formed as a result of gut wall or other presystemic metabolism. In addition, the Wellbutrin XL approved labeling explains that in tests in mice, hydroxybupropion was demonstrated to be half as potent as bupropion.[31] We reasonably conclude that based on its relative potency and exposure (as compared to threohydrobupropion and erythrohydrobupropion), hydroxybupropion contributes meaningfully to the safety and/or efficacy of the drug product. Consequently, we agree that the metabolite, hydroxybupropion, should be measured in bioequivalence testing, and the Agency expects ANDA applicants for generic bupropion HCl extended-release tablets to measure both the parent drug bupropion and the metabolite hydroxybupropion in their BE studies.

With regard to the other metabolites, threohydrobupropion and erythrohydrobupropion, there is currently insufficient scientific evidence upon which we can reasonably determine whether these two metabolites are formed as a result of gut wall or other presystemic metabolism, nor have you provided such information in the Petition. More importantly, the Wellbutrin XL approved labeling explains that in tests in mice, threohydrobupropion and erythrohydrobupropion were demonstrated to be five-fold less potent than bupropion. We cannot reasonably conclude that based on their relative potencies and exposure (as compared to hydroxybupropion), threohydrobupropion and erythrohydrobupropion contribute meaningfully to the safety or efficacy of Wellbutrin XL.[32] Therefore, we do not expect ANDA applicants for generic

---

[31] The approved labeling for Wellbutrin XL states that bupropion is extensively metabolized in humans and three metabolites have been shown to be active: hydroxybupropion, threohydrobupropion, and erythrohydrobupropion. In humans, peak plasma concentrations ($C_{max}$) of hydroxybupropion occur approximately 7 hours after administration of Wellbutrin XL, while the $C_{max}$ of the parent drug occurs approximately 5 hours after administration of Wellbutrin XL. The $C_{max}$ of hydroxybupropion is approximately 7 times the $C_{max}$ of the parent drug at steady state and the elimination half-life of hydroxybupropion is approximately 20 (±5) hours; its AUC is about 13 times that of bupropion at steady state. Bupropion and its metabolites exhibit linear kinetics following chronic administration of 300 to 450 mg/day (see the Wellbutrin XL labeling approved June 2006 (and revised July 2006)).

[32] You did not submit any evidence in the Petition to support a conclusion that threohydrobupropion and erythrohydrobupropion contribute meaningfully to safety and/or efficacy of Wellbutrin XL. In fact, the Summary Report of Study No. AK1BIOVAIL2548 (Study Summary 2548) states that erythrohydrobupropion "has only a minor contribution to the overall pharmacological activity due to its low potency" (Petition at Exhibit 2, p. 2).

bupropion HCl extended-release tablets to measure these two metabolites in their BE studies. We expect that measurement of bupropion, together with the metabolite hydroxybupropion, would be a scientifically reasonable and reliable indicator of the drug's activity.

You request that ANDA applicants be required to calculate and evaluate bioequivalence parameters for metabolites. You also assert that the conclusions on the assessment of bioequivalence in both the fasted and fed states can vary substantially depending on whether the assessment is based on the parent drug or individual metabolites (Petition at 4). We disagree. We note that even when the metabolite is measured because it is formed presystemically and contributes meaningfully to safety and/or efficacy, the BA/BE Guidance recommends that the metabolite data be used to provide supportive evidence of comparable therapeutic outcome (the BA/BE Guidance at 18) and that only the parent drug be analyzed using our bioequivalence statistical criteria.[33] Therefore, we do not intend to require the ANDA applicants to apply bioequivalence statistical criteria to hydroxybupropion. As explained in section II.A. of this response, we do expect ANDA applicants to conduct both a fasted and a fed bioequivalence study. In each study, they would measure the plasma concentrations of both bupropion and hydroxybupropion, but the metabolite hydroxybupropion would only be used to provide supportive evidence of comparable therapeutic outcome.

**C.    Conduct bioequivalence trials at steady-state, evaluating the performance of the dosage form based on AUC, $C_{max}$, and $C_{min}$.**

As discussed in section II.B. of this response, you cite the "Clinical Pharmacology -- Pharmacokinetics" section of the Wellbutrin XL labeling as setting forth the findings and methodology that you assert an ANDA applicant must follow with regard to comparing the equivalence of the extended-release formulation to the immediate-release and sustained-release formulations. You claim that the most reliable means to compare the rate and extent of exposure

---

[33] The statistical methodology for analyzing these bioequivalence studies is called a two one-sided test procedure. Two situations are tested with this statistical methodology. The first of the two one-sided tests determines whether a generic (test) product, when substituted for a brand-name (reference) product, is significantly less bioavailable. The second of the two one-sided tests determines whether the reference product, when substituted for the test product, is significantly less bioavailable. Consistent with FDA's long-standing policy, which was based on the opinions of medical experts and has been substantiated through many years of regulatory experience, a result showing a difference of greater than 20 percent between the test and reference products in either of the two one-sided tests is considered significant and therefore undesirable. Accordingly, the Agency has set a difference of 20 percent as the bounds for acceptability. For the first statistical test, these bounds are expressed as a limit of 80 percent for the ratio of the average results for the test product to the average results for the reference product and, correspondingly, for the second test, a limit of 80 percent for the ratio of the reference-product average to the test-product average. By convention, all data are expressed as a ratio of the average response (AUC and $C_{MAX}$) for the test product to the reference product, so the limit for the second statistical test is expressed as 125 percent (the reciprocal of 80 percent) (see the Orange Book, Introduction at pp. vii-viii, for further discussion of statistical criteria and general criteria for bioequivalence).

of the extended-release formulation of bupropion HCl to the immediate-release formulation is through the conduct of bioequivalence trials at steady-state and that steady-state comparisons are the most accurate and relevant because they make it possible to evaluate $C_{min}$ as well as $C_{max}$ and AUC. You also claim that comparisons of the AUC between immediate-release and extended-release bupropion HCl become problematic under single-dose conditions because of the difficulty in estimating the area from the last sampling point to infinity (Petition at 7). You state that the immediate-release estimate from time zero to infinity is straightforward; the extended release estimate is difficult because one is not measuring the true half life or elimination rate, but rather an apparent one. You state that if the studies are done at steady state, there is no estimation involved because the AUC of the dosing interval is being measured directly (Petition at 7).

We disagree. As we explained in section II.B. of this response, an ANDA applicant is not required to demonstrate bioequivalence of its generic bupropion HCl extended-release tablets to the immediate-release and sustained-release formulations of Wellbutrin and therefore your argument regarding conducting studies at steady-state for those studies is irrelevant.

With regard to a bioequivalence study comparing generic bupropion HCl extended-release tablets to Wellbutrin XL, we conclude, based on our experience and expertise, that a single-dose study is the preferred approach -- not a multiple-dose study. To conduct a steady-state comparison, multiple-dose studies are performed to achieve and measure the drug substance (e.g., active ingredient) at its steady-state level in blood or serum. A steady-state concentration will eventually be achieved when a drug is administered at a constant rate. At the point the drug reaches steady state, the rate of elimination (output) of the drug will equal the rate of drug availability (input). It has been FDA's experience that for a generic drug, single-dose studies are more sensitive at detecting small differences in formulation performance. Detecting small differences is important in determining bioequivalence (i.e., whether there is the absence of a significant difference in the rate and extent to which the active ingredient becomes available at the site of drug action when administered at the same dose). Because single-dose studies are considered more sensitive in addressing the primary question of bioequivalence, multiple-dose studies are generally not recommended.[34] For generic versions of modified-release products including sustained-release or extended-release products such as Wellbutrin XL, the Agency generally recommends a single-dose, cross-over, nonreplicate bioequivalence study.[35] This recommendation is consistent with the BA/BE Guidance, which recommends single-dose studies because "…they are *generally* more sensitive in assessing release of the drug substance from the drug product into the systemic circulation" (the BA/BE Guidance at 8, 16).

---

[34] The BA/BE Guidance at 16.

[35] See 21 CFR 320.26(a)(1) (stating generally that "[a]n in vivo bioavailability or bioequivalence study should be a single-dose comparison of the drug product to be tested and the appropriate reference material conducted in normal adults").

You have not submitted any data to substantiate your claim that steady-state comparisons are the most reliable means to assess the rate and extent of exposure of bupropion HCl. In addition, your assertion that steady-state comparisons are the most accurate because they make it possible to evaluate $C_{min}$ is not persuasive. We are not aware of, nor have you provided, data upon which we can reasonably conclude that $C_{min}$ would provide meaningful information beyond that already provided by AUC and $C_{max}$ in determining bioequivalence for generic bupropion HCl extended-release tablets.

D.  **Require the ANDA applicant to provide in vitro data demonstrating the absence of *dose dumping* if the extended-release dosage form is consumed with alcohol.**

You state that the labeling for Wellbutrin XL discloses that bupropion HCl is associated with a dose-related risk of seizures, and the consumption of alcohol could affect the dose-release mechanism of the extended-release tablet (Petition at 4). You also state that to reduce the risk of seizures, the labeling recommends that the total daily dose of bupropion not exceed 450 mg/day and that the rate of dose incrementation be gradual (Petition at 4). You assert that therefore, variability in the bupropion HCl release rate and/or dose dumping could lead to seizures in the patient (Petition at 4 and 8). You also assert that because Wellbutrin XL is indicated for the treatment of major depressive disorder, patients taking Wellbutrin XL are more likely to consume alcohol with the drug despite the labeling warnings to avoid alcohol when taking the drug (Petition at 7-8). You request that FDA therefore require ANDA applicants for generic bupropion HCl extended-release tablets (1) to submit in vitro data confirming that there are no substantial differences in the dose-release profile of the drug if consumed with alcohol, and (2) if differences exist, to determine whether the risks posed by the generic version are adequately addressed by the Wellbutrin XL labeling (Petition at 8).

FDA asked ANDA applicants for generic bupropion HCl extended-release tablets to submit data from in vitro dissolution studies using various concentrations of ethanol in the dissolution medium to evaluate the possible interaction between alcohol and the excipients in both Wellbutrin XL and generic bupropion HCl extended-release tablets. FDA will evaluate the results of the in vitro data submitted by the ANDA applicants and consider these results when determining whether to approve each ANDA.[36]

III.  **REQUEST FOR STAY**

---

[36] Biovail asks the Agency to consider, to the extent that any differences exist in the dose-release profile of generic bupropion HCl extended-release tablets in the presence of alcohol, whether the risks posed by the generic bupropion HCl extended-release tablets are adequately addressed by the Wellbutrin XL labeling (Petition at 8). We expect that the labeling for generic bupropion HCl extended-release tablets would carry the same substantive warnings with respect to alcohol as those warnings in the approved labeling for Wellbutrin XL.

In the Letter, you request that FDA take final action on the Petition no fewer than 2 business days before finally approving any ANDA for generic bupropion HCl extended-release tablets and provide you with notice of the action immediately upon taking action and no fewer than 2 days before finally approving any ANDA (Letter at 1).[37] You suggest that FDA may improperly delay its decision on the Petition and claim that granting your request will reduce the risk of violating Biovail's due process rights (Letter at 3). You also assert that "Biovail has a strong property interest that will be affected by FDA's approval of any ANDA for a competing generic version of [Wellbutrin XL]" and "Biovail stands to lose millions of dollars in sales and a significant portion of market share immediately upon the debut of any such generic" (Letter at 3). You further argue that FDA should grant your request to alleviate the burden on Biovail of having to seek a temporary restraining order against implementation of the final ANDA approval at the same time as seeking to challenge FDA's denial of the Petition (Letter at 4). You claim that irreparable harm would occur to Biovail if it does not seek or achieve a temporary restraining order and preliminary injunction immediately after final approval of an ANDA (Letter at 4). In addition, you assert that sound public policy and public health and other public interests outweigh the effects of your request (Letter at 5).

Because you are, in essence, requesting that FDA delay its final approval of an ANDA for at least 2 days after action on the Petition, your request is in effect seeking a stay of action, as you acknowledge.[38] FDA's regulation at 21 CFR 10.35(e) sets out the standard for review of a petition for stay of action:

> The Commissioner may grant or deny a petition, in whole or in part; and may grant such other relief or take such other action as is warranted by the petition. The Commissioner may grant a stay in any proceeding if it is in the public interest and in the interest of justice. The Commissioner shall grant a stay in any proceeding if all of the following apply:
> (1) The petitioner will otherwise suffer irreparable injury.
> (2) The petitioner's case is not frivolous and is being pursued in good faith.
> (3) The petitioner has demonstrated sound public policy grounds supporting the stay.
> (4) The delay resulting from the stay is not outweighed by public health or other public interests.

---

[37] Subsequent to your submission of the Letter, on August 23, 2006, Biovail filed a Motion for a Temporary Restraining Order (TRO) with the District Court of the District of Columbia alleging that the Agency violated the Administrative Procedure Act and Biovail's right to due process by failing to substantively respond to the Petition within 180 days. Biovail requested that the court compel the Agency to act on the Petition at least one week before approving any ANDA. The court determined that Biovail had not demonstrated a substantial likelihood of success on the merits of its claims or irreparable injury and issued an order on August 25, 2006, denying the motion for a TRO (*Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920 (D.D.C. Sept. 6, 2006)).

[38] Letter at 5 ("Public Health and Other Public Interests Outweigh the Effects of the Requested Stay").

14

The Commissioner shall grant a stay if all four of these criteria apply. FDA need not address your irreparable harm argument or whether or not the Petition has been filed in good faith and is not frivolous because FDA has determined that the Petition has failed to demonstrate public policy grounds for the stay and has determined that the delay would be outweighed by public health or other public interests.[39]

You assert that "[t]he approval of purported generic drugs that are not shown to be bioequivalent to the innovator drug is unlawful" (Letter at 5). You also assert that any FDA mistake in approving the generic drug could put unsuspecting patients at risk, damage the integrity of the generic drug industry, and significantly reduce the public's confidence in FDA (Letter at 5). Therefore, you conclude, "[s]ound public policy clearly supports requiring FDA to comply with its statutory and regulatory requirements" (Letter at 5).

You have not demonstrated that sound public policy grounds exist in support of the stay. An assumption underlying your arguments is that the Agency will not comply with the statutory and regulatory requirements and that its approval standards will, upon further examination, be found inadequate. This assumption is too speculative to form the basis of a public policy argument for grant of a stay.[40] As explained in section II of this response, FDA has analyzed your arguments and does not view them as demonstrating that the Agency's standards for approval of generic bupropion HCl extended-release tablets are inappropriate or would otherwise lead to unsafe and ineffective generic bupropion HCl extended-release tablets. The Agency expects to approve ANDAs for generic bupropion HCl extended-release tablets that meet applicable statutory and regulatory standards. In fact, the Act requires the Agency to approve an ANDA if all applicable requirements for approval have been met. Because the merits of your challenge are unpersuasive, there is no legitimate public policy ground to stay the approval of these ANDAs for these generic products.

You also have not demonstrated that the stay is not outweighed by public health or other public interests. You argue that "Public Health and Other Public Interests Outweigh the Effects of the Requested Stay" and "[a]ny delay caused by the need for additional data would be outweighed by the need to ensure that FDA follows the appropriate procedures and applies the proper approval criteria" (Letter at 5). Presumably, your argument is intended to address the fourth

---

[39] We note that the court determined when evaluating your Motion for a TRO that you did not make a sufficient showing of irreparable harm to support your request (*Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920, at *24 (D.D.C. Sept. 6, 2006)).

[40] In its decision on Biovail's Motion for a TRO, the court also stated that Biovail "asks the court to assume that [FDA] will approve unsafe drugs for the market if it does not respond to [Biovail's] citizen petition prior to approving the pending ANDA. Without more, however, the court fails to see how this result necessarily flows from the defendant's practice of deciding citizen petitions simultaneously with ANDAs" (*Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920, at *19 (D.D.C. Sept. 6, 2006)).

criterion, which is that "the delay resulting from the stay is not outweighed by public health or other public interests." Based on the circumstances in this case, we cannot conclude that this criterion has been met. FDA expects ANDA applicants for generic bupropion HCl extended-release tablets to meet applicable statutory and regulatory standards. As discussed previously in this subsection, your argument assumes that the ANDAs will not comply with applicable statutory and regulatory requirements and the Agency's approval standards will be found inadequate. This assumption is too speculative to form the basis of an argument that public health or other public interests do not outweigh the requested stay. Moreover, one of the purposes of the Hatch-Waxman Amendments is to foster the availability of low-cost generic drugs. This important public policy would be frustrated if FDA were to grant this requested stay.[41] Although you claim that you are trying to protect an important property right, the Hatch-Waxman Amendments did not grant NDA sponsors the right to be free of generic competition once patents or exclusivity have expired, been found to be unenforceable, or otherwise do not preclude ANDA approval. The policies behind Hatch-Waxman dictate that Biovail not be permitted to shield its market share when the Agency has reasonably determined that competing generic drug products may be approved under section 505(j) of the Act. For the reasons above, a stay of action (even for 2 business days) is not warranted.

Finally, we disagree with your claims that FDA is improperly delaying its decision on the Petition and that due process requires grant of the stay (Letter at 2-3). As you note, we provided you with an interim response dated June 7, 2006, in accordance with FDA regulations on citizen petitions.[42] As explained in the interim response, the FDA had not yet reached a decision on the Petition because it raised complex issues requiring extensive review and analysis by Agency officials. These issues and the Agency's conclusions are described in this response. In addition, in its decision on Biovail's Motion for a Temporary Restraining Order (TRO), the District Court of the District of Columbia determined that the Agency complied with the terms of 21 CFR § 10.30(e)(2) when it issued its interim response.[43] The court also determined that Biovail failed to offer any legal authority to support its assertion that the Agency must rule on the Petition before ruling on any ANDA.[44]

We also disagree with your assertion that due process requires FDA to provide you with at least 2 business days of notice of its decision on the Petition before finally approving an ANDA. You

---

[41] The court recognized that "the public also has an interest in 'receiving generic competition to brand-name drugs as soon as is possible'" and stated that Biovail "has not established, or even alleged, that the pending ANDA represents a drug that is unsafe" (*Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920, at *31 (D.D.C. Sept. 6, 2006) (citing *Boehringer Ingelheim Corp v. Shalala*, 993 F. Supp. 1, 3, (D.D.C. 1997)). The court concluded that the public interest would be best served by denying Biovail's motion for a TRO (*Id.*).

[42] 21 CFR 10.30(e)(2).

[43] *Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920, at *18 (D.D.C. Sept. 6, 2006).

[44] *Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920, at *19 (D.D.C. Sept. 6, 2006).

claim that Biovail is entitled to adequate procedures as a means to get its concerns appropriately addressed before allegedly being deprived of its property right (Letter at 3). In response to Biovail's Motion for a TRO which likewise raised a due process claim, the court determined that Biovail was not substantially likely to succeed on the merits of its claim. The court stated that to succeed on a due process claim, Biovail must demonstrate that (1) it has a constitutionally protected property interest and (2) the procedures employed deprived Biovail of that interest without constitutionally adequate procedure.[45] The court rejected Biovail's assertion that its business reputation, under these circumstances, constitutes a protected property interest. Even assuming, arguendo, that it has a protected interest in its business reputation, Biovail has not only filed a TRO, but as the court also noted, Biovail already filed the Petition and if it is denied, Biovail would be entitled to seek judicial review.[46] Biovail has been afforded constitutionally

---

[45] *Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920, at *21 (D.D.C. Sept. 6, 2006).

[46] *Biovail Corp. v. FDA*, CIV.A. No. 06-1487 (RMU), 2006 U.S. Dist. LEXIS 62920, at *22 (D.D.C. Sept. 6, 2006). In addition, as you recognize in the Letter, regardless of when the Agency acts on the Petition and any ANDA, both options of seeking a temporary restraining order against implementation of final ANDA approval and seeking reconsideration of our action on the Petition under 21 CFR 10.33 would have remained available for Biovail to pursue, and Biovail pursued a TRO even before the Agency acted on the Petition and any ANDA. We do not believe that due process requires FDA to tailor its schedule to alleviate Biovail's alleged burden of having to pursue both of these procedural avenues at the same time, nor do we believe that a 2-business-day delay in ANDA approvals would be fair to the ANDA applicants involved under these circumstances. Moreover, the timing of the Agency's action on the Petition in relation to its action on an ANDA is a matter within its discretion, as courts have recognized the powers of administrative agencies to control their own dockets (see, e.g., *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524-525 (1978) (observing that Congress has left the formulation of procedures to the discretion of agencies because they "will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved"); *GTE Services Corp. v. FCC*, 782 F.2d 263, 274 (D.C. Cir. 1986) (reiterating "the inherent powers of an agency to control its own docket"); *NRDC v SEC*, 606 F.2d 1031, 1056 (D.C. Cir. 1979) ("An agency is allowed to be master of its own house, lest effective agency decisionmaking not occur in any proceeding")).

adequate procedures by availing itself of, among others, the aforementioned opportunities to be heard. Biovail's due process claim has no merit. In addition, under section 505(j)(4) of the Act, the Agency must approve an ANDA for generic bupropion HCl extended-release tablets once the applicable requirements have been met. For the reasons summarized above, your due process claim has no merit.

## IV.  CONCLUSION

For the reasons discussed in this response, the Petition is granted in part and denied in part. FDA will require ANDA applicants for generic bupropion HCl extended-release tablets to demonstrate bioequivalence to Wellbutrin XL, but not to Wellbutrin SR and Wellbutrin. FDA expects ANDA applicants for generic bupropion HCl extended-release tablets to measure the metabolite hydroxybupropion in their bioequivalence studies, but does not expect ANDA applicants to measure the metabolites threohydrobupropion and erythrohydrobupropion. FDA also does not intend to require ANDA applicants to conduct steady-state bioequivalence studies. FDA asked ANDA applicants for generic bupropion HCl extended-release tablets to submit data from in vitro dissolution studies addressing the performance of the drug-release mechanism in the presence of alcohol and expects to consider this data in its review of each ANDA. Finally, for the reasons discussed in this response, the Letter seeking a delay in Agency action on any ANDA approval for generic bupropion HCl extended-release tablets is denied.

Sincerely,

Randall W. Lutter, Ph.D.
Associate Commissioner for Policy
and Planning