1          UNITED STATES DISTRICT COURT OF MARYLAND
                     SOUTHERN DIVISION

2

3

4 ----------------------------x
  BIOVAIL CORPORATION, et al    :
5                     Plaintiffs:
                                :
6                               :
  vs                            : Civil Action:RWT-06-3355
7                               :
                                :
8 US FOOD & FDA ADMINISTRATION:
  et al,                         :
9                     Defendants:
  ----------------------------x
10

11                         Thursday, December 21, 2006
                           Greenbelt, Maryland
12

      The above-entitled action came on for a Motion for
13 Temporary Restraining Order before the HONORABLE ROGER
   W. TITUS, United States District Judge, in courtroom
14 2A, commencing at 10:12 a.m.

15     THIS TRANSCRIPT REPRESENTS THE PRODUCT
       OF AN OFFICIAL REPORTER, ENGAGED BY
16     THE COURT, WHO HAS PERSONALLY CERTIFIED
       THAT IT REPRESENTS THE PORTIONS OF TESTIMONY
17     AND PROCEEDINGS OF THE CASE AS RECORDED
       AND REQUESTED BY COUNSEL.

18

19

20

21

22

23 Tracy Rae Dunlap, RPR, CRR         (301) 344-3912
   Official Court Reporter
24

25

Page    1

```
 1    APPEARANCES:

 2    On behalf of the Plaintiffs:

 3    KEVIN PERRA, Esquire
      JOHN DUBECK, Esquire
 4    BENJAMIN R. OGLETREE, Esquire
      KAREN COOMBS, Esquire
 5

 6    On behalf of the Defendants:

 7    GERALD C. KELL, Esquire
      MARCI NORTON, Esquire
 8    J. P. ELLISON, Esquire
      EUGENE M. THIROLF, Esquire
 9

10    On behalf of the Intervenors:

11    JAY LEFOWITZ, Esquire
      MICHAEL SHUMSKY, Esquire
12

13
                    I N D E X
14

15

16

17

18

19

20

21

22
                                          Page
23  Reporter's Certificate               103

24  Concordance                               104

25
```

18                    (On the record at 1:41 p.m.)

19          THE COURT:  Before proceeding with my opinion, I

20 wanted to first of all commend the extraordinary --

21 indeed, Herculean efforts of the attorneys on both

22 sides.  As I said, it's an impressive amount of paper

23 produced in a short period of time, and I'm sure a

24 number of you have probably had some sleepless nights

25 dealing with it.

1        I practiced law for 37 years and nobody could

2 ever pigeonhole me as to what I did, and I always

3 explained to new people in my firm that I did a low

4 volume of ugly messes.  This made me feel right at

5 home.  So, I was more of a generalist who stumbled into

6 occasional specialties, but I know how much effort it

7 took to do that.  I cannot tell you how much of a joy

8 it is to have well prepared pleadings, as opposed to

9 the nightmare of awful pleadings.  So, it makes my job

10 a lot easier when I have very well prepared pleadings.

11        Before the court is the plaintiff's motion for a

12 temporary restraining order and preliminary injunction.

13 On December 18th the plaintiffs, Biovail Corporation of

14 Ontario, Canada and Biovail Laboratories International

15 SRL of Barbados, West Indies filed suit against the

16 United States Food and Drug Administration and the

17 Commissioner of Food and Drugs Andrew C. von

18 Eschenbach.

19        The complaint, after describing the identity of

20 the parties, states that it seeks a declaration that

21 the FDA's approval of the commercial manufacture, use,

22 or sell of 300mg but Bupropion XL shall not be

23 effective until the expiration of a 30-month period

24 from the filing of an abbreviated new drug application

25 Number 77-415 as required by the provisions of Section

1 355(j)(5)(B)(iii) of Title 21 of the United States

2 Code.

3        The plaintiffs, who I will collectively refer to

4 as Biovail, state that they have developed and

5 manufacture Wellbutrin XL, which is an FDA-approved

6 innovator prescription drug, sometimes referred to as a

7 "pioneer" brand name or "branded drug," which is used

8 to treat a major depressive disorder, a common and

9 severe psychiatric disorder.  This drug was approved

10 for manufacture, market and sell by the FDA in August

11 2003, and the owner of the rights under that new drug

12 application is SmithKline Beecham, which has an

13 exclusive license under U. S. Patent Number 6096341.

14        Biovail manufactures and supplies this drug for

15 the U. S. market exclusively to GlaxoSmithKline, which

16 is one of the largest pharmaceutical companies in the

17 world.  This drug is described as being a substantial

18 asset and cash flow stream for Biovail, generating

19 hundreds of millions of dollars a year in revenue.

20        The complaint then goes on to describe the

21 relevant provision of Section -- of Title 21, Section

22 321, et seq. of the United States Code which

23 establishes, among others, a process for filing

24 abbreviated new drug applications for generic forms of

25 FDA-approved innovator drugs such as Wellbutrin XL.

1        The complaint goes on to describe that any

2  applicant filing an abbreviated new drug application --

3  affectionately referred to with the acronym that rhymes

4  with "panda" -- ANDA -- provide notice of the ANDA

5  filing to the entities with patent rights and is set

6  forth the bases of the applicant's opinion that those

7  patent rights are invalid or not infringed by the ANDA,

8  and that's referred to by those in the trade as a

9  "Paragraph IV Certification Notice."

10       The complaint then goes on to accurately

11  describe the applicable law in that if the patent

12  holder files a patent infringement suit within 45 days

13  of receipt of the Paragraph IV Certification Notice,

14  the ANDA may not be approved by the FDA until the

15  completion or expiration, that is, of 30 months from

16  the date the Paragraph IV Notice was received or the

17  resolution of the infringement suit, whichever is

18  shorter.

19       The complaint then goes on to state that on or

20  about January 20, 2005, Impax Laboratories, one of the

21  intervenors in this case, sent a Paragraph IV

22  Certification Notice to Biovail noticing its submission

23  to the FDA of ANDA 77-415 for Impax, bupropion

24  hydrochloride, a 150mg extended-release tablets, and

25  states that that notice was received on or about

1 January 24, 2005.

2       The complaint then goes on to state that on

3 January 24, 2005, Impax provided a Paragraph IV

4 Certification Notice of an amendment to its ANDA 77-415

5 providing for the addition of a 300mg tablet.  Biovail

6 reviewed the ANDA 77-415 and concluded that it did

7 indeed infringe on one of its patents and, on March 7,

8 2005, filed an action for patent infringement in the

9 United States District Court for the Eastern District

10 of Pennsylvania.

11       That litigation, which remains pending as of

12 this date, sought a judgment that the ANDA 77-415

13 infringed with a patent held by the plaintiff and

14 requested an order that ANDA 77-415 not be effectively

15 approved until the expiration of the 341 patent,

16 together with an injunction prohibiting the commercial

17 manufacture, use or sell of any product made pursuant

18 to ANDA 77-415.

19       The complaint alleges something that is at issue

20 in this case that the patent infringement action was

21 timely filed pursuant to the 45-day provisions

22 described in the complaint, and that is currently

23 pending.  Thus, the complaint alleges that the

24 mandatory 30-month stay period was triggered and that

25 there should not have been approval of the ANDA 77-415

1 with respect to the 300mg dosage by the FDA.

2       The plaintiff requests relief in the form of an

3 order that declares that the FDA's approval of the

4 Impax ANDA Amendment was arbitrary, capricious and

5 abuse of agency discretion and contrary to law,

6 directing the FDA to withdraw or suspend the approval

7 of the ANDA amendment until expiration of the 30 months

8 described above, and has a prayer for temporary,

9 preliminary and permanent injunctive relief.

10      The complaint was joined by a simultaneous

11 filing of a motion for a temporary restraining order

12 and a preliminary injunction.  The memorandum

13 accompanying that motion is very helpful one, which

14 provides a greater detail in support of the allegations

15 of the complaint and a fairly significant exposition of

16 the law relating to this subject.

17      As can be readily seen from an examination of

18 the moving papers, the congressional legislation that

19 brings us together are the Hatch-Waxman Amendments to

20 the Food, Drug and Cosmetics Act.  These amendments

21 were designed to address concerns in the congress as to

22 the availability or lack of availability of generic

23 drugs, delays in the approval process for drugs, and an

24 attempt to recognize legitimate patent rights but not

25 to allow those patent rights to interfere with the

1 orderly approval process for drugs that may be badly

2 needed and at a reasonable cost and in a competitive

3 atmosphere.

4        In order to expedite that process, the statute

5 provided for the ANDA process but also established a

6 procedure whereby upon certain certifications being

7 provided and tendered to the person potentially

8 claiming patent rights for a listed drug there would be

9 a 45-day period, and if the holder of patents was

10 displeased with the prospective approval of the

11 abbreviated new drug application, without further adieu

12 that person or the entity holding the patent rights

13 could initiate litigation and, if that litigation were

14 to be initiated within the requisite 45-day period,

15 that would trigger an automatic 30-day hold on the

16 FDA's approval of the abbreviated new drug application.

17 Thus, the congress attempted to alleviate the concerns

18 that it had as to the introduction of new and primarily

19 generic drugs in the marketplace, yet giving some

20 protection to patent holders.

21        By the -- through this process, the congress

22 allowed a patent holder to claim infringement upon

23 being provided with such a certification without their

24 having to be there having to be infringement in fact.

25 It became, in fact, a technical infringement giving one

1 the right to sue, but if you wanted to sue and have the

2 protections of the 30-day hold you needed to do so

3 within 30 days.  Otherwise, the FDA approval process

4 could proceed unfettered and without further delays

5 while patent issues are sorted out.  This, of course,

6 did not in any way preclude patent holders from

7 asserting those rights, but it did put a temporary hold

8 on the FDA's process if a patent holder initiated

9 litigation within the appropriate period of time.

10       The memorandum in support of the temporary

11 restraining order and preliminary injunction, in

12 addition to providing a description of the legal

13 background of ANDAs and the process by which patent

14 rights can be addressed, claims that Biovail will

15 suffer irreparable harm without injunctive relief.  It

16 indicates first that it will not be able to recover

17 damages from the FDA, because it is immune from suit

18 for damages under the federal Tort Claims Act.  Biovail

19 also asserts that there is no cognizable harm to others

20 with a substantial interest, a view which I'm sure is

21 not shared by the Intervenors in this case.

22       Finally, Biovail asserts that the public

23 interest favors granting injunctive relief, stating

24 that there's a public interest in the faithful

25 application of a statute.  It contends that Biovail is

1 highly likely to prevail on its claim and that the FDA

2 has failed to comply with federal law, and it also

3 would preserve the plaintiff's right to meaningful

4 judicial review.

5        The defendant, United States Food and Drug

6 Administration, has provided the court also with a very

7 helpful analysis of the underlying law, including the

8 approval process, and brings to the court's attention a

9 number of significant facts about that approval process

10 and the law applicable thereto.

11       And perhaps this would be an appropriate time to

12 address some of the language in the applicable statute

13 because of its impact on the resolution of the

14 controversy before the court.  Under the provisions of

15 the Hatch-Waxman legislation, which finds its itself in

16 section 355(j) of Title 21 of the United States Code,

17 there are procedures established for abbreviated new

18 drug applications.

19       First, subsection (2)(A) sets forth the

20 requirements for an abbreviated application which will

21 include, among others -- and I won't recite all of

22 them, because we will be here all day if I go through

23 all of them.  But pertinent to this case, it mentions

24 that an abbreviated application for a new drug shall

25 contain information to show the conditions of use

1 prescribed, recommended or suggested, and the labelling

2 for the new drug have been previously approved for a

3 drug listed under Paragraph VII which becomes a term of

4 art referred to as a "listed drug."

5        2.  It provides information -- requires

6 information with respect to ingredients -- and I won't

7 go into all the details on that.

8        Significantly, in part (2)(a)(iii), it requires

9 the application of the information to show that the

10 strength of the new judge -- new drug, excuse me, is

11 the same as that of the listed drug.

12        4.  It requires information to show that the new

13 drug is bio-equivalent to the listed drug.

14        5.  It requires information to show that the

15 labelling proposed is the same as the labelling

16 approved for the listed drug and, notably, it requires

17 a certification in the opinion of the applicant and to

18 the best of his knowledge with respect to each patent

19 which claims the listed drug referred to in this

20 provision that such patent information has not been

21 filed, that the patent has expired, that of the date on

22 which such patent will expire or that such patent is

23 invalid or will not be infringed by the manufacture,

24 use or sell of the new drug for which the application

25 is submitted.

1          With respect to the listed drug referred to in

2 this section, information was filed under another

3 section, which the applicant is seeking approval under

4 this section, a statement that the method of use patent

5 does not claim such a use.

6          In further portions of this statute there's an

7 obligation of an applicant to make a certification

8 described in subparagraph (a)(7)(iv), and that

9 certification relates to invalidity or non-infringement

10 of the patent and shall include -- the certification

11 must include a statement that the applicant will give

12 notice as provided in this section.

13          There's a provision with respect to the timing

14 of the notice; there's also a provision as to who is

15 supposed to get the notice.  Notably, it says an

16 applicant required under this subparagraph to give

17 notice shall give notice to each owner of the patent

18 and each holder of the approved application.  Then

19 there's specifications for what the content of the

20 notice is and, among matters that are required to be

21 contained in the notice is the following:

22          The notice must state that an application that

23 contains data from bio-available or bio-equivalent

24 studies has been submitted under this section for the

25 drug with respect to which the certification is made to

1 obtain approval to engage in the commercial

2 manufacture, use or sell of the drug before expiration

3 of the patent referred to in the certification; and

4        2.  Include a detailed statement of the factual

5 and legal basis of the opinion of the applicant that

6 the patent is invalid or will not be infringed.

7        Notably, the same statute states that if a

8 person wants to submit an abbreviated application for

9 new drug which has a different active ingredient or

10 whose root of administration, dosage, form or strength

11 differ from that of a listed drug, such person shall

12 submit a petition to the secretary seeking permission

13 to file such an application.

14        In the portion of the statute governing approval

15 of such a petition, among the factors that the

16 secretary is required to consider is the dosage, form

17 or strength, and whether they differ from the listed

18 drug.

19        A later portion of this section -- I dare not

20 try to give you the full citation without having to go

21 through six pages to get to it -- states that if the

22 applicant has made the certification that I've just

23 mentioned, the approval should be made effective

24 immediately, unless before the expiration of 45 days,

25 after the date on which the notice has been received,

1 an action is brought for infringement of the patent

2 that is the subject of the certification and for which

3 information was submitted to the secretary.

4        Now, that is essentially the statutory structure

5 governing what took place in this case.  The question

6 here is whether an ANDA that relates to a 150mg

7 strength of the listed drug and is later amended to

8 provide 300mg results in a timely patent infringement

9 action under the circumstances of this case.

10        In interpreting the statute in this case, the

11 plaintiff would have the court treat the dosage as

12 effectively being surplusage in this case and that the

13 complaint filed in the U. S. District Court in

14 Philadelphia referencing a 150mg dose should be read to

15 have encompassed a challenge to the ANDA in any form,

16 including the 300mg form, as to which it was later

17 amended.  That requires the court to take some notice

18 of the term "listed drug" as used in this statute and

19 as interpreted by the federal agency charged with

20 administration of this law.

21        As the FDA points out, beginning at Page 10 of

22 its Opposition Memorandum, the FDA has a longstanding

23 and publicly-noticed interpretation that a drug product

24 is defined by the active ingredient, dosage form,

25 strength, and root of administration.  They quote from,

1 among others, the statute that I was just quoting in

2 section 355(j)(2), and they point out, based upon their

3 interpretation of the statute, that ANDA applicants who

4 seek to market generic drugs must seek approval for

5 each strength of the drug product it seeks to market.

6       They go through an exhaustive and very prudent

7 analysis of the processes of that agency and the

8 regulations adopted by it and notes that for listed

9 drugs they are listed by strengths -- not by one drug

10 alone, but each strength is separately listed as a

11 listed drug.

12       While at first glance to somebody not regularly

13 immersed in FDA law, one would think that the 150mg

14 versus 300mg distinction is one without a material

15 difference.  That is not the agency practice and does

16 not appear to be the law.  As was observed by the

17 United States District Court for the District of

18 Columbia in Apotex versus Shalala, in interpreting this

19 statute and this section but not the three 30-month

20 provision but, rather, the 180-day marking exclusivity

21 section, a distinction which I find not to be material

22 in analysis of this matter.  The court concluded that

23 they are -- that different dosages of the same drug

24 were separate drug products for purposes of a different

25 portion of the very same subsection of the statute that

1 we're dealing with.

2        In the Apotex case, the court noted in -- at 53

3 Federal Supplement 2d, 454 at 463 that a decision of a

4 court that one strength of a product does not infringe

5 a patent cannot automatically mean that a different

6 strength does not also infringe.  In interpreting this

7 statute, I'm required to apply its plain and ordinary

8 meaning and, to the extent that any assistance in

9 interpreting it is required, I will give significant

10 deference to the interpretation that's been made and

11 consistently made by the agency charged with enforcing

12 it.

13        I'm also going to consider the intent of

14 Congress which, among other things in the Hatch-Waxman

15 Amendments, sought to encourage and foster competition

16 and the promotion of sale of generic drugs.

17        The court by order entered yesterday permitted

18 the intervention of Impax Laboratories, Inc. and Teva

19 Pharmaceuticals USA, Inc. to intervene as defendants in

20 this matter, and they have also filed a helpful

21 Memorandum in Opposition to the motion of the

22 plaintiffs.  They also review the statutory and

23 regulatory history of the matter before the court,

24 stress as well that each dosage of a drug product is a

25 different listed drug under the statute, and point out,

1 for example, at Page 6 that the statute enables both

2 patentees and putative generic entrance to obtain

3 patent certainty through litigation.  Thus, the filing

4 -- the act of filing a Paragraph IV certification

5 constitutes a technical act of patent infringement, and

6 ANDA applicants must promptly notify the patentee and

7 ANDA holder whenever they file such a certification.

8        If within 45 days the patentee responds to a

9 given Paragraph IV notification by filing an

10 infringement action, based on the underlying Paragraph

11 IV certification, the statute precludes the FDA from

12 approving the ANDA for 30 months.  If the patentee

13 fails to file suit within 45 days of receiving an ANDA

14 applicant's Paragraph IV notification, the ANDA

15 applicant may file an action against the patentee

16 seeking a declaratory judgment of non-infringement.

17        One matter brought to the attention of the court

18 by the intervening defendants was the corporate

19 machinations of the plaintiff in this case that took

20 place in late 2004/early 2005.  The applicable patents

21 in this case were originally held by Biovail

22 Laboratories, but they transferred their ownership of

23 those patents to Biovail Laboratories International SRL

24 through a series of relatively complex transactions

25 entered into under the laws of Barbados in the West

1 Indies.

2       They also point out that the infringement action

3 brought in the United States District Court for the

4 District of Pennsylvania, in addition in their view to

5 being late with respect to the 300mg dosage of the

6 applicable drug, was also brought by the wrong

7 plaintiff in that it was filed by an entity that had

8 been dissolved and no longer had any assets, and only

9 by a stipulated amendment at a later time after the

10 filing of an amended complaint did the correct Biovail

11 entity, having ownership rights in this patent, join

12 the litigation.  It also points out that the United

13 States Patent and Trademark Office was not informed of

14 the change in ownership until after Impax had sent its

15 Paragraph IV notices to Biovail Laboratories.

16       All parties point to the same applicable law

17 with respect to the granting of temporary and

18 preliminary injunctive relief.  That standard has been

19 long established and applied in this circuit, and the

20 most frequently cited case in this circuit is the

21 Blackwelder Furniture versus Selig Manufacturing

22 Company case which is in 550 Federal Supplement, 189.

23       In that case the Fourth Circuit stated that the

24 correct standard in the Fourth Circuit is the balance

25 of hardship tests as formulated by the Eighth Circuit

1 in Love versus Atchison to Topeka & Santa Fe Railway,

2 and that traditional formulation is where the questions

3 presented by an application for an interlocutory

4 injunction are grave and the injury to the moving party

5 will be certain and irreparable if the application be

6 denied and the final decree be in its favor, while if

7 the injunction be granted, the injury to the opposing

8 party, even if the final decree be in its favor will be

9 considerable or may be adequately indemnified by a

10 bond, the injunction usually will be granted.

11       The court goes on to point out that where

12 serious issues are before the court it is a sound idea

13 to maintain the status quo, provided that it can be

14 done without imposing too excessive an interim burden

15 upon the defendant.  The court went on the address how

16 and where the question of likelihood of success on the

17 merits comes into play.

18       The court is required to balance the likelihood

19 of irreparable harm to the plaintiff against the

20 likelihood of harm to the defendant, and if a decided

21 imbalance of hardship should appear in the plaintiff's

22 favor, then the likelihood of success is displaced by

23 Judge Jerome Franke's famous formulation that it will

24 ordinarily be enough that the plaintiff has raised

25 questions going to the merits so serious, substantial,

1 difficult and doubtful as to make them fair ground for

2 litigation and, thus, for more deliberate

3 investigation.

4        The importance of probability of success

5 increases as the probability of irreparable injury

6 diminishes.  And where the latter may be characterized

7 as simply possible, the former can be decisive.

8 Even so, it remains merely one strong factor to be

9 weighed alongside both the likely harm to the defendant

10 and the public interest.

11        Now, with those comments, let me address the

12 four Blackwelder factors.  As we stand here today, we

13 have the circumstance in which the ANDA of Impax has

14 already been approved by the FDA, and Teva has begun

15 commercially marketing it in reliance on that final

16 approval.  As a result, the harm or the vast bulk of

17 the harm that Biovail claims has already occurred, and

18 granting of injunctive relief may therefore be

19 problematical.

20        I also have to consider the nature of the harm.

21 In this case, the harm that is alleged, insofar as the

22 court can tell, is purely economic and is a nature that

23 if the plaintiff's prevail in their patent litigation

24 in the U. S. District Court in Philadelphia, there is a

25 remedy available to them in that court, should it

1 ultimately turn out that the drug, the distribution of

2 which has been authorized by the FDA, in fact infringes

3 patents held by the plaintiffs.

4         I'm also required to consider the likelihood of

5 irreparable harm to the defendant.  I find, as to the

6 plaintiff, that it is at best borderline as to whether

7 there's irreparable harm to the plaintiff.  On the

8 other hand, there are significant harms that could

9 apply to Teva and Impax, and I'll address the FDA in a

10 moment.  As to them, they have manufactured this drug,

11 sent it out for distribution, there are expiration

12 dates will approach.  Many of these drugs may become

13 useless and unsaleable, and that is a factor that would

14 run in favor of the intervening defendants.

15        There's also a question as to the balance of

16 hardship to the FDA, which is an agency charged by law

17 with protecting the public interest with the

18 distribution of safe drugs and also to promote through

19 this legislation, among others, legitimate competition

20 for the benefit of the consumer.  So, I find that that

21 would weigh in favor of the defendant.

22        Now, on the question of likelihood of success.

23 There are a number of problems that the court sees that

24 make the likelihood of success for the plaintiff

25 problematical.  The matter of the incorrect plaintiff

1 in Philadelphia is not a minor matter.  It is, in the

2 context of the Philadelphia litigation, a minor matter

3 because that is a forum in which the patent rights of

4 the patent holder and those against whom the patent

5 holder has asserted rights can and will be adjudicated,

6 and it is appropriate that the proper parties be before

7 the United States District Court for the Eastern

8 District of Pennsylvania.

9        That is not the issue here.  The issue here is

10 whether the holder of the patent initiated litigation

11 within the requisite period of time.  Those who engage

12 in corporate law simply cannot have it both ways.  They

13 are free to establish corporate structure, transfer

14 assets, create new corporations, merge, consolidate,

15 liquidate at will and, in the absence of fraudulent

16 purpose, courts are required to respect the corporate

17 forum in whatever manner it may be expressed.  But when

18 the entity that held the patent was dissolved and all

19 of its assets transferred to another entity, it is

20 simply not appropriate that the dissolved entity would

21 bring litigation or any other entity and that the only

22 one entitled to bring the action in the U. S. District

23 Court in Philadelphia is the holder of the patents,

24 which we now know is Biovail Laboratories International

25 SRL.  As a result of the corporate machinations that

1 took place in Barbados.

2       That it did not initially bring that case is not

3 a matter of inconsiderable moment.  It is -- I believe

4 that the defect in the identity of the plaintiff is not

5 cured by the stipulation which substituted the correct

6 Biovail for a plaintiff in that case for purposes of an

7 amended complaint which itself was well after the 45-

8 day period, as well as the original filing, at least

9 with respect to the 300mg dosage.

10       It's been brought to my attention that perhaps

11 this would be a matter covered by rules that would

12 solve the problem, but I do not agree that substitution

13 of the patent holder at that late date would be one

14 that would save the filing deficiency, assuming that

15 the entire complaint is originally filed timely in this

16 case because, as Wright and Miller point out in

17 discussing this rule, Rule 25(c), which is what's been

18 pointed out to me -- I'm referring now to Wright and

19 Miller at Section 1958.

20       Rule 25(c) speaks to the situation in which

21 there is any transfer of interest during the pendency

22 of an action.  If an interest has been transferred

23 prior to the commencement of this suit, Rule 17,

24 requiring that an action be brought in the name of the

25 real party in interest and defining capacity to sue and

1 be sued is controlling and that after suit is brought,

2 Rule 25(c) becomes the relevant provision.

3       Here the corporate machinations took place

4 before this complaint was filed and Rule 25(c) has

5 little, if any, relevance to the question of how one

6 treats that action as of the date it was filed.  As of

7 the date that action was filed, it was brought by an

8 entity that no longer existed.  It had been dissolved,

9 and that is something that took place not during but

10 prior to the pendency of the action, unless I've missed

11 my dates.  So it is not without some significance that

12 the wrong Biovail brought the case and that later, by

13 stipulation, the correct Biovail was substituted.  I do

14 not believe that that would relate back, since it was a

15 change made -- it was a matter done prior to the

16 initiation of the case, whereas Rule 25 contemplates

17 dealing with the situation that the transfer like that

18 would happen during the pendency of the litigation.

19       That then brings us to the question of the

20 compliance with the ANDA requirements in Section 355(j)

21 of Title 21 of the U. S. Code.  Now, the relevant dates

22 in this case are that on November 30, Impax submitted

23 an ANDA for a generic version of 150mg Wellbutrin XL to

24 the FDA.  It accompanied that application with a

25 Paragraph IV patent certification identifying patents

1 which had been referred to in the pleadings here as the

2 341 and the 327 patents as being invalid, unenforceable

3 or will not be infringed by the manufacture, use or

4 sell of the 150mg extended-release Bupropion HCL

5 tablets.

6        On December 28, 2004, Impax submitted an

7 amendment providing for the addition of a 300mg

8 strength.  It submitted another Paragraph IV patent

9 certification to the same effect, this time referring

10 to the 300mg tablets.

11        By letter dated January 20, Impax gave Biovail

12 notice of its Paragraph IV certification seeking

13 approval of its generic 150mg release tablets.  Biovail

14 received that notification on January 24.  Then on

15 January 24 Impax gave Biovail notice of its paragraph

16 certification filed with its amendment which sought to

17 add the approval of its 300mg tablet, and that was

18 received on January 26, 2005.

19        On March 7, two days after Biovail received the

20 250mg notice, it filed the infringement action in the

21 Eastern District of Pennsylvania.  That infringement

22 action identified on the first page in Paragraph 1 the

23 ANDA for 150mg extended-release tablets.  It further,

24 on Page 3, in Paragraph 12, again mentioned 150mg

25 extended-release tablets twice in the same Paragraph

1 12.

2        So, there's going to be little question but that

3 what was initiated by Biovail in the Eastern District

4 of Pennsylvania related to the actions taken by Impax

5 in its ANDA application for the 150mg extended-release

6 tablets.

7        On April 7, 2005, 72 days after receiving the

8 300mg notice, Biovail amended its patent infringement

9 action, and that amendment stated that it was now

10 seeking relief under patent laws for the 150mg and

11 300mg extended-release tablets, and the amended

12 complaint for the first time referenced the second

13 notice letter.

14        The question, thus, before the court, is what is

15 the effect of this sequence of events that I've just

16 outlined in terms of the 30-month hold that the statute

17 applies to the FDA when approving an ANDA application.

18        As I mentioned earlier, Biovail seeks to treat

19 the original complaint as essentially dealing with all

20 forms of the Bupropion XL tablets, while the defendants

21 assert that that is not correct and that the notice

22 that was given, the listed drugs are all listed by

23 strength and that there's no question but the original

24 notification for 150mg and the filing of a suit within

25 42 days of that triggered the 30-month period in which

1 the approval of the FDA may not be give.  But, the

2 300mg notice was given, and it was not until 72 days

3 later that Biovail amended its application and now

4 seeks to have the court disregard the 150 versus 300mg

5 provisions.

6         I conclude that I cannot ignore that

7 distinction.  As I have already indicated, in some of

8 the papers that have been submitted to me -- they're

9 very helpful papers -- this issue has been addressed in

10 a number of cases, including the Apotex case that I

11 quoted from previously, and when you look at the

12 language of the statute, as was pointed out by counsel

13 for the Justice Department when first addressing the

14 court, that it's not that complicated.  You pick the

15 statute up and take a look at it, and this statute uses

16 terms -- terms of art, terms that are used in the

17 trade, terms that are used with regularity by the

18 agency, and they are not without significance.

19         The term "listed drug" is not something that was

20 dreamed up by the agency.  It's what was dreamed up by

21 Congress.  The agency has taken that term and used it

22 and given it a very subtle meaning.  And when you look

23 at the language of the statute in terms of what gets

24 protected and what gets deferred for 30 months, it's

25 pretty clear that it relates to the drug with respect

1 to which the certification is made, and in the statute

2 itself it refers to strengths and, not surprisingly,

3 the FDA, in administering this statute and establishing

4 a system of listed drugs, has listed them separately by

5 strength, and it is for the sake of those who are not

6 expert in medical matters obvious that two 250mg

7 tablets of aspirin are used for something different

8 than 80mg taken at night to keep my circulatory system

9 running well and that they have different

10 characteristics relating to each.

11         I conclude, on the basis of what I've just said,

12 that the motion for temporary restraining order and

13 preliminary injunction should and must be denied, and I

14 will therefore enter an order that recites --

15 incorporates my oral ruling, and we'll get you out of

16 here today.

17         Now, I have a question for you.  Does the

18 plaintiff wish to keep this case going beyond this

19 stage?  You may want to think about that.  The reason I

20 ask is that if we're to proceed further, there needs to

21 be answers filed to this complaint.  Once they're

22 filed, then we go through discovery and so forth.

23 Events in Philadelphia may change that.  I don't know.

24         I do want to point out one thing to both sides.

25 Cases like this are best resolved if they can be

1  voluntarily by parties, and I'm here to decide cases

2  for you, and I'll do that with or without a jury, but I

3  want to make sure everyone in this courtroom -- you may

4  not all be regulars to this courthouse -- know that

5  this court uses the magistrate judges of this court for

6  mediation.  Mediation services of our magistrate judges

7  is free, so the price is right.

8        The magistrate judges of this court are good.

9  I, as a practitioner, was on the selection panel for

10 all three of the magistrate judges that got here before

11 me; one got here after me.  I speak of the virtues of

12 our magistrate judges fondly, because they helped me

13 resolve some awful cases.  The last case I -- ugly last

14 case -- this is in my category of "low volume of ugly

15 messes."  A case I settled was Consumer Products Safety

16 Commission versus Wal-Mart.  I won't tell you who I

17 represented, but that was not easy, and so federal

18 agencies can resolve cases with very big companies and

19 now we've got more people in this fight.  So, all I'll

20 point out to you is that you may want to seriously

21 consider whether there's a way to resolve this which, I

22 assume, is primarily a matter between the plaintiffs

23 and the intervening defendants.  The agency is probably

24 not as happy a participant in that process as the

25 others, but I just want to point that out to you

1 because it would be delightful if you could have some

2 discussions with each other that would resolve this, as

3 well as Philadelphia, and I'm sure Judge Brody would be

4 delighted if you took that case off her hands, too.

5        Those are my musings on this wonderful statute

6 and how it's been applied by the agency, and I wish you

7 all Happy Holidays.  Thank you.

8                    (Off the record at 2:37 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE

 2

 3      I, Tracy Rae Dunlap, RPR, CRR, an Official Court

 4 Reporter for the United States District Court of

 5 Maryland, do hereby certify that I reported, by machine

 6 shorthand, in my official capacity, the proceedings had

 7 and testimony adduced upon the Motion for Temporary

 8 Restraining Order Proceedings in the case of BIOVAIL

 9 CORPORATION, et al v U.S. FOOD & DRUG ADMINISTRATION,

10 et al, Civil Action Number RWT-06-3355, on December 21,

11 2006.

12

13      I further certify that the foregoing 102 pages

14 constitute the official transcript of said proceedings,

15 as taken from my machine shorthand notes, of said

16 proceedings.

17

18      In witness whereof, I have hereto subscribed my

19 name, this 22nd day of December 2006.

20

21

22              _____

                TRACY RAE DUNLAP, RPR CRR
23              OFFICIAL COURT REPORTER

24

25
```