## Thomson StreetEvents℠

### BVF - Q2 2006 Biovail Corporation Earnings Conference Call

Event Date/Time: Aug. 10. 2006 / 8:30AM ET



www.streetevents.com        Contact Us

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

| Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call |
|---|

## CORPORATE PARTICIPANTS

**Ken Howling**
*Biovail Corporation - VP-Fin., Corp. Affairs*

**Doug Squires**
*Biovail Corporation - CEO*

**Ken Cancellara**
*Biovail Corporation - SVP, General Counsel*

**Peter Silverstone**
*Biovail Corporation - SVP, Medical, Scientific Affairs*

**Charlie Rowland**
*Biovail Corporation - SVP, CFO*

## CONFERENCE CALL PARTICIPANTS

**Doug Miehm**
*RBC Capital Markets - Analyst*

**Marc Goodman**
*Credit Suisse - Analyst*

**Hari Sambasivam**
*Merrill Lynch - Analyst*

**Elliot Wilbur**
*CIBC World Markets - Analyst*

**John Maletic**
*Scotia Capital - Analyst*

**Christina Charette**
*BMO Capital Markets - Analyst*

## PRESENTATION

**Operator**

Good morning, ladies and gentlemen and welcome to the second quarter 2006 earnings conference call for Biovail Corporation. [OPERATOR INSTRUCTIONS] As a reminder, a replay of this conference call will be available until 7:00 p.m. eastern daylight time on Thursday, August 17. Callers from Toronto and countries other than the United States should dial 416-695-5800. Callers from the rest of Canada and the U.S. should dial 1-800-408-3053. The access code for the replay is 3193564 followed by the pound key. On behalf of the speakers who follow, investors are cautioned that the presentations and responses to questions may contain forward-looking statements within the meaning of the U.S. Private Securities Litigation Reform Act of 1995 and which comprise forward-look informations within the meaning of the Safe Harbor provisions of Canadian Provincial Securities laws. Forward-looking statements involve risks and uncertainties and undo reliance should not be placed on such statements.

Certain material factors or assumptions are applied in making forward-looking statements and actual results may differ materially from those expressed or implied in such statements. Forward-looking statements include but are not limited to our goals, targets, strategy, intentions, plans, beliefs, estimates, expectations, outlooks, and other statements which contain language such as believe, anticipate, expect, intend, plan, will, may, and other similar expressions. For additional information about the material factors or assumptions underlying such statements and about the material factors that may cause actual results to vary from those expressed or implied in such statements, please consult the Company's earnings and guidance news releases dated August 10, 2006, that are available on the Company website as well as its filings with the Securities and Exchange

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

Commission and the Ontario Securities Commission including the risk factors detailed in its most recent annual report on Form 20-F item 3-D. The Company does not undertake to update any forward-looking statements. At this point, I would now like to turn the call over to Ken Howling, Vice President of Finance and Corporate Affairs of Biovail Corporation. Mr. Howling will moderate today's call.

**Ken Howling** - *Biovail Corporation - VP-Fin., Corp. Affairs*

Thank you, operator. Good morning, everyone. On behalf of Biovail, thank you for joining us this morning. Joining me on today's call are Dr. Douglas Squires, Chief Executive Officer of Biovail Corporation; Charles Rowland, Senior Vice President and Chief Financial Officer; Ken Cancellara, Senior Counsel; and Peter Silverstone, Senior Vice President, Medical and Scientific Affairs. They will be available along with myself to participate during the question-and-answer session.

I would also like to remind you that detail pertaining to Biovail's performance for the second quarter and first half of 2006 is contained in the Company's news release distributed earlier this morning. As is our practice, we will try to answer as many questions as possible while limiting the call to approximately one hour. After the call, other participants are encouraged to follow-up with the Company by calling 905-286-3000 and asking for Investor Relations. Doug, would you like to begin?

**Doug Squires** - *Biovail Corporation - CEO*

Thank you, Ken. Good morning, everyone. Thank you for joining us this morning. As always, the fundamental purpose of our quarterly conference call is to provide detail about Biovail's financial and operational performance. However, during today's call and in light of last week's news pertaining to Biovail's patent infringement case against Anchen Pharmaceuticals, we'll also discuss shortly a number of important strategic, legal, and scientific issues related to this matter.

So first and foremost, let me begin by saying that the first half of 2006 and the second quarter in particular have been periods marked by accomplishment by Biovail. Once again, we executed strongly against our stated financial and operational objectives. We posted strong revenues, net income, and earnings per share. We continued to strengthen our balance sheet and have further fortified our cash position. Various key areas of our underlying business performed very well, meeting or exceeding our expectations. From an operational perspective, both the second quarter and first half of 2006 have been exceptionally strong.

Some of the highlights, total revenues for the second quarter and six months ended June 30, 2006, were up 17 and 21% to $252.8 million and $473.3 million respectively. These increases can in large part be attributed to the continued strong performance of Wellbutrin XL and Zovirax. U.S. GAAP net income for the second quarter and six months ended June 30, 2006 were $80.6 million and $145.1 million. Exponentially higher than for the corresponding period a year earlier.

GAAP diluted earnings per share for the second quarter of 2006 were $0.50 compared to $0.02 for the second quarter of 2005. And $0.91 in the first half of 2006 versus $0.09 for the first half of 2005. Biovail's strong financial and operational performance in the second quarter again allow us to announce that Biovail will pay a dividend of $0.125 per share, payable September 1, 2006, to shareholders of record as of August 18, 2006. Later in the call, Biovail's Chief Financial Officer Charlie Rowland will provide you with a more detailed look at our financial performance in the second quarter and first half of 2006.

In the first half of 2006, Biovail's results benefited from the launch of two new products. In February, our marketing partner Ortho-McNeil launched Ultram ER in the United States and in April Biovail Pharmaceutical Canada, our Canadian sales and marketing arm launched Wellbutrin XL. In May, we entered into two promotional agreements, one for Zoladex in the U.S. and one for the ulesco franchise in Canada, further leveraging the Company's existing sales and marketing infrastructure on both sides of the border. The launch of Ultram ER in late February marked the commercial debut of the first extended release tramadol product released in the United States for relief of moderate to moderately severe chronic pain in adults. Available in once-daily dosage strengths of 100, 200, and 300 milligram tablets, Ultram ER is also being promoted to healthcare practitioners by Biovail's U.S. specialty sales force.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

| Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call |
|---|

To date, there are a number of factors that have contributed to the current run rate for new prescriptions and total prescriptions for Ultram ER. First, our partner OMI launched the product in February without the typical array of sales aids, detail pieces, and literature as these items were under review by the U.S. Food and Drug Administration. Biovail agreed and supported this approach knowing it would take some time for this review to be completed. Collectively, we felt it was important to begin in essence the awareness phase of the introduction of Ultram ER despite not having these materials. During this phase of the launch sales representatives were using annotated package inserts to detail the product to physicians.

As discussed before, OMI's approach to positioning of Ultram ER was to target new patients. That is, patients who haven't previously taken tramadol. We believe this is the best approach for long-term results while acknowledging this approach has an initial slower uptake. For this reason, conversion from multidose tramadol to Ultram ER will inherently take time. The benefit of the approach of targeting new patients allows Ultram ER to be well-positioned with where this product fits in the prescribing spectrum of pain medications. Ultram ER is also well-positioned between traditional over-the-counter pain medications and federal medications such as morphine and oxycodone.

Also impacting the initial launch of Ultram ER was a manufacturing issue during the second quarter of 2006, which resulted in a recall of some product. This, however, primarily affected the 300 milligram strength. After receiving FDA approval for all the marketing literature and other product collateral, the product has now moved into its next phase of launch. OMI sales representatives now have full product availability, a full complement of sales aids and importantly the support of OMI's advertising, which is critical in creating greater awareness and reinforcing the sales representatives descriptions of the features and benefits of Ultram ER and tramadol. OMI and Biovail remain enthusiastic. Both companies are confident the market potential for this product is significant and our collective long-term outlook for this product remains unchanged.

In the second quarter and first half of 2006, our revenue from sales of Wellbutrin XL increased 62% and 67% respectively compared with the corresponding periods of 2005 due to higher volumes sold by our marketing partner GlaxoSmithKline, as well as price increases affected by GSK in 2006. In the second quarter, GSK's net sales of Wellbutrin XL exceeded the sales dollar threshold, resulting in an increase in our supply price from the first to the second tier. In June 2006, the FDA approved Wellbutrin XL for the prevention of seasonal affective order. The first and only medicine to receive FDA approval for this indication. And GSK continues to proactively move forward with plans to build new markets for Wellbutrin XL in Europe.

With respect to patent infringement litigation related to Wellbutrin XL, the United States District Court for the Central District of California last week granted in part Anchen Pharmaceutical's motion for summary judgment, ruling that their abbreviated new drug application did not infringe on Biovail's patents. At the same time, the court denied the portion of their motion that sought to invalidate Biovail's patent. The court also denied Biovail's motion for partial summary judgment. Considering the events immediately proceeding the judge's final decision, the final ruling was not expected by anyone. I would now like to ask Ken Cancellara, Biovail's Senior Counsel to provide you with additional detail as it pertains to the legal aspects of this ruling. He will also outline some of the strategies that Biovail is currently considering. Ken?

---

**Ken Cancellara** - *Biovail Corporation - SVP, General Counsel*

Thanks, Doug. First, let me reiterate that Biovail remains steadfast in its commitment to protect and defend the integrity and validity of the intellectual property that covers Wellbutrin XL. To this end, the Company fully intends to vigorously pursue all available legal options to protect these important assets. I would be remiss if I, too, didn't say that Biovail and indeed its entire team of external legal counsel were quite surprised at the judge's ruling given the events immediately preceding the judge's decision. Let me explain.

On July 21, Judge James Selna had issued a tentative ruling in advance of the July 24, hearing that denied both motions. In the tentative ruling Judge Selna had ordered the matter to proceed to trial because the judge had found a plethora of material factual disputes in connection with expert testimony and other evidence which the court found necessitated a trial and which could only therefore be resolved at a trial. In all other material respects, the order issued by the court on August 1, was the same

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

as the tentative order with the exception of the free of stabilizer limitation as in Biovail's U.S. patent number 6096341, or the 341 patent as we call it. In the tentative order, the Court had concluded that there was a genuine issue of material fact with respect to this limitation and had ordered the matter to proceed to trial. However, in the final order, the Court reversed its tentative order, concluded that there was no material factual dispute on the free of stabilizer limitation, and granted summary judgment in favor of Anchen on the infringement claim.

Biovail believes this reversal of position by the U.S. District Court is contrary to the record and was made in error. We believe as the Court had tentatively concluded that there are material factual disputes in the evidence which require a trial and which may only be determined at a trial after all the evidence has been tabled. It is for this reason that we are considering various options to correct this error.

Let me now say a word about the timing in respect of the finalization of the order just issued. The ruling granting Anchen's motion for summary judgement becomes final and appealable only after the Court has formally issued and entered a final judgment. Biovail will likely file in the next week a motion for reconsideration with the district court on the basis that the Court failed to consider certain evidence that established a material issue of fact regarding Anchen's alleged infringement. While it is not possible to give precise timelines, in all likelihood, the judge's decision on the motion for reconsideration, if filed, will be released in early or mid-December -- I'm sorry, mid-September. The Court has scheduled a status conference for August 14. The probable purpose of this status conference is to determine whether the Court should proceed to trial to determine Anchen's claim that Biovail patent is invalid or whether it should dismiss as moot Anchen's invalidity claim summarily in light of the Court's finding of noninfringement.

If and when the court enters a final judgment in favor of Anchen, Biovail has a right to appeal that judgment to the United States Court of Appeals for the Federal Circuit. Such an appeal must be filed within 30 days following the entry of judgment. While the timing of a final decision from the appeals court is uncertain, our attorney's best estimate at this time is that a decision on an appeal would be released in approximately 18 months or longer. Biovail continues to assess the impact that the court's ruling may have on the timing of Anchen's launch of a generic version of Wellbutrin XL. The timing of when Anchen may enter the market may be impacted by Biovail's continuing review and consideration of a number of legal strategies and options, including Biovail's filing of the aforementioned motion for reconsideration and the Court's decision thereon. The Company's open citizen petitions with the FDA, a recent amendment made by Anchen to its ANDA and whether such has any approval repercussions, whether Anchen and any manufacturer of the product and/or distributor of that product will proceed with the manufacture and/or distribution of the product at risk following Biovail's potential filing of an appeal, and Anchen's ability to manufacture commercial quantities for the market. This concludes my comments. Doug?

**Doug Squires** - *Biovail Corporation - CEO*

Thank you, Ken. Before Anchen can legally launch a generic version of extended release bupropion hydrochloride in the U.S. market, it must first receive final approval for its abbreviated new drug application from the FDA. Biovail has filed two citizen's petitions with the FDA, one in March 2003 and another in December 2005. In March 2003, Biovail submitted a citizen's petition requesting that the FDA require that an ANDA filer amend its ANDA -- that an ANDA filer that amends its ANDA such that its paragraph 4 certification is no longer accurate to recertify to the ANDA holder on patent holder with respect to each ANDA amendment. As Biovail points out in its citizen's petition, the jurisdiction of a court to adjudicate a potential patent infringement is critically dependent upon the identity and characteristics of a drug product that is the subject of the ANDA.

After receiving tentative approval, Anchen filed with the FDA an amendment that Biovail believes reinforces the merits of this citizen's petition and that has the potential to ultimately impact the analysis of Anchen's patent infringement. The fundamental purpose of the petition filed in December 2005, which we'd like to discuss in some detail is to ensure that generic versions of Wellbutrin XL are safe and effective as the innovator of product.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

I would now like to call on Dr. Peter Silverstone, Biovail's Senior Vice President of Medical and Scientific Affairs to provide you with an additional perspective on the importance of this petition. Peter is a practicing psychiatrist who has treated hundreds of patients with Wellbutrin and served as an independent consultant to Biovail with regard to the safety of this molecule prior to joining the Company in May of this year. He has held leadership positions in the clinical research industry for over 10 years, he has participated as an active clinical investigator in more than 40 studies and has over 150 peer-review publications and presentations to his credit. Peter?

**Peter Silverstone** - *Biovail Corporation - SVP, Medical, Scientific Affairs*

Thank you, Doug. Biovail's fundamental concern behind the filing of its citizen's petition is to ensure that any generic formulation of Wellbutrin XL truly is bioequivalent to and therefore a safe and effective acid branded product. This is particularly the case with regard to seizures. Biovail's petition filed in 2005 argues that in order to assess the potential risks of the generic formulation, it is critical that the FDA require that any abbreviated new drug application for a generic version of Wellbutrin XL satisfy the following four criteria. One, all bioequivalence trials should calculate and evaluate the parameters based on concentrations of the parent drug and active metabolites Two, any generic formulation should be shown based on the above criteria to be bioequivalent to Wellbutrin XL sustained release and immediate release bupropion.

Three, the bioequivalent studies described above should be conducted at steady state, evaluating the performance of the dosage form based on a number of metrics, including area under the curve, maximum concentration or C-max and minimum concentration, or C-min. Number four, data using the FDA's in vitro approach for evaluating the affect of alcohol on the performance of controlled release dosage form should be required to ensure that the absence of dose dumping if the drug is consumed with alcohol.

It's important to recognize that the incidents of seizures is a key safety item for the FDA. During a tonic-clonic or grand mal seizure, the individual will lose consciousness, fall to the floor and experience rhythmical jerkings of their arms and legs. One could imagine the potentially lethal consequences of this should it occur with an individual while driving, having a bath, or doing some other critical activity. One would understand while any safety concerns that could possibly increase the possibility of grand mal seizures require such careful consideration from the FDA

Several issues arise about the risk of seizures and bupropion that are relevant to the citizens petition. The first is to recognize that the reason for the increased seizure risk with bupropion is not understood. Once it is clear from the research on immediate risk bupropion that the risk of seizures with this drug is higher with increased dosages, the reason for this isn't clear. However, one possibility is that the seizure rates increase with the rate of release and/or the rate of absorption. Another possibility is that one or more bupropion metabolites or a specific ration of these metabolites may be responsible for the increased risk of these seizures. Thus it's important to ensure that all of these factors remain unchanged in any generic versions, first to minimize the rates of increased seizure rates.

In terms of the frequency of seizures with bupropion this is being determined primarily for the immediate release formulation with some information or survey available for the twice per day SR formulation. This is the reason Biovail's citizen petition requests that the FDA requires any generic formulation to show equivalence to both of these, as there have been no specific safety studies for the XL formulation. As many of you may be aware, Biovail conducted clinical studies with bupropion hydrochloride for the purpose of developing a 450 milligram dosage. Biovail made the decision to terminate development plans for this product in part because the incidence of seizure in two Phase 1 studies was unacceptably high.

I would like to talk about one of these in a little more detail. I should point out that a summary of this study as previously been published on the GlaxoSmithKline clinical trials website, study number B04-696PK-P05P2. The original objective of this study was to compare the peak C-max and systemic exposure area under the curve of three Wellbutrin XL 150 milligram tablets compared to a single bupropion HCL ER 450 milligram tablet under fasting conditions. This study was done at the steady state in normal, healthy, nonsmoking male and female volunteers. All subjects were screened to minimize seizure risks. In this study

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

subjects first received Wellbutrin XL 150 milligrams and then 300 milligram for three weeks before receiving one of the 450 milligram formulations. In this study, one subject taking the 450 milligram bupropion formulation had a seizure while none of the subjects who were taking three tablets of Wellbutrin XL 150 had any seizures.

Coming back to the petition, one of the key points is that any generic formulation should be equivalent to the active substance and its active metabolites. In the study I've just described, a scruff blood level was obtained from the subject that had a seizure and the metabolite levels and ratios were determined. In a review published last year by Jefferson and his colleagues in clinical therapeutics, they reviewed several aspects of bupropion and its metabolism. They concluded that the ration of bupropion to its major metabolites, varied for each metabolite. Thus for the most common metabolite, which is hydroxy bupropion, the ratio is usually 4 to 7 times of that bupropion. For CO hydroxy bupropion the ratio is usually around 5 to 1 and for erythro hydrobupropion, the ratio is usually around 1 to 1.

In contrast, the ratios in this subject who had a seizure in the study I've just described were considerably different. Thus, where the ratio of theo hydroxybupropion is usually 5 to 1, in this subject the ratio was 75 to 1. And for erythrohydrobupropion, where the ration is normally 1 to 1 it was 10 to 1 in this subject. Therefore, it's certainly conceivable that the change in the me tab lite ratios underlay the significant increased risk of seizures and it's certainly possible that this was due primarily to differences in formulation. Jefferson and his colleagues in the same study I referenced earlier also states that 7 to 10 days are required for bupropion and its metabolites to reach steady state. It's for this reason the citizen's petition specifically asks that the appropriate bioequivalent studies be carried out at steady state. Thus there appears to be evidence suggesting that bupropion metabolites contribute meaningfully to the safety as well as the efficacy of bupropion. And that steady state studies are required to accurately measure bioequivalence. This is clinically meaningful and may significantly affect seizure rates.

In addition, an independent report by Dr. Sidney Kennedy, a world renowned expert in depression concluded that, and I quote "in the absence of conclusive evidence to explain Wellbutrin induced seizure, any significant departure in a pharmacokinetic properties of a generically programmed product, from the relatively safe reference listed drug must represent an added risk for patients, which I as a psychiatrist and psychopharmacologist would not find acceptable", end of quote. The citizen's petition also specifically asked the FDA to consider the issue of alcohol and dose dumping. This is also important since alcohol itself lowers the seizure threshold. And if this is combined with an increased release of bupropion, it's likely that the seizure rate could increase further.

Thus, in conclusion, Biovail's fundamental concern behind the filing of these petitions is to ensure the safety for patients were they to receive a generic formulation of Wellbutrin XL. It is clear that the FDA will need to carefully consider these factors before determining whether or not to allow specific generic formulations to come to market. Indeed, in a letter to Biovail, the FDA stated that the citizen's petition, and I quote, "raises complex issues requiring extensive review and analysis by agency officials", end quote. This concludes my comments. Doug?

**Doug Squires** - *Biovail Corporation - CEO*

Thank you, Peter. Like the timing of any generic Wellbutrin XL entry into the market is unknown, Biovail has multiple strategies that it will implement as required to strengthen its operational performance. Among them, Biovail's Board of Directors have decided not to spin off its Legacy products into a separate entity at this time. Revenues from these off patent branded pharmaceutical products continue to provide significant cash flow that the Company may deploy to accelerate a number of research and development programs as well as a number of business development opportunities.

Biovail will continue to accelerate other development activities related to our [barvadolol], venlafaxine, and bupropion SSOI combination programs. We will continue to identify ways to reduce clinical trial and regulatory timelines to decrease the time to market for a number of our active programs. At this time, Biovail is completing an extensive review of its various pipeline programs with the goal to accelerate those of most value and to reassess or terminate those of lesser value. An example of this

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

| Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call |
|---|

is the acceleration of Biovail's Phase III clinical program for tramadol in set combination. Our investigational new drug application was submitted to the FDA in July and we expect to initiate our Phase III study program before the end of 2006.

Biovail also remains on track to file our novel bupropion cell formulation, which we believe may offer unique safety features by the end of the current quarter. Biovail will explore opportunities to partner products in its development pipeline at earlier stages in the process. Partnering with other companies should enable the Company to increase the number of ongoing programs and accelerate a number of programs that are currently under development. It may also allow us to manage our overall R&D spending more efficiently going forward. Additionally, Biovail will continue to implement a number of initiatives as a result of an ongoing and comprehensive review to enhance our operational efficiencies and reduce variable and nonessential spending. That concludes my remarks. Ken?

**Ken Howling** - *Biovail Corporation - VP-Fin., Corp. Affairs*

Thanks, Doug. I would now like to introduce Charles Rowland, Biovail's Senior Vice President and Chief Financial Officer. Charlie will now provide you with more in depth information pertaining to the Company's financial performance for the second quarter and first half of 2006. Charlie?

**Charlie Rowland** - *Biovail Corporation - SVP, CFO*

Thanks, Ken. Good morning, everyone. Biovail reports its financial results in U.S. dollars and under just generally accepted accounting principals, or U.S. GAAP guidelines. All earnings per share information discussed in the conference call today will be presented on a diluted basis. For the three months ended June 30, 2006, Biovail generated record second quarter revenues, robust cash flows from operations and strong earnings per share. On a consolidated basis, total revenues for the second quarter of 2006 were $252.8 million compared with $216.2 million for the second quarter of 2005, an increase of 17%.

Total revenues from the first half of 2006 were 473.3 million compared with 389.9 million for the corresponding period in 2005, an increase of 21%. These results were driven primarily by the strong performance of Wellbutrin XL and Zovirax, the launch of Ultram ER, which was tempered by a $7.8 million reduction in revenue associated with the Ultram recall, and declines in revenues for Cardizem LA and Teviden associated with the May 2005 transaction with Koss Pharmaceuticals. Net income for the second quarter of 2006 was 80.6 million, compared with 3.7 million for the corresponding period in 2005. For the first half of 2006, net income was 145.1 million versus 14.8 million for the six months ended June 30, 2005. Diluted earnings per share for the second quarter of 2006 were $0.50 compared to $0.02 in the second quarter of 2005. EPS for the first half of 2006 was $0.91 compared with $0.09 in the first half of 2005.

Second quarter 2006 GAAP net income and EPS figures were impacted by costs associated with the Ultram ER recall, which negatively impacted pretax net income and EPS by 13.4 million and $0.08 respectively. In the first half of 2006, Biovail also incurred a $2.3 million write-down related to the sale of Nutravail to Futuristic Brands which is reflected in the $3.8 million loss from discontinued operations. In the first half of 2005, Biovail reported charges that negatively impacted U.S. GAAP net income and EPS by 50.1 million and $0.31, respectively. Wellbutrin XL revenues were 114 million in the second quarter of 2006 compared with 70.5 million for the same period a year ago, an increase of 62%.

For the six-month period ended June 30, 2006, Wellbutrin XL generated 179 million in revenues compared with 107.2 million for the same period in 2005, an increase of 67%. This strong performance of Wellbutrin XL in the second quarter can be attributed to continued prescription growth for the product, price increases instituted by GSK in May of 2006. These resulted in us reaching the second tier of our three tier pricing agreement with GSK earlier than anticipated. It should also be noted that we have again -- anticipate reaching the third tier of the agreement during the third quarter of 2006.

Revenues for the second quarter of 2006 for Biovail's Zovirax franchise were up 59% to 29.1 million, compared with 18.3 million for the prior-year period. For the six months ended June 30, 2006, Zovirax generated 53.6 million in revenue, an 18% increase

over the 45.4 million in the first half of 2005. The increase in revenue reflects the timing of wholesaler inventory purchases and a price increase in January of 2006. Zovirax continued to gain market share in the second quarter as the brand captured 71.9% of the topical antiviral market for Herpes, a 3 point percentage point increase from the corresponding period in 2005.

Biovail Pharmaceuticals Canada generated revenues of 19.5 million in the second quarter of 2006 compared with 23.7 million in 2005. First half 2006 revenues for BPC were 39.3 million compared with 48.7 million in the first half of 2005. The declines reflect the availability of generic formulations of Tiazac and Wellbutrin SR, partially offsetting these declines were the continued growth of Tiazac XE, Glumetza, and Wellbutrin XL which was formally launched in April. Since Tiazac XE was introduced in January 2005 it has continued to gain market share and accounted for 35% of the total prescriptions written for the Tiazac brand in the second quarter of 2006.

Turning now to Cardizem LA, revenues for this product in the second quarter of 2006 were 9.2 million compared with 17.6 million for the corresponding period in 2005. For the first six months of 2006, Cardizem LA generated revenues of 25.4 million compared with 29 million in the first half of 2005. As was expected, these declines are attributed to the May 2005 strategic alliance with Koss Pharmaceuticals. Under the terms of this agreement Biovail now manufacturers and supplies Cardizem LA to Koss at contractually predetermined prices that are in excess of 30% of Koss' net selling prices. The amortization of deferred revenues associated with the Koss transaction positively impacted revenues for Cardizem LA by 3.8 million if the second quarter of 2006.

In late February 2006, our marketing partner Ortho-McNeil Inc. launched Ultram ER in the United States. In the second quarter, Ultram ER was being promoted to women's healthcare practitioners by Biovail's Pharmaceuticals Inc. generating net revenues of $0.9 million. This is net of the 7.8 million return provision associated with the recent recall of certain dosages of the product. Biovail also incurred 5.6 million in inventory and administrative costs related to the recall and the write-off of Ultram ER product that had not been shipped.

Biovail's portfolio of legacy products generated revenues of 36.7 million for the second quarter of 2006 compared with 39.1 million in the second quarter of 2005. Revenues for Biovail's portfolio generic products were 32.8 million in the second quarter of 2006 compared with 34.3 million in the second quarter of 2005. Gross margins based on product sales were 74.4% and 75.3% in the second quarter and first half of 2006 respectively. Compared with 70.7% and 72.3% in the corresponding 2005 periods. Included in the second quarter 2006 gross margin is the impact of a $3.0 million write-off of certain Ultram ER and Cardizem LA inventories and a 7.8 million Ultram ER return provision. Excluding these specific items, margins for the second quarter and first half of 2006 would have been 76.7% and 76.6% respectively.

Turning now to the expense side of the income statement, SG&A expenses for the second quarter of 2006 were 66.7 million compared with 57.2 million in the second quarter of 2005. This 17% increase reflects higher legal expenses, a $3 million administrative cost related to the Ultram ER recall, increased costs related to Sarbanes-Oxley compliance, information technology infrastructure upgrade, and promotional costs associated with the recent launches of Glumetza and Wellbutrin XL in Canada, as well as stock-based compensation costs of 2.9 million in the second quarter of 2006. The majority of which was recorded in SG&A.

Research and development expenditures were 18.4 million for the second quarter and 40.7 million for the first half of 2006 compared with 22.3 million and 42.2 million for the corresponding periods in 2005. Under the terms of the Wellbutrin XL agreement with GSK, Biovail may be required to make payment to GSK in the event of a generic competitor entering the market. This payment will be reduced by the total dollar amount of Wellbutrin XL samples supplied that ultimately will be purchased by GSK prior to the commercial entry of a generic competitor. As a result of the Anchen court decision, the Company currently believes that it is likely that it may have to make such a payment to GSK. Prior to this event we believed that the likelihood of having to make this payment to GSK was less than likely or remote.

Biovail currently estimates based on the sample supply purchased by GSK that the amount of this payment is within a range of 4.5 to $40 million depending upon when a generic version of Wellbutrin XL is introduced commercially. However, we cannot

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

make a reasonable estimate of the amount to accrue within that range due to the uncertainty associated with predicting a time of when a generic version of Wellbutrin may enter the market. As a result and in accordance with FAS 5, accounting for contingencies we have recorded a liability of $4.5 million for the minimum estimated amount of this payment. This liability may be revised if necessary in subsequent periods based on greater clarity in respect to when a generic for Wellbutrin XL may enter the market.

With regard to the balance sheet, at the end of the second quarter of 2006, Biovail had cash balances of $571.3 million in the second quarter of 2006. Biovail reduced its long-term obligations by 7.7 million, the Company's long-term debt to equity ratio stood at 0.3 at the end of the second quarter of 2006 compared with 0.4 at December 31, 2005. Cash flows from operations were 110.8 million in the second quarter of 2006 compared with 88.2 million in the second quarter of 2005. Net capital expenditures in the second quarter of 2006 amounted to 14.3 million. This should reflect the ongoing expansion of the Company's signed back manufacturing facility, which we expect the work to be completed in 2006. As Doug mentioned earlier, Biovail will pay a dividend of $0.125 per share payable on September 1, 2006, for shareholders of record on August 18, 2006.

Turning now to financial guidance for 2006. Biovail is reiterating its 2006 total revenue guidance of 990 million to 1.07 billion and diluted earnings per share guidance of $2.30 to $2.40. We are not providing EPS guidance for the third and fourth quarters of 2006. Biovail is increasing its 2006 Wellbutrin XL revenue guidance from a range of 400 million to 410 million to a range of 425 million to 435 million. This reflects both the price growth and volume growth that have been realized in the first half of this year and these trends resulted in Biovail entering the second and anticipating entering the third tiers earlier than we had originally forecasted.

We also are still confident or assuming that a generic formulation of Wellbutrin XL will not be launched in 2006 as Doug and Ken talked about the strategies there earlier. With respect to Ultram ER, Biovail is revising its guidance from a range of 75 to 85 million to a range of 50 million to 60 million. This updated guidance is a result of current prescription trends that have been negatively impacted by a number of variables, including the timing of the initiation of an advertising campaign and the recent recall of certain dosage strengths of the product among other things. The Company in all remain confident in Ultram ER's long-term growth potential. As a result of this change, the anticipated revenue mix, Biovail is increasing guidance for the gross margins on product sales from a range of 78 to 79% to a range of 79 to 80%. We intend to accelerate a number of key pipeline programs in the second half of 2006 and accordingly, research and development expenses are now projected to be within a range of 110 to 120 million for 2006.

Selling, general, and administrative expenses are now forecasted to be in the range of 255 to 265 million as a result of increased legal expenses primarily related to the ongoing patent infringement litigation. Guidance for cash flow from operations in 2006 remain unchanged at 400 to 460 million. Biovail's 2006 financial guidance is based on our expectation that a generic formulation of Wellbutrin XL will not be launched in 2006. In addition, as before, our guidance does not include the impact of new generic competition for any of the Company's key products, any business development activities, any new supply and distribution agreements or acquisitions, restructuring, or other specific charges. For more comprehensive information pertaining to Biovail's financial and operational performance for the second quarter and first half of 2006, please refer to the news release distributed earlier this morning. That concludes my review of Biovail's financial performance and I'd like the turn it back over to Ken.

**Ken Howling** - *Biovail Corporation - VP-Fin., Corp. Affairs*

Thanks very much, Charlie. Before we open the call to questions from analysts that currently provide research coverage on the company, I would now like to ask Doug Squires to make his closing remarks. Doug?

**Doug Squires** - *Biovail Corporation - CEO*

Thank you, Ken. In closing, I would like to share with everyone my views on the status of Biovail today. Fundamentally I steadfastly believe in Biovail's business model and its ability to formulate, test, and gain approval for novel, clinically meaningful enhanced

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

versions of well established compounds. Our products like every other pharmaceutical company's products will ultimately be subject to the entry of generic formulations at some point during their life cycle. Although we will continue to protect our intellectual property as our right and obligation to our shareholders.

While it remains possible that a generic version of Wellbutrin XL could be approved and launched later this year, we have assessed the potential of this happening and we believe for a number of reasons that a generic version of Wellbutrin XL won't occur until 2007 or later if we are successful in protecting our intellectual property. However, we do not take this risk to our business lightly and we therefore continue to take steps to build for the future.

As mentioned earlier this morning, we have decided to retain our legacy product portfolio and use a portion of these funds to accelerate a number of R&D programs, including the upcoming initiation of Phase III trials for our tramadol enzet combination product. We also see opportunities to potentially partner some of our pipeline programs earlier than we have in the past. This results in essentially converting a portion of the longer term value of these assets into near-term value. The combination of these activities allows us to increase the number of ongoing product development and research programs and to accelerate our spending on a number of development programs.

The key to Biovail's success has always been and remains its ability to exploit its technologies, exploit its product development capabilities, protect and defend these assets with intellectual property, and commercialize these products through strategic partnering arrangements and through internal means. We remain committed to these activities and look forward to updating you on these and other developments in the coming months. This concludes my comments in the formal position of today's call. I will turn the call over to the operator for questions. Operator?

## QUESTIONS AND ANSWERS

**Operator**

Thank you, sir. [OPERATOR INSTRUCTIONS] The first question is from Doug Miehm with RBC Capital Markets.

**Doug Miehm** - *RBC Capital Markets - Analyst*

Good morning. Just a couple questions. I guess starting off with Ultram ER. As we look at the guidance and the midpoint of the guidance, originally 80 million dropping down to 55, so a $25 million difference. Part of that, 8 million or so is accounted for with the return provision, but the bulk of it really has to do with slower than anticipated scripts. Maybe you could go into a bit of detail as to why we're going to see a material uptrend relative to what we've seen recently. I understand the issues associated with the advertising promotion materials, but maybe you could get a little bit more specific with what OMI might be doing.

**Peter Silverstone** - *Biovail Corporation - SVP, Medical, Scientific Affairs*

Good morning, Doug. Ultram ER, we look at it in two ways. It was an interesting launch because we decided to launch the product without the classic and standard nonsalesman support advertising promotion and so on. This was the appropriate decision, but nonetheless, it has an impact when you launch a product into this marketplace in terms of reinforcement of the brand, reinforcement of the product, follow-up on salesman visits, direct mail and so on. We knew that that was going to be the case.

We also knew the approval process for those types of materials was taking longer than it had in the past. But we accepted that and felt it was appropriate to get the product on the market and so on. So we very much see ourselves in the second phase of the launch as does our partners OMI. We spent some considerable time talking with them recently about what is effectively the second phase of the launch with the full-blown support and the support of multiple sales forces and I think it's fair to say that

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

F I N A L   T R A N S C R I P T

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

we both remain very confident that we're going to see -- expect to see and hope to see in the next few months a very significant uptick in new prescriptions and total prescription and that we don't look at this as predictive of a smaller product, but rather a shift to the right in time. We expect and they expect that their peak year sales will be the same as the original forecast. So the next few months are going to tell a tale on that. But that's the current view.

**Doug Miehm** - *RBC Capital Markets - Analyst*

Okay. And then for Ken Cancellara. In terms of the motion for reconsideration, if that's denied by the court, I realize that you're going to appeal. But the only thing that, in my understanding, that would prevent Anchen from launching that point at risk of course would be the citizen's petition. In the event that that were to occur, could the FDA go ahead and approve this citizen's petition -- well, I guess, approve Anchen and give them final approval even in the face of that citizen's petition?

**Ken Cancellara** - *Biovail Corporation - SVP, General Counsel*

It's just a very difficult to see how the FDA can approve this product finally if it looks at our citizen's petitions and agrees with them, for all the reasons that Peter mentioned earlier. It just a very difficult thing to imagine, because the two items are inconsistent. If the substance of our citizen's petitions governs, it wouldn't be possible for the FDA to approve a generic version without compelling obviously additional studies as we've indicated.

**Doug Miehm** - *RBC Capital Markets - Analyst*

And on that note, do you have any idea where Anchen stands with respect to completing these additional studies, if they're required?

**Ken Cancellara** - *Biovail Corporation - SVP, General Counsel*

Well, we don't know, Doug. Part of our strategy that we cannot talk about today, we will not discuss today, will involve our ability to compel the FDA to recognize our citizen's petition. As they themselves have indicated they were reviewing them and until that happens, it's impossible for us to know exactly what communications occurred between the FDA and Anchen to this point.

**Doug Miehm** - *RBC Capital Markets - Analyst*

Okay, thank you. And finally, Medicare reimbursement for Ultram ER, when would you expect that to occur? Thanks.

**Operator**

The next question is from Marc Goodman with Credit Suisse.

**Marc Goodman** - *Credit Suisse - Analyst*

Before I go, do you want to answer that question?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

**Doug Squires** - *Biovail Corporation - CEO*

Yes. I'm not sure exactly what the Medicare reimbursement timing is. I'd have to follow-up with OMI and find out if they're comfortable with sharing that. I just don't know off the top of my -- Doug, I don't know if anybody else does. Doug, we'll have to get back, I don't know the answer.

**Marc Goodman** - *Credit Suisse - Analyst*

Okay. Doug, first question. How much time have you guys spent thinking about obviously the worst case scenario here and what kind of changes you'd make to the infrastructure of the Company, if you would make any? And also, I heard you mention in your prepared comments about potentially partnering some of the R&D projects earlier than you normally would have. That sounds like a change. So if that's the case, do you have some projects that are -- formulations have been done, so you feel confident you have something to go out and talk to? Have you started these conversations? And are there any other R&D projects that you can mention besides the one that moved into Phase III?

**Doug Squires** - *Biovail Corporation - CEO*

Good morning, Marc. There, of course, have been a lot of analyses and study of a variety of potential scenarios from worst case to best case, even though we remain confident. The worst case, it's not going to occur, it's only prudent to do so and of course we have some of those kinds of plans in place and so on that we would look at operational efficiencies and our infrastructure and our spending levels and so on. One thing we want to try and do however is preserve our ability to ensure that we can invest in the rapid development of our pipeline, which is the future success and growth and sustainability of Biovail. In virtually all of those scenarios we look at a variety of different ways of doing that. One of the ways of course, is our announcement today with respect to legacy, which I think preserves some cash flow in any scenario that we can redeploy and our R&D, and I mentioned the other one which is partnering earlier, which is something we discussed periodically and yes we do have compounds where that is certainly possible, both formulated and soon to be formulated.

Many of the programs that we're looking at are programs that involve a significant clinical component, clinical development component. Of course, that's where the largest dollars in R&D expenditure always go, Phase III programs and so on. I think we have a number of those that could be very attractive to a potential partner to get involved with early, and that changes the economics and so on. But I think that's something that we will actively pursue. We plan sort of sometime later in the year and trying to give more granularity on our pipeline review. I don't want to comment too much on it now, because it's a number that are under active consideration, and some that we're planning on actually bringing in that we have not done before. The reason I'd like to point to the tramadol nonsteroidal combination is it's one where we have accelerated its Phase III program very considerably and that's done through utilizing sophisticated regulatory and clinical consultants and the addition of people that are very skilled in this area, like Peter Silverstone. I think the same is true for our bupropion SSRI combination and others. But we're going to give a little more granularity on that later in the year when we finish the process.

**Marc Goodman** - *Credit Suisse - Analyst*

And just a follow-up on the partnership, so are you in fact actually talking to potential partners right now about some projects?

**Doug Squires** - *Biovail Corporation - CEO*

Yes.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

**Marc Goodman** - *Credit Suisse - Analyst*

And are any of those discussions even remotely far along?

**Doug Squires** - *Biovail Corporation - CEO*

I'm not going to comment much more than that except to say that we are in discussion with a number.

**Marc Goodman** - *Credit Suisse - Analyst*

Okay.

**Ken Howling** - *Biovail Corporation - VP-Fin., Corp. Affairs*

Next question, operator.

**Operator**

Thank you. The next question is from Hari Sambasivam with Merrill Lynch.

**Hari Sambasivam** - *Merrill Lynch - Analyst*

Thank you. Doug, this is again a question about not necessarily infrastructure but rather about your G&A spending, which at this point in time again has been ratcheted up understandably given the legal expenditure. In the event that Wellbutrin XL is approved earlier than what you think, could you give us a sense of what level of this G&A that you would want to keep or you're able -- I guess, what I'm trying to figure out is, is there leverage here or is there ability within Biovail to actually trim down that G&A, or is that an actual number that cannot be paired going forward. And that's the question that I'm really focusing on. Secondly, you also got over 500 million in cash right now. Could you give us a sense as to what would be a preferred method of deploying that cash? Is it primarily for acquisition, or is it for share buybacks? Where do you think the preferred use of cash would be at this -- going forward?

**Doug Squires** - *Biovail Corporation - CEO*

Good morning. In terms of your SG&A question, I would certainly not regard what's in our current spending as the minimum baseline required to maintain the functioning of the Company. I think there are a very significant number of opportunities, I may be not going to quantify them here today for you, but significant opportunities that if indeed we needed to trade some longer term strategies for some near-term stability or cash we could certainly do that and would do that and have modeled that. On the cash side, it's always a nice thing, actually, it's a very toxic thing to have a significant amount of cash on your balance sheet. We still maintain the same position that we have in the past. We recognize that there's a variety of potential uses for cash, whether that's share buybacks, debt paydown, so forth and so on. But we still are fundamentally focused on reinvesting a significant portion of that cash back into the business in terms of acquisitions and/or other types of licensing product acquisition opportunities.

**Hari Sambasivam** - *Merrill Lynch - Analyst*

Is that a near-term -- is the acquisition -- I know you've been talking about for a while, but should we be anticipating anything in the near term with that use of cash, Doug?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

**Doug Squires** - *Biovail Corporation - CEO*

Well, Hari, the easiest thing in the world to do is spend cash, the more difficult thing to do is to spend it either for appropriate acquisition or deal. I hate to say there's an absolute certainty of anything by the end of the year, but I can say that we're very actively engaged in a number of very serious discussions that would be characterized as perhaps in the later stage rather than the earlier stage. And I think that's about all I can say on that.

**Hari Sambasivam** - *Merrill Lynch - Analyst*

Thank you.

**Operator**

Christina Charette, BMO Capital Markets.

**Christina Charette** - *BMO Capital Markets - Analyst*

Thanks. I have two questions. One is, I want to explore the Ultram ER a bit more. You gave us the guidance in March. You already knew at that point based on your comments that the details support when to be there and you've had to decrease the guidance. So what has changed since then, since you already knew that back then? I know there's been a recall, but the recall was just for 10% for the 300 milligrams, really, which represents a small percentage of sales. And even if we look at the July prescriptions after the detail material had been available and after the launch, the prescriptions are not all that strong. As part of that, can you address what percentage life coverage you have right now, what tier they're on and whether or not they need preauthorization? Even if they're on a certain tier do they need preauthorization to be able to get drug reimbursed.

And the second question regards Wellbutrin seizures. I think there's some evidence out there that the seizure is actually related to the peak concentration. And I believe that Glaxo in the past has used that as their reason to go on the XL rather than ER. How does that impact your argument regarding the metabolite in the citizen's petition?

**Doug Squires** - *Biovail Corporation - CEO*

Okay. Good morning, Christina. I've got to make sure I've got all the Ultram ER questions here now, we had a question on what the tiers are and I think they're at 90% tier 3. And do you have any further comment, either Ken or Charlie, on the managed care coverage?

**Charlie Rowland** - *Biovail Corporation - SVP, CFO*

Christina, this is Charlie. 90% of the patients or the lives are in tier 3 and LMI is very, very pleased with where they're and actually I think they're ahead of where they thought they'd be in terms of coverage.

**Doug Squires** - *Biovail Corporation - CEO*

There's always issues here when your introducing a new product into a generecized marketplace and changes in co-pay and conversion rates. Conversion rates of patients already on that, it wasn't a primary target of the launch, but if you expected a certain amount, that's probably, I would say -- fair to say less slower than we thought it would be for a variety of reasons that are related to things like co-pays, patient satisfaction, physician unwillingness maybe to change or satisfy -- and all those sorts of things. That's sort of a depressing thing, but the real core thing for us is new patients.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

And I don't think -- you can't overestimate the impact for the lack of nonsalesman promotion in this marketplace. I think it's very significant, I think it's very significant in reinforcing the brand and there's a two-edged sword to the brand of Ultram. If a physician just writes Ultram even though he's been detailed on Ultram ER, he writes Ultram OD, you get filled with an immediate release generic. So the salesman's got one hit at it, then he gets, four or six weeks later he gets another hit at it, there's no reinforcement of that. I think that's a very significant issue for us. And that's why I think that the tale of Ultram ER and its true potential is going to be told for the next couple of months and I think it's premature to make an absolute judgment on it's ultimate size or the product. Peter, do you want to take a crack at the seizure question?

**Peter Silverstone** - *Biovail Corporation - SVP, Medical, Scientific Affairs*

Thanks, Christina. Just to clarify, I did mention in my remarks earlier that certainly the seizure rate may well increase the rates of release and/or rates of absorption as you've noted. There is certainly a strong possibility that this may also be impacted by metabolites. The rate at which the metabolite will change or possibly one or more of the metabolites might increase the seizure risk. In the study we -- analyze certainly suggested that and I think this is something that's unknown. I think that's the reality. There isn't scientific certainty around this at the moment and it is a realistic and conceivable possibility that they're involved.

**Christina Charette** - *BMO Capital Markets - Analyst*

Okay, thank you.

**Operator**

The next question is from Elliot Wilbur with CIBC World Markets.

**Elliot Wilbur** - *CIBC World Markets - Analyst*

Good morning, thank you. Around the timing of the filing for the new salt form of bupropion, I hate to be focused on excessive level of detail, but third quarter filing, are you thinking by the end of August or by -- toward the latter part of third quarter? The reason I ask the question, just kind of seems like timing is of the essence there. And then can you just maybe give us some descriptives of why there's been a delay in the program. I'm not even sure that's really the case. I mean I know that there were a couple of programs running in parallel, so I'm not sure if you've become more comfortable with some of the products or some of the forms that were maybe a little bit behind the development program or whether or not there's actually been some delays. And then, second question around Wellbutrin XL, how comfortable are you with your current degree of competitive intelligence on Anchen's ability to actually supply the marketplace? Thanks.

**Doug Squires** - *Biovail Corporation - CEO*

Okay. Just a couple of comments on the salt. We expect the file of salt in September. Secondly, as it relates to an issue of delay, I think it's always unfortunate to remember that we are dealing with science and technology and we make our best guess and our best assessment as to timing and when we can achieve it, but every once in a while you have to tweak the formulation or something looks a little odd in stability and so on, so it's that type of thing that was full bore focus and so on and as I say, we'll be submitted in September.

As it relates to Wellbutrin XL and the ability to supply the marketplace, that's a very significant question. You have to remember that number one, this is not an easy product to manufacture. We know that better than anyone else. Number two, we supply just under 1 billion tablets a year to the marketplace. This is a huge product and very large and so I think there are very significant issues that anyone would face in attempting to supply the marketplace in the best of circumstances. I also think it's a huge challenge for a very small company to get this product on the marketplace and all the front end investments and all the

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

manufacturing that's necessary. And then lastly, there's the issue of a company like Anchen who will not obviously be manufacturing it itself, will not be logistically commercializing it itself, launching at risk and having their partners launch at risk in the light of what we think will be a very potent appeal that will likely be filed as a result of this recent decision. Operator?

**Operator**

[OPERATOR INSTRUCTIONS] John Maletic with Scotia Capital.

**John Maletic** - *Scotia Capital - Analyst*

I just wanted to explore the Ultram launch strategy. Do you know how many drug reps OMI has dedicated to the product that have it in their first lot?

**Doug Squires** - *Biovail Corporation - CEO*

I do, but I'm not going to tell you.

**John Maletic** - *Scotia Capital - Analyst*

Has the aggressiveness of the launch been up to your expectations or do you feel that it could have gone out stronger initially?

**Doug Squires** - *Biovail Corporation - CEO*

I think that from a sales representative point of view, I think it was very aggressive, both on our side -- remember, we have a direct touch into the marketplace, because we market the product ourselves directly to women's health care practitioners. So I think from a sales representative point it was very aggressive. Again, I can't overemphasize the fact that a sales representative going in there detailing a new product to a physician from an annotated package insert is a very difficult thing to do, because you're trying to talk to the doctor about doses and doses -- so you've got no reminder items, you've got very little other than your annotated package insert and your sample. Along with that first phase of the launch, almost a prelaunch if you want to think of it that way, where you're going out and so on. If you don't have all the materials and all the pieces necessary to do that, that may be less than effective.

**John Maletic** - *Scotia Capital - Analyst*

And secondly, on the citizen's petition, I understand that you have a fair bit of confidence in your argument, but is the FDA obligated to follow-up with the citizen's petition, or can they -- have there been precedence where they have approved product with outstanding citizen's petitions?

**Doug Squires** - *Biovail Corporation - CEO*

Well, without going in any great detail I can say that it is our intent to ensure that the FDA rules as soon as possible on these citizen's petitions and we feel we can do that. Operator, can we have the last question, please?

**Operator**

The next question is from Christina Charette with BMO Capital Markets.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

**Christina Charette** - *BMO Capital Markets - Analyst*

Thanks for taking the follow-up. Has there been any sense as whether or not Glaxo would launch an authorized Wellbutrin XL generic and what would be the agreement -- what would the agreement look like if they did so? And can you just clarify the status conference on August 14. Is that for the invalidity issue only, or will the infringement issue be discussed and could the judge rule on your motion to reconsider at that point?

**Doug Squires** - *Biovail Corporation - CEO*

Christine, the first part of your question with respect to an authorized generic, the initial supply and manufacturing agreement we entered into with GSK provides for the exclusive supply of that product by us. It's obviously GSK's decision with respect to launching an authorized generic, but we are the exclusive manufacturer and supplier if they were to do that. And we do participant economically.

**Christina Charette** - *BMO Capital Markets - Analyst*

Has there been a decision, or when is it likely to be made.

**Doug Squires** - *Biovail Corporation - CEO*

I won't comment on behalf of them, you can speak to them about that.

**Ken Cancellara** - *Biovail Corporation - SVP, General Counsel*

Good morning, Christina. The conference on the -- the status conference on the 14, is primarily to discuss Anchen's invalidity litigation on the patent. And to determine whether or not that claim will be abandoned or whether or not that claim will be proceeded with a trial on September the 12th. As to the motion for reconsideration, we don't have to file prior to August 14. We are still considering whether or not we will be filing on August 14, or file shortly after August 14. So it is very unlikely that a judge would decide on the motion for reconsideration if we decided to file by the 14. The more likely scenario is that if we file, we'll file on the 14th, or subsequently and the judge will take some time to consider our motion.

**Christina Charette** - *BMO Capital Markets - Analyst*

Thank you.

**Doug Squires** - *Biovail Corporation - CEO*

Christina, maybe the only further comment I would add to that, while it is clearly GSK's decision, we would certainly be prepared. Thanks very much. Operator?

**Operator**

The conference has now ended, please disconnect your lines at this time. We thank you for your participation and have a great day.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

**Aug. 10. 2006 / 8:30AM, BVF - Q2 2006 Biovail Corporation Earnings Conference Call**

### DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2006, Thomson Financial. All Rights Reserved.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.